IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

|  |  |
|---|---|
| MINNESOTA TELECOM ALLIANCE, *et al.* | ) ) ) ) |
| Petitioners, | ) ) |
| v. | ) Case No. 24-1179 and ) consolidated cases ) |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA | ) ) ) ) |
| Respondents. | ) ) ) |

On Petitions for Review of an Order of
the Federal Communications Commission

_____

### RESPONDENT FEDERAL COMMUNICATIONS COMMISSION'S OPPOSITION TO MOTION FOR EXPEDITED BRIEFING AND ORAL ARGUMENT

Respondent Federal Communications Commission opposes the motion of the Industry Petitioners for expedited briefing and oral argument of their challenges to the order under review, *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, FCC 23-100, 2023 WL

1

Appellate Case: 24-1179    Page: 1    Date Filed: 03/19/2024 Entry ID: 5374815

8614401 (Nov. 20, 2023) ("*Order*").[1] The Industry Petitioners are one of two distinct groups of challengers to the *Order* that so far (the statutory window for new petitions is open through March 22, 2024) have filed 16 petitions for review now consolidated before this Court. The other group, the "Public-Interest Petitioners," has indicated that it needs at least the ordinary time allowed under the Federal Rules of Appellate Procedure to complete its opening brief. Public-Interest Opp. 7–8. The Industry Petitioners, by contrast, argue that the Court should enter a briefing schedule that opens the day the statutory window for new petitions closes; provides for overlength briefs totaling at least 80,000 words; deprives the government of the time it needs to prepare and coordinate its response brief; and either significantly limits the Court's time to prepare for oral argument or requires the Court to conduct a special session during its summer recess.

The Industry Petitioners' extraordinary request is unjustified. Beyond purported and unquantified "compliance costs," they face no realistic prospect of harm from the *Order* before briefing, argument, and disposition of this case in the normal course. And accelerating this highly complex proceeding would prejudice both the government and other parties, as well as unnecessarily burden this Court. The motion should be denied.

---

[1] A copy of the *Order* is attached as Exhibit A to the Minnesota Telecom Alliance's petition for review in this proceeding's lead case, No. 24-1179.

I.     Background

   A.     Statutory And Regulatory Background

*Governing Statutes.* Promoting equal access to communications by "wire and radio" has been central to the FCC's mandate since the agency's inception. 47 U.S.C. § 151. In 1996, Congress expanded this traditional role by directing the Commission to promote universal access to both telecommunications and "advanced services"—such as broadband internet access service—at just, reasonable, and affordable rates. *See* 47 U.S.C. § 254. The Commission implements this directive through a number of "universal service" subsidy programs. *See Order* ¶¶ 6, 8 & n.14.

Notwithstanding the support available through the Commission's universal service programs, however, broadband service remains inaccessible to many millions of Americans. *See Order* ¶¶ 10–11. In part to combat this "digital divide," Congress enacted the Infrastructure Investment and Jobs Act ("Infrastructure Act"), Pub. L. No. 117-58, 135 Stat. 429 (2021).

In the Infrastructure Act, Congress found that "[t]he digital divide disproportionately affects communities of color, lower-income areas, and rural areas." *Order* ¶ 14 (quoting Infrastructure Act, Division F-Broadband, 135 Stat. 1182, Sec. 60101 (Findings), codified at 47 U.S.C. § 1701). Consistent with those findings, the Infrastructure Act set in motion a broad range of efforts by the Commission and other federal agencies aimed at achieving universal deployment

3

and effective use of broadband. Congress provided $65 billion in funding to address barriers to digital equity in the United States through seven different programs. *See Order* ¶ 15; Infrastructure Act §§ 60101, *et seq*. It paired this funding with a mandate that the Commission adopt rules preventing discrimination of access to broadband. Specifically, the FCC was required, by November 15, 2023, to "adopt final rules to facilitate equal access to broadband internet access service, … including … preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." Infrastructure Act § 60506(b). The Act defines the term "equal access" to mean "the equal opportunity to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions." 47 U.S.C. § 1754(a)(2).

**Order** *Under Review.* After collecting "more than 1,400 pages of record comments … from a wide range of stakeholders"—"including public interest organizations, broadband internet service access providers, state, local, and Tribal governments, industry advocacy organizations, and research institutes"—the Commission adopted rules implementing section 60506. *Order* ¶ 26.

The Commission defined the phrase "digital discrimination of access" in section 60506(b)(1) to mean "[p]olicies or practices, not justified by genuine issues of technical or economic feasibility, that (1) differentially impact consumers' access

4

to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin or (2) are intended to have such differential impact." *Order* ¶ 33. For purposes of the new rules, the Commission adopted its existing definition of "broadband internet access service." *See id.* ¶ 97 (adopting the definition from 47 U.S.C. § 8.1(b)).

Before making any determination of unlawful differential impact, the Commission will (1) require credible evidence that the alleged disparity is caused by a covered entity's specific policy or practice, and (2) allow entities the chance to demonstrate why practices with discriminatory effects might be justified, notwithstanding those effects, by genuine issues of technical and economic feasibility. *Id.* ¶¶ 49–50; *id.* ¶¶ 140, 157.

FCC staff will investigate possible violations based on data gathered through the agency's complaint process—as revised to comply with the Infrastructure Act, *see Order* ¶¶ 107–118—and on other information the Commission may obtain. *Id.* ¶¶ 111, 132. This informal approach will "afford[] the Commission necessary flexibility" while minimizing burdens on complainants and covered entities alike. *Id.* ¶ 119; *id.* ¶¶ 84, 109, 113. The agency will conduct investigations using its standard "enforcement toolkit, which ranges from letters of inquiry to remedial orders to forfeiture proceedings." *Id.* ¶ 119.

Recognizing that entities subject to the Commission's digital discrimination rules may "need time to review their policies and practices in light of the rules" adopted in the *Order*, the Commission committed not to "initiate any enforcement investigation solely concerning conduct that produces differential impacts under these rules until at least six months after the effective date of the rules." *Id.* ¶ 132. This means that such investigations under the *Order* will not commence until at least September 22, 2024, and possibly a good deal later. *See id.* ¶ 227; 89 Fed. Reg. 4128. In the meantime—and going forward—the *Order* sets forth a process through which covered entities may seek advisory opinions from agency staff concerning the permissibility of their policies and practices. *See id.* ¶¶ 146–151.

### B. Procedural Background

A summary of the *Order* was published in the Federal Register on January 22, 2024. Within the next 10 days, 10 petitions for review of the *Order* were filed across six different circuits, triggering a judicial lottery under 28 U.S.C. § 2112(a). After the Judicial Panel on Multidistrict Litigation selected this Court in the lottery, those petitions for review were transferred here, and additional cases were filed. There are currently 16 consolidated cases in this proceeding, the most recent of which was filed on March 8, 2024. The deadline for filing any additional petitions for review is March 22, 2024, *see* 28 U.S.C. § 2344, and the (current) deadline for petitions to intervene in support of the petitioners is April 8, 2024, *see* Fed. R. App. P. 15(d).

On February 28, 2024, the Clerk of Court issued a letter requesting that all parties "meet and confer and … submit, within thirty (30) days of the date of [the] letter, a joint proposed briefing schedule to which the parties [could] reasonably anticipate adherence with minimal requests for extensions of time." Letter Order in Cases No. 24-1179 et al., Entry ID 5368286 at 1 (8th Cir. Feb. 28, 2024) (*February 28 Letter Order*). This letter further directed the parties to "familiarize themselves with the [Court's] Local Rules," *id.* at 1, and to "provide for briefing to be complete, and the cases ready for submission on the merits, before the end of calendar year 2024," *id.* at 2. As it turned out, the parties had already been engaged in preliminary discussions about a joint briefing schedule.

In accordance with the Court's letter, the parties met to confer by videoconference on March 13, 2024. At that meeting, the Industry Petitioners proposed a schedule under which they would file an opening brief of up to 20,000 words on March 22, 2024, the Public-Interest Petitioners would file an opening brief of up to 10,000 words the same day, and the Respondents would file their response brief of up to 23,000 words 45 days later. The proposed schedule provided for final briefs to be filed on May 30, 2024, and requested argument the week of June 10, 2024. During the call, the Industry Petitioners for the first time raised an alternative schedule, according to which the Industry Petitioners would adhere to their original schedule, government response time, and requested argument date, but under which

7

the Public-Interest Petitioners would be permitted to file a month later, on April 22, 2024, and the government would respond to those petitioners separately.

Later that same day, after failing to obtain consent from the FCC or the Public-Interest Petitioners to either proposal, the Industry Petitioners filed their motion to expedite.

## II. Expedited Briefing And Oral Argument Is Unwarranted

There is no good reason to rush the parties' briefing or the Court's consideration of this case. Given the complexity of this proceeding and the Industry Petitioners' request to file a significantly overlength brief, the government reasonably requires 60 days after submission of the briefs of all petitioners and their supporting intervenors to prepare and coordinate its response brief both within the FCC and with the Department of Justice. And this Court's consideration of the issues raised by this case should not be unreasonably constrained by the Industry Petitioners' proposal for accelerated briefing and argument.

Neither the Industry Petitioners nor any other party will suffer harm if the Court does not decide this case "in advance of, or as near as possible to," the so-called "September 22 enforcement date." Mot. 13. The *Order* merely provides that, as of that date, the FCC may (not will) commence (not conclude) disparate impact investigations. Any such investigations would not immediately (or even necessarily) lead to monetary penalties. And although the Industry Petitioners complain that they

8

"have already begun to incur" unquantified "compliance costs" under the new rules (which are not yet in effect), Mot. 4, that is a commonplace result for regulated entities and not, by itself, a ground for expedition.

### A. The Industry Petitioners' Proposals Would Prejudice Other Parties And Unnecessarily Burden The Court

The Industry Petitioners' initial proposal is for both groups of existing petitioners to file opening briefs, totaling up to 30,000 words, on March 22, 2024, and for the Respondents to file a response brief of up to 30,000 words no more than 45 days later. Mot. 8. They request oral argument the week of June 10, 2024—approximately two weeks (11 to 15 days) after the date they propose for the submission of final briefs. That dramatically shortened timeline is not reasonable in a proceeding of this complexity.

This proceeding—to date—involves 16 separate petitions for review and two groups of petitioners on different sides of the *Order*: one challenging the Commission's rules as too lenient, the other arguing they are too harsh. Additional parties may challenge the *Order* through March 22, 2024 (the date the Industry

9

Petitioners seek to begin briefing), and, even assuming no other petitions for review are filed, parties may intervene as late as April 8, 2024. Fed. R. App. P. 15(d).[2]

The *Order* under review spans more than 100 pages, and the petitioners' challenges may implicate novel legal issues, including the proper interpretation of the Infrastructure Act's digital discrimination provision, 47 U.S.C. § 1754, which no court has yet considered. Consistent with the substantive complexity of the case—as well as the number of parties and issues—the Industry Petitioners have indicated that significantly overlength briefing will be needed. Under the circumstances, the Commission reasonably requires more time than for briefing a run-of-the-mill case. Among other things, agency counsel will need to consult with numerous stakeholders within the FCC and with multiple components of the Department of Justice, which represents the United States, a statutory respondent. *See* 28 U.S.C. § 2344. The Industry Petitioners' proposal would unfairly short-change the government's necessary processes.

The proposal would similarly require the Court to deviate from its ordinary practice. The Industry Petitioners request both a highly accelerated schedule and

---

[2] Although the Industry Petitioners have stated they do not anticipate additional parties on their side (but cannot rule the possibility out), the Public-Interest Petitioners have indicated they are aware of additional parties who have "expressed interest in intervention or filing amicus briefs in support of the Public-Interest Petitioners." Public-Interest Opp. 8.

significantly overlength opening and reply briefs: 20,000 and 12,000 words, respectively. Mot. 8. Under the Industry Petitioners' principal proposal, the Court would be called on to review the Industry Petitioners' overlength briefs alongside an additional, 10,000-word brief from the Public-Interest Petitioners. *Id.*

In addition, the Industry Petitioners propose to truncate significantly the Court's preparation time for oral argument. The judges assigned to an argument panel ordinarily have "six to eight weeks" to review the briefs. Eighth Cir. Internal Op. Proc. at 20. Under the accelerated schedule requested by the Industry Petitioners, however, the judges assigned to the argument panel here would receive, at most, 14 days between the close of briefing and the date of argument. Mot. 8.

Implicitly recognizing the impracticality of their primary proposal, the Industry Petitioners have proposed a variant in which their challenge to the Commission's *Order* would proceed on a separate track from that of the Public-Interest Petitioners, and the Court would hear oral argument on (and perhaps resolve) the Industry Petitioners' claims first. *See* Mot. 10. This variant of their primary proposal is as flawed as the first.

To begin with, the alternative proposal is at odds with the Court's previous recognition that these consolidated cases should "ultimately [be] argued and submitted together to the same panel of judges on the same day." *February 28 Letter Order* at 2. The alternative plan would also deprive the government of the

11

opportunity to present a single cohesive argument addressing all challenges to the FCC's *Order* in a unified response brief. Whatever time the government might gain in the short term, moreover, under the alternative plan, by being able to limit its first response brief to defending against the Industry Petitioners' claims and thereby saving time, the government would lose that saved time later, when it would need to devote additional resources to preparing and coordinating a separate, additional brief responding to the Public-Interest Petitioners. Similarly, the Court would face a duplicate burden of reviewing at least one additional set of briefs and preparing for an additional day of oral argument (possibly with an entirely different panel).

### B. The Industry Petitioners Have Not Established Good Cause For Expedition

The Industry Petitioners contend (at Mot. 4) that the Court should apply the "good cause" standard for the suspension of ordinary rules. *See* Fed. R. App. P. 2(a). Other courts require a showing of "irreparable" harm or injury. *See* United States Court of Appeals for the Ninth Circuit, Circuit Rule 27-12; United States Court of Appeals for the D.C. Circuit, Handbook of Practice and Internal Procedures at 34. Under either standard, expedition is not called for here.

The challenged rules will go into effect on March 22, 2024, but the FCC will not begin any differential impact investigation until September 22, 2024, and, of course, quite possibly later. *Order* ¶ 132. The Industry Petitioners characterize this six-month grace period as an affirmative guarantee that the FCC will initiate

enforcement proceedings in September. *See* Mot. 4. But the *Order* merely makes clear that no enforcement proceedings will begin before that date. It makes no representation about when enforcement actions will begin afterwards, assuming a need for such actions arises.

The Industry Petitioners have not shown that they will face imminent jeopardy of harm, let alone irreparable harm, even once investigations begin. The challenged *Order* explains that the FCC will investigate possible rule violations only where it determines that investigation is warranted based on credible evidence. *Order* ¶¶ 132, 144. This investigative framework will protect covered entities from having to expend resources to respond to meritless complaints. *Id.* ¶ 142. And as an additional protection, covered entities concerned about the legality of their policies or practices have recourse to the advisory opinion process that the Commission put in place. *See id.* ¶¶ 146–151.

What is more, any investigations will take time. FCC enforcement actions involve a prolonged, multi-step process that includes substantial time for investigation, communication with potential targets, and internal deliberation. *See Enforcement Overview*, Federal Communications Commission Enforcement Bureau 7–9 (Apr. 2020).[3] The Commission has elected to conduct its disparate impact

---

[3] https://www.fcc.gov/sites/default/files/public_enforcement_overview.pdf.

investigations using the agency's standard enforcement toolkit, including letters of inquiry and subpoenas, audits, and inspection, *see Order* ¶ 142, which will allow covered entities an opportunity to respond at each stage. Any entity the FCC investigates will have ample opportunity to show why a practice or policy that causes a discriminatory effect is nevertheless justified by genuine economic and technical constraints. *See id.* ¶¶ 49–50, 63. It may do so not only in response to questions the FCC poses in the course of its investigation, but also in response to the formal notice of apparent liability that the agency must provide, detailing its preliminary findings, before issuing a forfeiture order. *See id.* ¶ 140 & n.442. The FCC will pursue penalties only if—at the conclusion of this lengthy administrative process—it determines both that a practice or policy demonstrably causes a discriminatory effect and that the entity in question has failed to justify that effect. *See id.* ¶¶ 49–50, 63. Thus, at every stage, the investigated party will be provided ample due process. Only after the issuance of a letter of inquiry and then a notice of apparent liability, each of which provides the party with an opportunity to respond, and the adoption of a forfeiture order, which the party may administratively appeal, will any entity be subject to monetary penalties.

In addition, any monetary forfeiture the FCC might eventually impose, upon concluding its administrative processes, would not have to be paid until the United States first prevailed in a civil suit for recovery of the forfeiture. 47 U.S.C. § 504(a).

14

For this reason, should the FCC investigate and penalize any of the Industry Petitioners (or their members), the affected entities face no realistic risk of being required to pay monetary penalties until long after this case can be briefed, argued, and disposed of in the normal course.

The lone case that the Industry Petitioners cite in support of their expedition request is inapposite. Mot. 6 (citing *School of the Ozarks, Inc. v. Biden*, No. 21-2270, Entry ID 5055848 at 1–4 (8th Cir. July 17, 2021)). In *School of the Ozarks*, the appellant requested (and the Court granted) expedited oral argument without any effect on the briefing schedule. No. 21-2270, Entry ID 5055848 at 1. The proposed schedule was far less accelerated than that which the Industry Petitioners propose here; the appellant there asked in July 2021 that the Court set argument for its October or November 2021 sittings, more than a month after briefing was already scheduled to conclude. *Id*. The government did not oppose that request "so long as it would not affect the deadline for appellees' brief." *Id*. at 4. *School of the Ozarks* was also a far simpler case, involving only a single plaintiff-appellant and none of the procedural or substantive complexities that accompany this proceeding.

## III. The Government's Proposed Briefing Schedule

For the above reasons, the Commission respectfully requests no less than 60 days from the close of all affirmative briefing for the government to file a response brief equivalent in length to whatever combined word allotments the Court may

15

Appellate Case: 24-1179     Page: 15     Date Filed: 03/19/2024 Entry ID: 5374815

authorize for all petitioners' briefs in this proceeding. The briefing schedule proposed in the table below would be reasonably typical for cases of this complexity.[4]

**The Government's Proposed Briefing Schedule**

| Petitioners' opening briefs | Monday, April 22 |
|---|---|
| Briefs of intervenors supporting petitioners | Monday, May 6 |
| Respondents' brief | Friday, July 5 (60 days from the submission of the briefs of all petitioners and their supporting intervenors) |
| Briefs of intervenors supporting respondents | Friday, July 19 |
| Petitioners' reply briefs | Friday, August 2 |
| Deferred appendix | Friday, August 9 |
| Final briefs | Friday, August 16 |
| Oral argument | At the Court's convenience |

Under this schedule, the Court, if it desired, could hear oral argument at its regularly scheduled September or October sittings. There is, moreover, no need to hold argument during a special session during the Court's summer recess. Mot. 12–

---

[4] *See, e.g.*, *City of Portland v. FCC.*, 9th Cir. No. 18-72689, Dkt. 55 (Apr. 18, 2019) (setting briefing schedule for consolidated petitions); *In Re FCC 11-161*, 10th Cir. No. 11-9900, Doc. ID 01018892701 (Aug. 7, 2012) & Doc. ID 01018907223 (Sept. 4, 2012) (same).

13. This Court rarely holds expedited special sessions, and even more rarely during its summer recess. The two examples the Industry Petitioners point to are not comparable. *See id.* (citing *Miller v. Thurston*, No. 20-2095, Text Docket Entry (8th Cir. June 29, 2020), and *United States v. Garges*, No. 20-3687, Entry ID 5063161 (8th Cir. Aug. 6, 2021)). *Miller* involved an urgent election-law issue in the midst of the pandemic; the Court convened by videoconference and ultimately overturned a permanent injunction issued by the district court. *Miller v. Thurston*, 967 F.3d 727, 732 (8th Cir. 2020). In *Garges*, the Court initially removed the case from the argument calendar, but rescheduled argument by videoconference after the government filed a 28(j) letter informing the Court of an intervening Supreme Court decision. *Garges*, No. 20-3687, Entry ID 5036698 (8th Cir. May 18, 2021), 5063161 (8th Cir. Aug. 6, 2021). While the Commission is prepared to adhere to any schedule set by the Court, the Industry Petitioners have identified no special circumstances necessitating a special session during the Court's summer recess.

## CONCLUSION

For the foregoing reasons, the FCC respectfully requests that the Court deny the Industry Petitioners' motion to expedite and instead adopt the government's proposed briefing schedule.

Respectfully submitted,

*/s/ Adam L. Sorensen*

Jacob M. Lewis
Sarah E. Citrin
William J. Scher
Adam L. Sorensen
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

*Counsel for FCC*

Dated: March 19, 2024

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Undersigned counsel certifies that the foregoing ("Response") complies with the type-volume limit of Fed. R. App. P. 27(d) and 32(a)(7)(B) and the word limit of Fed. R. App. P. 5(c)(1) and 27(d) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the Response contains 3,691 words. The Response complies with the typeface requirements of Fed. R. App. P. 27(d) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 27(d) and 32(a)(6) because the Response has been prepared in a proportionally spaced typeface using Word 2016 in size 14 Times New Roman font.

Respectfully submitted,

*/s/ Adam L. Sorensen*
Adam L. Sorensen
Federal Communications Commission
445 12th Street, SW
Washington, D.C. 20554
202-418-7399

*Counsel for Federal Communication Commission*

Dated: March 19, 2024

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. and Circuit Rule 25, I hereby certify that I have this day caused the foregoing Opposition to Motion for Expedited Briefing and Oral Argument to be filed through this Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record. All parties are represented by the following counsel registered with CM/ECF:

*/s/ Adam L. Sorensen*
Adam L. Sorensen
Federal Communications Commission
445 12th Street, SW
Washington, D.C. 20554
202-418-7399

Dated: March 19, 2024