No. 24-1179 (and consolidated cases)

# In the United States Court of Appeals for the Eighth Circuit

MINNESOTA TELECOM ALLIANCE, *ET AL.,*
*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,
*Respondents.*

On Petition for Review from the
Federal Communications Commission
(No. 22-69, FCC 23-100)

## BRIEF AMICUS CURIAE FOR
## NTCA-THE RURAL BROADBAND ASSOCIATION
### *In Support of Industry Petitioners*

ELLIE J. BAILEY
DARLA POLLMAN ROGERS
RITER ROGERS, LLP
319 S. COTEAU
PIERRE, SD 57501
(605) 224-5825
e.bailey@riterlaw.com

*Counsel for Amicus Curiae, NTCA*

JOSHUA SEIDEMANN
TAMBER RAY
NTCA-THE RURAL BROADBAND ASSOCIATION
4121 WILSON BLVD., SUITE 1000
ARLINGTON, VA 22203
(703) 351-2035
jseidemann@ntca.org

*Counsel for Amicus Curiae, NTCA*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, NTCA-The Rural Broadband Association makes the following disclosure:

NTCA-The Rural Broadband Association (NTCA) is a 501(c)(6) not-for-profit cooperative association organized under the laws of the District of Columbia. NTCA does not have a parent corporation and no publicly held corporation has an ownership stake of 10% or more in it.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................i

I.    INTRODUCTION ........................................................................................1

II.   JURISDICTIONAL STATEMENT ...............................................................3

III.  STATEMENT OF THE ISSUES ..................................................................3

IV.   ARGUMENT ...............................................................................................3

      A.   THE ORDER IMPLICATES SIGNIFICANT IMPACTS ON SMALL
           BUSINESSES ...................................................................................... 3

      B.   SECTION 60506 IS A NARROWLY TAILORED DIRECTIVE
           THAT IS ADJUNCT TO OTHER BROADBAND-RELATED
           DIRECTIVES IN A LARGER COMPREHENSIVE STATUTE .........6

           1.   Implementation of Section 60506 is Limited to the Deployment
                Goals Stated in the Language of the Section and Cannot
                Expand to Reach Other Issues ....................................................6

           2.   Rate Regulation is Beyond the Language of the Statute and
                Conflicts with Other Pre-Existing Legal Structures ................10

           3.   The Order Establishes an Unreasonable Standard for Technical
                and Economic Infeasibility ......................................................14

V.    CONCLUSION ..........................................................................................24

# TABLE OF AUTHORITIES

**CASES**
*Supreme Court*

*Alabama Ass'n of Realtors v. HHS,* 594 U.S. 758 (2021) ......................................22

*Caldwell v. U.S.,* 250 U.S. 14 (1919).........................................................................23

*EPA v. West Virginia,* 597 U.S. 697 (2022) ...................................................7, 13, 18

*FCC v. Prometheus Radio Project,* 592 U.S. 414 (2021) ........................................20

*GE Energy Power Conversion SAS, Corp., v. Outokumpu Stainless USA, LLC,*
590 U.S. 432 (2020)..................................................................................................11

*NationsBank v. Variable Annuity Life Ins. Co.,* 513 U.S. 251 (1995).......................9

*Russello v. United States,* 464 U.S. 16 (1983) .........................................................12

*U.S. v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 220 (2001) ..........................8

*Van Buren v. United States,* 593 U.S. 374, 393-94 (2021)......................................12

*U.S. Court of Appeals*

*Chemical Manufacturers Ass'n v. EPA,* 28 F.3d 1259
 (D.C. Cir. 1994)........................................................................................................23

*State Courts*

*Local 1494 of Int'l Ass'n of Firefighters v. City of Coeur d'Alene,* 586 P.2d 1346
(Idaho) (1978) ...........................................................................................................13

*Statutes and Regulations*

18 U.S.C. § 1839(3)(B) .............................................................................................18

Appellate Case: 24-1179     Page: 4     Date Filed: 05/17/2024 Entry ID: 5395169

47 C.F.R. § 16.2(f)(3) ..............................................................6

47 U.S.C. § 222(e) ................................................................11

47 U.S.C. § 254 ...................................................................15

47 U.S.C. § 335(b)(3) ...........................................................11

47 U.S.C. § 1301, *et seq* .......................................................8

47 U.S.C. § 1701, *et. seq* ......................................................8

47 U.S.C. § 1702, *et seq* .......................................................8

47 U.S.C. § 1702(e)(1)(B)(ii)(1)(aa)(DD) ..................................7

47 U.S.C. § 1754(a)(2) ..........................................................10

Consolidated Appropriations Act 2021, Pub. L. 116-260 (2020) ............9

Infrastructure Investment and Jobs Act of 2021,
Pub. L. No. 117-58, 135 Stat. 429 (2021) ...............................3

Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, *amending* the
Communications Act of 1934 (1996) ........................................15

### *Regulatory Materials*

*Connect America Fund: A National Broadband Plan for Out Future High-Cost
Universal Service Support; ETC Annual Reports and Certifications;
Telecommunications Carriers Eligible to Receive Universal Support; Connect
America Fund – Alaska Plan; Expanding Broadband Services Through the ACAM
Program: Report and Order, Notice of Proposed Rulemaking, and Notice of
Inquiry,* Federal Communications Commission, Docket Nos. 10-90, 14-58, 09-197,
16-271, RM-11868, FCC 23-60 (2023) ..................................22

*Connect America Fund, ETC Reports and Certifications, Developing a Unified
Intercarrier Compensation Regime: Report and Order, Order and Order on
Reconsideration, and Further Notice of Proposed Rulemaking,* Federal

Communications Commission, Docket Nos. 10-90, 14-58, 01-92, FCC 16-33 (2016) .................................................................................................21

*Connect America Fund; ETC Annual Reports and Certification; Establishing Just and Reasonable Rates for Local Exchange Carriers; Developing a Unified Intercarrier Compensation Regime: Report and Order, Further Notice of Proposed Rulemaking, and Order on Reconsideration,* Federal Communications Commission, Docket Nos. 10-90, 14-58, 07-135, 01-92, FCC 18-176 (2018).......22

*Empowering Broadband Consumers Through Transparency: Report and Order and Further Notice of Proposed Rulemaking,* Federal Communications Commission, Docket No. 22-2, FCC 22-86 (2022) ....................................................19

"FCC Restores Net Neutrality," FCC News (Apr. 25, 2024) (https://docs.fcc.gov/public/attachments/DOC-402082A1.pdf).............................11

*Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination: Report and Order and Further Notice of Proposed Rulemaking,* Federal Communications Commission, Docket No. 22-69, FCC 23-100 (2023) ............................................................................................2

*Small Business Exemption from Open Internet Enhanced Transparency Requirements: Order,* Federal Communications Commission, Docket No. 14-28, FCC 17-17 (2017) ...............................................................................................19

### Other Authorities

Antonin Scalia & Bryan A. Garner, "Reading Law: The Interpretation of Legal Texts" 107-11 (Thomson West) (2012)..................................................................10

"Broadband/Internet Availability Survey Report," NTCA-The Rural Broadband Association (Arlington, VA) (Dec. 2023) ...........................................................1, 15

"Connect America Cost Model (A-CAM)," Model Methodology, A-CAM Version 2.3.1, Document Version 2.3.1, CostQuest Associates, Inc. (rev. Aug. 12, 2016) (https://transition.fcc.gov/wcb/Model%20MethodologyACAM_2_3_1%20-%20Final.pdf) ..........................................................................................................21

"Future Proof: Economics of Rural Broadband," Vantage Point Solutions (Mitchell, SD) (2021)................................................................................................14

iii

"Quick Facts," U.S. Census Bureau
(www.census.gov/quickfacts/fact/table/US/POP060210) ........................................4

Steve Parsons and Jim Stegman, "Rural Broadband Economics: A Review of Rural
Subsidies," CostQuest Associates (Cincinnati) (2018)
(https://transition.fcc.gov/wcb/Model%20MethodologyACAM_2_3_1%20-
%20Final.pdf) ............................................................................................14

Table of Small Business Size Standards, U.S. Small Business Administration
(2022) ......................................................................................................1

"Universal Service," Federal Communications Commission
(www.fcc.gov/general/universal-service) ................................................................15

"Urban Area Facts," U.S. Census Bureau (www.census.gov/programs-
surveys/geography/guidance/geo-areas/urban-rural/ua-
facts.html#:~:text=2%2C534.4%20persons%20per%20square%20mile%3A%20O
verall%20urbanized,population%20density%20in%20the%20U.S.) ......................4

Appellate Case: 24-1179   Page: 7   Date Filed: 05/17/2024 Entry ID: 5395169

## I.  INTRODUCTION

NTCA-The Rural Broadband Association (NTCA)[1] hereby submits this brief *amicus curiae* in the above-captioned proceeding. NTCA is a 501(c)(6) not-for-profit cooperative association representing small, locally operated telephone and broadband providers in rural communities throughout the United States. With rare exception, all NTCA telecom members are small businesses according to Small Business Association North American Industry Classification (NAICS) Codes, on average employing 35 people and serving approximately 6,000 fixed broadband service customer accounts. *See,* Table of Small Business Size Standards, U.S. Small Business Admin., at 25 (2022) (www.sba.gov/sites/sbagov/files/2023-03/Table%20of%20Size%20Standards_Effective%20March%2017%2C%202023%20%281%29%20%281%29_0.pdf) (visited Apr. 27, 2024); *see, also,* "Broadband/Internet Availability Survey Report," NTCA-The Rural Broadband Association, at 4 (Arlington, VA) (Dec. 2023) (www.ntca.org/sites/default/files/documents/2023-12/2023%20Broadband%20Survey%20Report%20FINAL.pdf) (visited Apr. 27,

---

[1] Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *Amicus* state that: (i) there is no party or counsel for a party in the pending appeal who authored the *amicus curiae* brief in whole or in part; (ii) there is no party or counsel for a party in the pending appeal who contributed money that was intended to fund preparing or submitting the brief; and (iii) no person or entity contributed money that was intended to fund preparing or submitting the brief, other than *Amicus* and their members.

1

2024). NTCA telecom members are subject to the Federal Communications Commission (Commission) Order that is the subject of the instant appeal. *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination: Report and Order and Further Notice of Proposed Rulemaking,* Federal Communications Commission, Docket No. 22-69, FCC 23-100 (2023) (Order) (App.___). In addition to the overarching issues presented in the Initial Brief of the Industry Petitioners (ACA Connects – America's Communications Association, *et. al.*) NTCA takes special interest in the impact of the Order on its small business members. These potential adverse effects risk particular impact to small businesses that generally lack access to resources and economies of scale that can enable larger businesses to absorb substantial market or regulatory changes. These impacts, however, are neither envisioned nor authorized by the statute, whose language contemplates a far more limited scope of implementation. Moreover, compliance with certain of the standards presented in the Order is effectively impossible since the processes by which those measures can be achieved are wholly inconsistent with the normal and ordinary practices within which NTCA members conduct their business. Specifically, the standards contemplate the ability of small private businesses to have access to the confidential business considerations of other businesses. This result, too, is neither contemplated nor accommodated in the statutory language.

Appellate Case: 24-1179    Page: 9    Date Filed: 05/17/2024 Entry ID: 5395169

NTCA was an active participant in the underlying Commission rulemaking proceeding below.

## II.   JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 47 U.S.C. 402(a). The Order was published in the Federal Register on January 22, 2024. The Petitioners filed their appeals within 60 days. 28 U.S.C. § 2344; *see,* 47 U.S.C. § 405(a); 47 U.S.C. § 1.4(b)(1).

## III.   STATEMENT OF THE ISSUES

1.   Whether implementation of Section 60506 is limited to network deployment goals and cannot expand to reach other issues.

2.   Whether rate regulation is beyond the language of the statute and conflicts with other pre-existing legal structures.

3.   Whether the Order establishes an unreasonable standard for technical and economic infeasibility.

## IV.   ARGUMENT

### A.   THE ORDER IMPLICATES SIGNIFICANT IMPACTS ON SMALL BUSINESSES.

Tucked within an expansive legislative initiative, Section 60506 of the Infrastructure Investment and Jobs Act adjures the Commission to prevent and eliminate "digital discrimination of access." Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, 135 Stat. 429 (2021) (IIJA). The section recognizes explicitly, both in its initial and directive statements, that circumstances of economic and technical infeasibility can account for instances in which disparate

3

outcomes affecting access to broadband might be experienced by enumerated protected classes. *See,* Section 60506(a) (" . . . insofar as technically and economically feasible . . .") and Section 60506(b) (" . . . taking into account the issues of technical and economic feasibility . . ."). These guardrails establish crucial guidelines and are of critical importance to NTCA members, who serve some of the most rural areas of the United States. Terrain, topology, climate, and the remoteness of these regions implicate special technological considerations, while sparse populations across whom the high costs of capital-intensive broadband infrastructure can be distributed implicate substantial economic concerns. On average, NTCA members serve areas with a population density of eight people per square mile, compared to a national U.S. average of 94 people per square mile and a national average of 2,534 people per square mile in urban U.S. areas. *See,* "Quick Facts," U.S. Census Bureau (www.census.gov/quickfacts/fact/table/US/POP060210) (visited Apr. 27, 2024) *and* "Urban Area Facts," U.S. Census Bureau (www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/ua-facts.html#:~:text=2%2C534.4%20persons%20per%20square%20mile%3A%20Overall%20urbanized,population%20density%20in%20the%20U.S.) (visited Apr. 27, 2024).

4

All NTCA members participate in the Universal Service Fund (USF) program administered by the Commission, and many participate in support programs administered by the Department of Agriculture; these and other programs facilitate critical financial support without which NTCA members would face fundamental difficulties to deploy networks. As small businesses, NTCA members are particularly sensitive if not susceptible to the major changes envisioned by the Order; their participation in the afore-mentioned programs evidences the inherent economic challenges they face serving rural and remote regions. The prophylactic safeguards of the Order not only introduce significant regulatory overhang and liabilities but do so without regard to the narrow and limited construction of the statutory language. Accordingly, the potential impact of the Order's far-reaching and invasive standards begs fundamental questions as to whether Congress intended to impose these impacts on these small businesses and whether, as a result, the Commission has the authority to implement those relevant provisions.

The Order attempts to implement a brief section of the IIJA. Section 60506 places upon the Commission responsibility to prevent and eliminate "digital discrimination of access." Although, and as explained more fully below, the language of Section 60506 concerns itself chiefly with deployment and moreover recognizes explicitly the potential impacts of technical and financial infeasibility, the Order takes a broader view and embraces nearly every operational aspect of

5

internet service providers (ISPs). These considerations intrude not only on issues that heretofore were principally within the normal and ordinary business undertakings of private businesses, but also upon the major questions doctrine, specifically, whether the Commission can visit such profound change on the industry without clear and direct instruction from Congress. Neither the statute nor the legislative history demonstrates reason nor intent to fundamentally reform the business practices of small businesses in a manner that places inordinate and increased cost-causing liabilities at their doorstep.

## B. SECTION 60506 IS A NARROWLY TAILORED DIRECTIVE THAT IS ADJUNCT TO OTHER BROADBAND-RELATED DIRECTIVES IN A LARGER COMPREHENSIVE STATUTE.

### 1. Implementation of Section 60506 is Limited to the Deployment Goals Stated in the Language of the Section and Cannot Expand to Reach Other Issues.

By its language, Section 60506 does not contemplate the wide-ranging oversight over business aspects such as pricing, customer premises equipment, marketing, or other functions undertaken in the normal and ordinary course of business. Rather, the statutory language is clear, stating its aim to ensure "equal opportunity to subscribe" and prohibiting "deployment discrimination," but containing no language that would indicate or support invasive intrusions into such functions as "[m]arketing, advertisement and outreach . . . ." *See,* Order at Appendix A, p. 104, *codifying* 47 C.F.R. § 16.2(f)(3). And yet the Order imposes

6

unreasonable and unworkable expectations on small providers that could lead to a Hobson's dilemma of undertaking ventures that are inconsistent with internal corporate practices, including risk and investment standards, or subjecting those providers to debilitating enforcement actions of unknown and unspecified impacts (*see,* Order at para. 141, "Toward this end, the Commission will bring to bear its full suite of available remedies, including the possibility of monetary forfeitures.") (App.___). These results are inconsistent with the statutory language of the section that includes specific mention of technical parameters, but not other aspects pertaining to the provision of broadband service, implicating a "transformative expansion" of Commission authority that is presumed to arise from Section 60506. *See, EPA v. West Virginia,* 597 U.S. 697, 724 (2022) (internal citation omitted).

The IIJA must be viewed as a composite structure that incorporates several provisions aimed at expanding broadband deployment and adoption, including the Broadband Equity Access and Deployment (BEAD) program and the Affordable Connectivity Program (ACP). These various provisions, alongside Section 60506, envision avenues by which the goals of wider digital broadband engagement can be achieved. Provisions allowing funding to be used for broadband mapping assist in defining where broadband efforts must focus such as permitting subgrant funding to be used for data collection, broadband mapping, and planning (*see,* IIJA § 60102(f)(3) *codified at* 47 U.S.C. § 1702(e)(1)(B)(ii)(1)(aa)(DD)). Likewise,

7

BEAD funding assists deployment of broadband networks in those spaces, the ACP aims to increase affordability and adoption, and the Digital Equity Act aims to further the benefits among more users (*see,* IIJA Section 60102, *codified at* 47 U.S.C. § 1702, *et seq.*; IIJA Section 6002, *codified at* 47 U.S.C. § 1301, *et seq.;* and IIJA Section 60301, *codified at* 47 U.S.C. § 1701, *et. seq.*)*.* Section 60506 buttresses those efforts by adjuring the Commission to prevent and eliminate discrimination "based on" users' inclusion in certain enumerated protected classes. But the Commission's scope of regulation in this regard must be viewed *alongside and in coordination with* the other provisions of the IIJA (as well as other applicable laws outside the IIJA). The limited meaning and intent of Section 60506 is established by its relation to the other sections of the IIJA; " . . . the meaning of a provision is 'clarified by the remainder of the statutory scheme . . .'". *U.S. v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 217 (2001) (internal citation omitted). Narrowly, Section 60506 must be viewed in a supplemental role to address the discrete issue of discriminatory actions that may affect network deployment and not be interpreted to encroach upon or otherwise invade issues already addressed by other laws of which Congress is presumed to be aware. The language specifies "equal opportunity to subscribe to an offered service," and elaborates by describing technical service metrics (speed, capacities, latency) that are part and parcel of network infrastructure characteristics. Since Section 60506

8

does not address other issues or preempt other laws (*i.e.,* those dealing with affordability or rate regulation), the effects of rules promulgated to implement that section may reach only the areas designated by the statute. Although Section 60506 states its intent to ensure "equal access" (Section 60506(a)(2)), that "access" must be read in the context of the section which devotes itself to deployment and technical standards such as speed, capacities, and latency, and *not* marketing or other non-network related functions. To be sure, a statutory listing may be "exemplary, not exclusive." *NationsBank v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257 (1995). However, a holistic reading of the IIJA invokes the principle of *pari materia* and informs that "access" in Section 60506 is to be construed as access to technical capabilities.

Section 60506 is a brief part of a larger Division F, Title V of the IIJA, "Broadband Affordability." Nearly two-thirds of Title V is devoted to the ACP, which itself was an extension of the earlier-legislated Emergency Broadband Benefit. Section 60502(a)(2), *amending* Consolidated Appropriations Act 2021, Pub. L. 116-260 (2020). If the broadband sections of the IIJA are read as a composite unit, then ACP addresses access by affordability, BEAD addresses access to networks, and Section 60506 addresses prohibitions on not deploying infrastructure based on prospective customers' inclusion in protected classes. And, because Section 60506 enumerates only technical aspects (speed, capacities,

9

latencies), it cannot be read to "add on" to the consumer-oriented marketing (Section 60504/Consumer Broadband Labels). Stated different, Section 60502 addresses affordability; Section 60504 addresses marketing. Therefore, inasmuch as Section 60506 does not mention those issues, it cannot be interpreted to include them, but rather to *complement* those other sections with a unique statutory purpose of its own. *See,* Antonin Scalia & Bryan A. Garner, "Reading Law: The Interpretation of Legal Texts" 107-11, at 252 (Thomson West) (2011) ("[L]aws dealing with the same subject – being in *pari materia* . . . – should if possible be interpreted harmoniously."). As well, the rule of *expressum facit cessare tacitum* – what is expressed makes the silent cease – must be applied: Section 60506 does not state features beyond technical aspects of the network. Therefore, the section must be viewed as affecting issues relating to the availability of technical, "quality of service metrics," only. *See,* Section 60506(a)(2).

### 2. Rate Regulation is Beyond the Language of the Statute and Conflicts with Other Pre-Existing Legal Structures.

Section 60506 defines "equal access" as "the equal opportunity to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions." Section 60506, *codified at* 47 U.S.C. § 1754(a)(2). The Order's extension to contemplate prices is improper. *See,* Order at para. 105 (App.___) (" . . . we find that the statutory language encompasses discriminatory pricing."). But

10

rate regulation of broadband internet access services alone would be a major departure from standing law at the time the IIJA was enacted. Moreover, even in its April 25, 2024, reclassification of broadband internet access service as a Title II common carrier service, the Commission declined to impose rate regulation on broadband internet access services. *See,* "FCC Restores Net Neutrality," FCC News (Apr. 25, 2024) (https://docs.fcc.gov/public/attachments/DOC-402082A1.pdf) (visited Apr. 27, 2024). The Commission cannot read into the limited boundaries of the statute the type of broad authority the Order seeks to impose on small businesses. Section 60506 focuses on deployment and technical characteristics of broadband networks; the section does not mention or contemplate prices and rates. If a statute does not address an issue, it "'is to be treated as not covered' – a principle 'so obvious that it seems absurd to recite it.'" *GE Energy Power Conversion SAS, Corp., v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440 (2020) (internal citation omitted). Although the section includes the phrase, "terms and conditions," it does not include "rates." Rates are a factor different and distinct from "terms and conditions," as evidenced by other statutory provisions that set "rates" apart from "terms and conditions," and therefore are specifically not contemplated by Congress in this section. *See, i.e.,* 47 U.S.C. § 222(e) ("rates, terms, and conditions"); 47 U.S.C. § 335(b)(3) ("prices, terms, and conditions"). The intent of Congress to exclude rates from this section is apparent from the

11

absence of the term in the text; the Commission cannot insert words that Congress omitted. *See, Russello v. United States,* 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally in the disparate inclusion or exclusion."). If Congress had intended to address rate regulation, it would have done so.

To be sure, Congress expresses significant interest in broadband in the IIJA, including: $14 billion for ACP, $2.75 billion for digital literacy, and $42.45 billion for BEAD. Yet with the exception of generally requiring an affordable rate component for providers who accept BEAD funding (IIJA Section 60102(h)(5)) (which the IIJA also expressly directs should not enable rate regulation, *see,* IIJA Section 60102(h)(5)(D)), the IIJA does not address rate regulation through any clear direction as it addresses in Section 60506 various factors that can affect broadband deployment and engagement. This absence precludes the Commission from attaching it to Section 60506. Congress does not intend agencies to address issues not mentioned explicitly in the law, and certainly not matters of such consequence. *See, Van Buren v. United States,* 593 U.S. 374, 393-94 (2021) ("[T]he far-reaching consequences of the Government's reading . . . underscores the implausibility of the Government's interpretation."). The focus on technical quality of service metrics implicates the principle of *expressio unius est exclusion alterius*

Appellate Case: 24-1179    Page: 19    Date Filed: 05/17/2024 Entry ID: 5395169

– where a statute designates something, that designation by construction excludes other things. *Local 1494 of Int'l Ass'n of Firefighters v. City of Coeur d'Alene,* 586 P.2d 1346, 1355 (Idaho) (1978). The unlawful and acontextual imposition of potential price regulation on small businesses like the members of NTCA would introduce significant challenges to their operations. In the first instance, these companies rely on the ability to price services in response to market demand and other conditions. The imposition of price regulation without concomitant assurances that potential revenue shortfalls would be compensated creates an unfunded mandate that threatens the operations of small businesses who lack comparative access to resources and economies of scale as larger entities. The plain language of Section 60506 that focuses on network deployment and technical parameters related thereto, taken within the context of the Title V and other sections of the IIJA, informs that absent clear direction, Congress did not intend the Commission to address more than the statute articulates. Absent such directive, the supplemental regulatory imprints imposed by the Order that would speak to the fundamental business practices of small businesses must be rejected as an improper "transformative expansion" of presumed authority. *EPA v. West Virginia,* 597 U.S. 697, 724 (2022).

Appellate Case: 24-1179    Page: 20    Date Filed: 05/17/2024 Entry ID: 5395169

### 3. The Order Establishes an Unreasonable Standard for Technical and Economic Infeasibility.

Having addressed the limited scope of Section 60506, NTCA now turns its attention to how the Order interprets critical criteria of technical and economic infeasibility and how those standards would visit substantial adverse and unlawful impacts on NTCA members and similarly situated businesses. Section 60506 twice qualifies that technical and economic feasibility must be recognized. These are critical criteria as the costs of building networks in rural areas served by NTCA members are exceedingly high. Numerous studies define and quantify the economic inputs and resulting higher-than-urban costs of building broadband in rural spaces. *See, i.e.,* Steve Parsons and Jim Stegman, "Rural Broadband Economics: A Review of Rural Subsidies," CostQuest Associates (Cincinnati) (2018) (www.ntca.org/sites/default/files/documents/2018-07/CQA-RuralBroadbandEconomics-AReviewofRuralSubsidies_FinalV07112018R2.pdf) (visited Apr. 27, 2024); *see, also,* "Future Proof: Economics of Rural Broadband," Vantage Point Solutions (Mitchell, SD) (2021) (www.ntca.org/sites/default/files/documents/2021-05/Future%20Proof%20--%20Economics%20of%20Rural%20Broadband%20FINAL_0.pdf) (visited Apr. 27, 2024) . In a 2023 survey report, 88% of NTCA members reported "cost of deployment" as a significant barrier to widespread fiber deployment, while 55.9% reported "long loops"—cost drivers that refer specifically to the distance between

14

an end-user location and the central ISP office—as another obstacle on the way to ubiquitous deployment; these findings are consistent with survey reports conducted annually for more than a decade. *See,* "Broadband/Internet Availability Survey Report," NTCA-The Rural Broadband Association, at 14 (Arlington, VA) (Dec. 2023) (www.ntca.org/sites/default/files/documents/2023-12/2023%20Broadband%20Survey%20Report%20FINAL.pdf) (visited Apr. 27, 2024). These high costs are recognized by Congress in the Universal Service provisions of the Telecommunications Act of 1996 and the comprehensive scheme of USF regulations enacted throughout numerous Commission Orders. *See,* Section 254, Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, amending the Communications Act of 1934 (1996), *codified at* 47 U.S.C. § 254 *et. seq.*; *see, also,* "Universal Service," Federal Communications Commission (www.fcc.gov/general/universal-service) (providing overview of Universal Service Fund programs and rulemaking proceedings) (visited Apr. 27, 2024). Likewise, Section 60506 recognizes the impact of technical and economic conditions on the deployment of capital-intensive network deployment and finds that those issues can legitimately inform deployment decisions and timelines. However, the Order renders those statutory parameters effectively meaningless as the rules establish standards that would demand unreasonable and unrealistic business practices. Particularly for small businesses like the members of NTCA, the Commission's

15

formulation of rules to govern analyses of what is technically or economically feasible do not account for the highly specialized and individualized needs of small businesses serving remote rural spaces.

The Commission explains that it bases its standards on whether there was a "less discriminatory alternative to the challenged policy or practice." Order at para. 63 (App.___). But it is the gauge by which the Commission makes that determination that transcends the contours of the statute. The Commission explains that it will base its judgment in hindsight on whether there is "evidence[] [of] prior success by covered entities under similar circumstances . . . clearly indicating that the policy in question may reasonably be adopted, implemented, and utilized." Order at para. 66 (App.___). This standard, for several reasons, is problematic.

In the first instance, the Order does not define critical terms such as "success" or "similar circumstances." Left unknown is whether success is measured by meeting deployment numbers or percentages, mirroring technological deployments, or achieving a return on investment at a rate determined by the Commission. Critically, as well, "similar circumstances" has no bounds in the Order: To many, the ISP industry is a monolithic sector, while policymakers may distinguish between large, publicly traded companies, mid-sized companies, and small, local companies that make up the membership of NTCA. But, even within NTCA, there are members with several hundred subscribers and members whose

16

subscriber counts reach into the thousands. Moreover, the diversity of their service regions—topography, population density—also begs the question of how a company could reasonably be expected to (i) predict both how the Commission would define "similar," and then (ii) obtain confidential information from that other company or companies to create its own working business model.

Investments and other business decisions are informed by many factors. Many may be common to all market participants, for example, fuel costs, access to material, and labor supplies. Other factors are grounded in matters individual and unique to each company approaching a decision, including those enumerated by the Commission in the Order: "projected income, projected expenses, net income, expected return on investment, competition, cash flow, market trends, and working capital requirements . . . ." Order at para. 71 (App.___). *Arguendo* the Commission could create a matrix by which the impact of certain of those factors might be measured, applied, and adjudicated, it can hardly be argued that Congress intended Section 60506 to dictate risk tolerance to corporate or cooperative boards, effectively telling one company that it must substitute its standard investment strategies with those of a company that is more comfortable assuming greater liabilities. The Commission explains that it wants covered entities to "consider what is more than convenient" (Order at para. 73 (App.__)), but the enumerated criteria speak to the most intricate details of corporate decision making itself. The

17

Commission proposes an invasion of private decision-making, a stunning departure that would require clear Congressional direction under the major questions doctrine. *EPA v. West Virginia,* 597 U.S. 697 (2022).

Moreover, the Commission's interpretation of Section 60506 cannot stand because its application cannot be undertaken in the manner envisioned by the Order. It would be effectively impossible for one company to know the business plans (as well as the underlying dynamics) of other companies in the market to the extent the Commission envisions. To comply with the Order, a company would need to include in its deployment evaluations not only the outcomes of other businesses' plans but the full range of financial, future plannings, technical, and other proprietary considerations that informed the decisions of the other company. It would be at best illogical to propose that Congress would expect highly confidential information of businesses to be so readily available that other companies in the market could study and use it as a model for their own business plans, to determine whether their plans will meet the Commission's standards. These are trade secrets the law endeavors to protect. *See,* 18 U.S.C. § 1839(3)(B) (includes "information . . . not generally known to . . . the public."). This is especially relevant to small businesses as (1) their individual rural business conditions are unique and unlike those that pervade the larger, general marketplace,

18

and (2) they cannot reasonably be expected to gather, sort, and evaluate for applicability information from hundreds of other small businesses.

The Order, in its encompassing, all-embracing interest in affecting numerous facets of private enterprise, presents problems of a unique nature to the small broadband provider members of NTCA. Overall, principles of economics recognize that larger companies with greater access to human resources, technology, and economies of scale are better positioned to absorb the impacts of regulatory and market change. The Commission has recognized on numerous occasions the constraints faced by small businesses. *See, i.e., Small Business Exemption from Open Internet Enhanced Transparency Requirements: Order,* Federal Communications Commission, Docket No. 14-28, FCC 17-17, at para. 6 (2017); *see, also, Empowering Broadband Consumers Through Transparency: Report and Order and Further Notice of Proposed Rulemaking,* Federal Communications Commission, Docket No. 22-2, FCC 22-86, at paras. 117, 118 (2022) (finding that small providers are "less likely to have in-house attorneys and compliance departments" to assist with implementing consumer broadband label requirements). Particularly for small businesses, the Order sets the stage for agency second-guessing rational and everyday business decisions, portending a universe of unfunded mandates in which businesses pursue investment projects they otherwise would not but for regulatory order.

Appellate Case: 24-1179     Page: 26     Date Filed: 05/17/2024 Entry ID: 5395169

The Commission noted the potential for increased costs on small providers, but its acknowledgment does not reveal a complete appreciation for the fundamental shift in business practices the Order implicates. The Order explains,

> When investigating claims of digital discrimination, small entities will need to gather and provide information needed by the Commission to assess claims of technical or economic feasibility, and prove by a preponderance of the evidence that the policy or question is justified by genuine issues of technical or economic feasibility. This may involve staff time, possibly by engineering and accounting professionals that can speak to technical or economic issues. Order at Appendix B, para. 22 (App.___).

But even in this, the Order contemplates only the *post hoc* costs (the Order in fact concedes "[t]he Commission does not have sufficient information on the record to quantify the cost of compliance for small entities." Order at Appendix B, para. 23 (App.___)), but does not address the prerequisite costs of endeavoring to know that which, essentially, cannot be known about other companies in the market. This immediately illustrates that the Commission could not consider the full and complete impact of the Order on small providers and therefore could not issue a reasonably-based decision. *See, FCC v. Prometheus Radio Project,* 592 U.S. 414, 423 (2021) (requiring agencies to "reasonably consider[] the relevant issues").

In the first instance, it is critical to note that broadband networks are built in stages and that deployment decisions contemplate numerous factors including distance from existing facilities, terrain, climate, and anticipated market demand. The various iterations of the Commission's Connect America Model (CAM),

20

including the Alternative Connect America Model (A-CAM), which is designed specifically to address the needs of rural carriers, contemplate numerous factors, including capital expenses, operational expenses, architectural components, topology, and end user demand data. *See,* "Connect America Cost Model (A-CAM)," Model Methodology, A-CAM Version 2.3.1, Document Version 2.3.1, CostQuest Associates, Inc. (rev. Aug. 12, 2016). (https://transition.fcc.gov/wcb/Model%20MethodologyACAM_2_3_1%20-%20Final.pdf) (visited Apr. 27, 2024); *see, also, Connect America Fund, ETC Reports and Certifications, Developing a Unified Intercarrier Compensation Regime: Report and Order, Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking,* Federal Communications Commission, Docket Nos. 10-90, 14-58, 01-92, FCC 16-33, at paras. 17, 18 (2016) (describing industry participating in model refinement). Each of these factors, separately and collectively, inform deployment decisions. However, the Commission at the same time demands that decisions to deploy may not be delayed indefinitely: Every Commission-administered program aimed at supporting broadband deployment in remote high-cost areas includes deployment milestones that must be met as a condition of funding. By way of example, the 2018 Revised A-CAM rules require program participants to increase deployment coverage by 10% annually over a period of six years. *See, Connect America Fund; ETC Annual Reports and*

Appellate Case: 24-1179    Page: 28    Date Filed: 05/17/2024 Entry ID: 5395169

*Certification; Establishing Just and Reasonable Rates for Local Exchange*

*Carriers; Developing a Unified Intercarrier Compensation Regime: Report and*

*Order, Further Notice of Proposed Rulemaking, and Order on Reconsideration,*

Federal Communications Commission, Docket Nos. 10-90, 14-58, 07-135, 01-92,

FCC 18-176, at para. 67 (2018). Further revisions promulgated in 2023 created

new funding and obligations matrices, but these, too, recognized that networks,

especially those challenged by normal economic models, are built in stages and not

"all at once." *See, Connect America Fund: A National Broadband Plan for Out*

*Future High-Cost Universal Service Support; ETC Annual Reports and*

*Certifications; Telecommunications Carriers Eligible to Receive Universal*

*Support; Connect America Fund – Alaska Plan; Expanding Broadband Services*

*Through the ACAM Program: Report and Order, Notice of Proposed Rulemaking,*

*and Notice of Inquiry,* Federal Communications Commission, Docket Nos. 10-90,

14-58, 09-197, 16-271, RM-11868, FCC 23-60, at paras. 47, 48 (2023). The Order,

however, does not appear to accommodate standard industry practices as affirmed

by other regulatory strictures.

The Commission cannot invoke Section 60506 to "authorize[] . . . powers of

'vast economic and political significance'" absent "clear[]" Congressional

direction. *Alabama Ass'n of Realtors v. HHS,* 594 U.S. 758, 764 (2021) (internal

citations omitted). It is unreasonable to suppose that small businesses will have

insight into the proprietary details of peer company planning as they manage issues unique to small providers such as the members of NTCA.

The Commission's broad interpretation of Section 60506 violates the narrow bounds set by its plain language. Section 60506 addresses deployment, *i.e.,* the construction and implementation of operable networks. Section 60506 cannot be read to allow the expansive powers the Commission has abrogated to itself, including directives that businesses will be required to know, review, and incorporate analyses drawn from other companies' actions into their planning. Statutes granting or relinquishing rights must be construed strictly. *Caldwell v. U.S,* 250 U.S. 14, 20 (1919). The Order is also infirm because it seeks to impose comprehensive, unprecedented, and nearly unlimited regulatory reach where the Commission itself stated that "there is little or no evidence in the legislative history of Section 60506 or the record of this proceeding indicating the intentional discrimination . . . contributes to disparities in access to broadband internet access service across the Nation." Order at para. 38 (internal citation omitted) (App.___). The Commission's heavy-handed approach, accordingly, is arbitrary and capricious since "there is simply no rational relationship" between the regulations and actions of industry participants. *See, Chemical Manufacturers Ass'n v. EPA,* 28 F.3d 1259, 1265 (D.C. Cir. 1994) (reversing the imposition of an air dispersion model used to

23

measure pollutants when the model did not reflect the known behavior of the pollutant to be measured).

## V.    <u>CONCLUSION</u>

WHEREFORE the reasons stated herein and above the Court should hold unlawful and set aside the Commission's Order.

Respectfully submitted,

<u>s/*Joshua Seidemann*</u>

JOSHUA SEIDEMANN

TAMBER RAY

VP POLICY AND INDUSTRY INNOVATION

NTCA-THE RURAL BROADBAND ASSOCIATION

4121 Wilson Blvd., Suite 1000

Arlington, VA 22203

(703) 351-2035

jseidemann@ntca.org

*Counsel for Amicus Curiae, NTCA*

<u>s/*Ellie Bailey*</u>

ELLIE J. BAILEY

DARLA POLLMAN ROGERS

RITER ROGERS, LLP

319 S. Coteau

Pierre, SD 57501

(605) 224-5825

e.bailey@riterlaw.com

*Counsel for Amicus Curiae, NTCA*

DATED:  May 17, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the Federal Rules of Appellate Procedure 29(a) and 32(a), because it contains 5,170 words.

This brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared using a proportionally spaced typeface in 14-point font Times New Roman using Word (Microsoft 365).

Pursuant to Eight Circuit Rule 28A(h), the electronic version of this brief was scanned for viruses and is virus-free.


*s/Ellie Bailey*
ELLIE J. BAILEY

Dated: May 17, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_s/Ellie Bailey_
ELLIE J. BAILEY

Dated: May 17, 2024