# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

MINNESOTA TELECOM ALLIANCE, *et al.*,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF
AMERICA,

*Respondents.*

On Petition for Review of an Order of the Federal Communications Commission
(FCC 23-100)

## BRIEF FOR INTERVENORS

Edward G. Caspar
David Brody
Marc P. Epstein
Alizeh Ahmad
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K St. N.W., Suite 900
Washington, DC 20005
(202) 662-8600
ecaspar@lawyerscommittee.org
dbrody@lawyerscommittee.org
mepstein@lawyerscommittee.org
aahmad@lawyerscommittee.org

*Counsel for Media Alliance and Great
Public Schools Now*

Andrew Jay Schwartzman
BENTON INSTITUTE FOR
BROADBAND & SOCIETY
525 9th Street N.W., 7th Floor
Washington, D.C. 20004
(202) 241-2408
andyschwartzman@gmail.com

*Counsel for Benton Institute for
Broadband & Society*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. ii

SUMMARY OF THE ARGUMENT ......................................................................1

ARGUMENT ......................................................................................................4

I.    Congress authorized FCC to issue disparate impact rules. ...........................4

    A.   Faithful consideration of Section 60506 in its entirety shows it authorizes disparate-impact coverage....................................................4

    B.   Subsection 60506(a) states Congress's results-oriented intent...............8

    C.   Subsection (b) directs FCC to accomplish the goals Congress established in Subsection (a)..................................................................11

    D.   The technical and economic feasibility consideration indicates Section 60506 covers disparate impact..............................................15

II.   *Loper Bright* supports deference to FCC......................................................17

III.   The major questions doctrine does not apply. ...............................................18

IV.   The burden-shifting framework is appropriate...............................................21

    A.   FCC adhered to the statutory text. .......................................................21

    B.   The Order appropriately addresses less discriminatory alternatives and single instances. ................................................................................23

CONCLUSION ..................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Bd. of Educ. of City Sch. Dist. of City of New York v. Harris*,
444 U.S. 130 (1979)................................................................ *passim*

*Biden v. Nebraska*,
600 U.S. ___, 143 S. Ct. 2355 (2023) .................................. 18, 19

*Bradford v. U.S. Dep't of Lab.*,
101 F.4th 707 (10th Cir. 2024)........................................ 18, 19, 20

*Chamber of Com. of U.S. of Am. v. Consumer Fin. Prot. Bureau*,
691 F. Supp. 3d 730 (E.D. Tex. 2023) ...........................................21

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)......................................................................19

*Fox v. Standard Oil Co. of N.J.*,
294 U.S. 87 (1935)........................................................................10

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971)........................................................ 4, 5, 9, 14

*Kungys v. United States*,
485 U.S. 759 (1988)......................................................................12

*Loper Bright Enters. v. Raimondo*,
No. 22-451, 2024 WL 3208360 (U.S. June 28, 2024)...............2, 17

*Louisiana v. U.S. Env't Prot. Agency*,
No. 2:23-CV-00692, 2024 WL 250798 (W.D. La. Jan. 23, 2024).................21

*Luis v. United States*,
578 U.S. 5 (2016)..........................................................................13

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
819 F.3d 581 (2d. Cir. 2016)........................................................24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ..................................................................19

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*
  ("*NFIB*"),
  595 U.S. 109 (2022) (per curiam) ..............................................19

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999) ..................................................................14

*Orloff v. FCC*,
  352 F.3d 415 (D.C. Cir. 2003) ..................................................20

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ..................................................................17

*Smith v. City of Jackson*,
  544 U.S. 228 (2005) ........................................................ *passim*

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ........................................................ *passim*

*Town of Huntington v. Huntington Branch, NAACP*,
  488 U.S. 15 (1988) (per curiam), *aff'g* 844 F.2d 926 (2d Cir. 1988) ...........23

*United States v. Paz*,
  411 F.3d 906 (8th Cir. 2005) .....................................................17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ..................................................................16

*Waters v. Madson*,
  921 F.3d 725 (8th Cir. 2019) .....................................................17

*West Virginia v. Env't Prot. Agency*,
  597 U.S. 697 (2022) .......................................................... 18, 19

**Statutes**

29 U.S.C. § 623 .............................................................................6

42 U.S.C. § 2000e-2 .......................................................................5

42 U.S.C. § 3604 ........................................................................7, 16

47 U.S.C § 1701 .................................................................................11

47 U.S.C. § 151 ..................................................................................19

47 U.S.C. § 153 ..................................................................................10

47 U.S.C. § 1722 ................................................................................11

47 U.S.C. § 1754 .......................................................................... *passim*

47 U.S.C. § 201 ..................................................................................10

47 U.S.C. § 202 ..................................................................................19

**Other Authorities**

*Objective*, Merriam Webster,
   https://www.merriam-webster.com/dictionary/objective (last visited July 1,
   2024) ...............................................................................................12

*Prevent*, Merriam-Webster,
   https://www.merriam-webster.com/dictionary/prevent (last visited July 1,
   2024). ..............................................................................................12

Thomas M. Cooley, *Constitutional Limitations* (1868) ..........................................13

# SUMMARY OF THE ARGUMENT[1]

A digital divide separates the United States. Because of one's race or income, a person may receive worse broadband internet service or no service at all. Congress passed the Infrastructure and Investment Jobs Act (IIJA or "Act") to bridge that divide. Section 60506 explicitly states that objective and requires the Federal Communications Commission ("FCC") to regulate to achieve equal access to broadband. It authorizes FCC's disparate-impact rules.

First, Congress authorized FCC to promulgate rules covering disparate impact. Subsection 60506(a) explicitly states Congress's intent that consumers "benefit from equal access" to broadband. 47 U.S.C. § 1754(a)(1). It defines equal access in terms of "equal opportunity," a core concept underpinning disparate impact. *Id.* § 1754(a)(2). And it instructs FCC to "take steps to ensure that all people of the United States benefit from equal access" to broadband. *Id.* § 1754(a)(3). Subsection 60506(b) reiterates FCC's obligation "to facilitate equal access," and tells FCC how to accomplish that "objective": by issuing rules "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." Congress directed that those rules take into account "issues of

---

[1] Public-Interest Intervenors adopt FCC's Summary of the Case, Jurisdictional Statement, Statement of the Issues 1-5, Statement of the Case Sections A and B.1-B.2, and arguments regarding issues raised by Industry Petitioners unaddressed in this brief. *See* Resp'ts' Br. Arg't Sections III-V.

technical and economic feasibility," a clause that would become superfluous if the statute only covered disparate treatment. *Id*. § 1754(b). Paragraph (b)(2) further supports the disparate-impact coverage of the statute, instructing FCC to identify "necessary steps" to take to "eliminate discrimination" in broadband.

Second, FCC's adoption of disparate-impact rules is entitled to deference under *Loper Bright Enterprises v. Raimondo*, No. 22-451, 2024 WL 3208360 (U.S. June 28, 2024). *Loper Bright* holds that courts must "respect" Congress's appropriate delegations of authority to agencies. *Id.* at *22. Such is the case here. Congress gave FCC broad discretion to promulgate "rules to facilitate equal access to broadband ... including" preventing and eliminating digital discrimination. 47 U.S.C. § 1754(b).

Third, there is no major questions issue. Unlike old, rarely-used, ancillary provisions comprising most major questions cases, Section 60506 is a new statute granting FCC expansive authority to facilitate equal access. FCC has not changed a longstanding interpretation, nor attempted to enter an economic or political sphere that it was not directed to address. Even if major questions did apply, Congress clearly authorized FCC to promulgate disparate-impact rules.

Finally, Industry Petitioners' challenge to the burden-shifting framework is meritless. They ask this Court to override the statute's plain text with a framework Congress chose not to employ. The Order's technical and economic feasibility defense follows the statute and the cautionary principles of *Texas Department of*

*Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).

The Court should uphold FCC's anti-discrimination rules.

**ARGUMENT**

**I.     Congress authorized FCC to issue disparate impact rules.**

Decades of Supreme Court precedent establish that anti-discrimination laws encompass disparate impact when statutory language aims at outcomes and effects, does not focus exclusively on intent, and is consistent with statutory purpose. Section 60506 contains all the hallmarks of disparate-impact coverage. Subsection 60506(a) states the result Congress sought to achieve—to provide the benefits of "equal access to broadband." 47 U.S.C. § 1754(a)(1). Subsection (b) likewise is results oriented. Congress instructed FCC to achieve the "objective" in Subsection (a), including by preventing digital discrimination of access and identifying necessary steps to take to eliminate such discrimination. Indeed, reading Section 60506 to cover only disparate treatment would render superfluous parts of Subsection (b)—specifically, that FCC consider technical and economic feasibility.

**A.     Faithful consideration of Section 60506 in its entirety shows it authorizes disparate-impact coverage.**

Section 60506 must be construed to encompass disparate impact if it "refers to the consequences of actions and not just to the mindset of actors," and if such "interpretation is consistent with statutory purpose." *Inclusive Communities*, 576 U.S. at 533.

In *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), the Court considered Title VII, which forbids an employer "to limit, segregate, or classify his employees or

applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's" protected characteristics. 42 U.S.C. § 2000e-2(a)(2). The Court held the statute covers disparate impact because "[t]he objective of Congress in the enactment of Title VII," which was "plain from the language of the statute," "was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs*, 401 U.S. at 429-30. The Court considered how Black people received "inferior education in segregated schools," and resulting consequences on supposedly neutral employment tests. *Id.* at 430. It held Title VII's promise of "equality of opportunity" requires "the posture and condition of the job-seeker be taken into account." *Id.* at 431. Thus, Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.*

Next, the Court considered the Emergency School Aid Act (ESAA). *Bd. of Educ. of City Sch. Dist. of City of New York v. Harris*, 444 U.S. 130 (1979). Congress passed ESAA to provide funding to eliminate school segregation and discrimination and their effects. *Id.* at 132. Educational agencies were ineligible if their practices or policies resulted "in the disproportionate demotion or dismissal of instructional or other personnel from minority groups" or if they "otherwise engaged in

5

discrimination." *Id.* at 132-33 (quoting ESAA). Reading the relevant provision "in its entirety," the Court held it covers disparate impact. *Id.* at 141. The Court reasoned ESAA had a "general impact orientation" and its "focus clearly is on actual effect, not on discriminatory intent." *Id.* at 141, 143. The "expressly .... stated purpose" was "elimination" of "minority group isolation," and the "pronouncement of federal policy" spoke "in terms of national uniformity with respect to conditions of segregation by race in the schools." *Id.* at 141 (cleaned up). Thus, "it was effect, and not intent, that was dominant in the congressional mind when ESAA was enacted." *Id.*

The Court addressed disparate impact again in *Smith v. City of Jackson*, 544 U.S. 228 (2005), when it considered the Age Discrimination in Employment Act (ADEA). ADEA forbids an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2). A plurality relied on several indicia to hold ADEA covers disparate impact. First, the provision "focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer." *Smith*, 544 U.S. at 236. Second, like *Griggs*, the record showed Congress "ruled out discrimination based on racial animus as a problem." *Id.* at 235 n.5. Third, another provision would be largely superfluous without disparate impact coverage. *Id.* at

238-39 (holding "reasonable factors other than age" provision was "simply unnecessary to avoid liability" in disparate-treatment actions and played its "principal role" in disparate-impact cases); *see also id.* at 246 (Scalia, J., concurring) (provision is relevant "*only* as a response to employer actions 'otherwise prohibited' by the ADEA").

In 2015, in *Inclusive Communities*, the Court reaffirmed the principles of *Griggs*, *Harris*, and *Smith*. The Fair Housing Act (FHA) makes it unlawful "to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The Court held "antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose." *Inclusive Communities*, 576 U.S. at 533.

FHA covers disparate impact for several reasons. It uses the phrase "otherwise make unavailable," which "refers to the consequences of an action rather than the actor's intent." *Id.* at 534. Similar phrases in Title VII, ADEA, and FHA "serve[d] as catchall phrases looking to consequences, not intent." *Id.* at 534-35. It was immaterial that "Congress did not reiterate Title VII's exact language," "because to do so would have made the relevant sentence awkward," "unclear," "grammatically

obtuse," "difficult to interpret," and overbroad. *Id.* at 535. Recognizing disparate impact was also "consistent with the FHA's central purpose." *Id.* at 539. Disparate-impact suits allow developers "to vindicate the FHA's objectives" and play "a role in uncovering discriminatory intent." *Id.* at 540. Further, subsequent amendments contained exemptions that "would be superfluous if Congress had assumed that disparate-impact liability did not exist under the FHA." *Id.* at 537-38 (citation omitted).

**B.      Subsection 60506(a) states Congress's results-oriented intent.**

Subsection 60506(a) states Congress's intent to realize a specific result: achieving the benefits of equal access to broadband. It also states Congress's intent that FCC take steps to accomplish that result. Congress premised its goal on providing equal opportunity, which is the foundation of disparate-impact coverage.

Section 60506 unequivocally states Congress's intent. *See Harris*, 444 U.S. at 141 (relying on Congress's "expressly .... stated purpose"). In *Griggs*, *Smith*, and *Inclusive Communities*, the Court relied on legislative history and individual statutory phrases. Section 60506 is more explicit: "It is the policy of the United States that, insofar as technically and economically feasible ... subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service." 47 U.S.C. § 1754(a)(1). Congress defined "equal access" as "equal opportunity to subscribe to an offered service that provides

comparable" quality and terms. *Id.* § 1754(a)(2). Congress instructed that FCC "should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service." *Id.* § 1754(a)(3). Section 60506's goal is achieving the benefits of "equal access," defined as "equal opportunity," and FCC's mandate is to accomplish that goal.

By making "equal access" contingent on providing individuals with "equal opportunity," Congress ensured the statute covers disparate impact. "Equal opportunity" is the basis of *Smith* and *Griggs. See Smith*, 544 U.S. at 241 (plurality) (relying on "Congress' intent to give older workers employment opportunities whenever possible"); *Griggs*, 401 U.S. at 429-31 (because "[t]he objective of Congress in the enactment of Title VII" was "to achieve equality of employment opportunities," "tests or criteria for employment or promotion" that deny equal opportunity are unlawful). Congress could have defined "equal access" to mean broadband access free of disparate treatment. Instead, it wrote that subscribers should have "equal opportunity." 47 U.S.C. § 1754(a)(2).

Subsection 60506(a) contains other results-oriented language as well. To "benefit from" something is an end-result. *Id.* § 1754(a)(1), (3). And just as ESAA spoke "in terms of national uniformity," *see Harris*, 444 U.S. at 141, so too does Section 60506 seek "comparable" broadband service for "all people of the United States," 47 U.S.C. § 1754(a).

Industry Petitioners' argument that the definition of "equal access" is irrelevant because it appears in the statement of policy is meritless. Industry Br. 31. Definitions commonly appear in different sections or titles, let alone different subsections or paragraphs. *See, e.g.*, 47 U.S.C. §§ 153, 201 (Communications Act definitions and common carrier obligations). Moreover, the statute states the definition of "equal access" applies "for purposes of this section." 47 U.S.C. § 1754(a)(2). "There would be little use in such a glossary if we were free in despite of it to choose a meaning for ourselves." *Fox v. Standard Oil Co. of N.J.*, 294 U.S. 87, 96 (1935) (Cardozo, J.).

Industry Petitioners assert interpreting Section 60506 to cover disparate impact would conflict with IIJA's broader goals. This is improperly myopic, as it ignores Subsection 60506(a). *See Harris*, 444 U.S. at 141 (construing ESAA "in its entirety"). Nevertheless, *Smith* rejected the same argument. "[W]hile Congress may have intended to remedy disparate-impact-type situations through 'non-coercive measures' in part, there is nothing to suggest that it intended such measures to be the sole method of achieving the desired result of remedying practices that had an adverse effect on older workers." *Smith*, 544 U.S. at 236 n.7. So too here; Congress can address a problem with both carrots and sticks. Indeed, much of Industry Petitioners' brief amounts to little more than policy complaints—not legal disputes. *See* Industry Br. 41-46.

In any event, Congress's findings in other IIJA sections demonstrate Section 60506 matches IIJA's broader goals. In *Smith* and *Griggs*, the Court found the legislature had "ruled out discrimination based on racial animus" as the operative problem. *Smith*, 544 U.S. at 235 n.5 (plurality). Likewise, here, IIJA's findings do not mention "intentional discrimination" or "disparate treatment." *See* App. ___ (*Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-100 (rel. Nov. 20, 2023) ("Order") ¶ 47). Instead, IIJA discusses "[t]he digital divide" and how it "disproportionately affects communities of color, lower-income areas, and rural areas," 47 U.S.C § 1701(3), and describes how lack of equal access to broadband "materially harms" people, *id.* § 1722(2). These are results-oriented statements that signify disparate-impact coverage.

C.    **Subsection (b) directs FCC to accomplish the goals Congress established in Subsection (a).**

Subsection (b) begins by restating Congress's intent that FCC implement Congress's "objective" of achieving equal access to broadband. It directs FCC to "adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective." 47 U.S.C. § 1754(b).

This provision commits FCC to accomplishing a result and affords FCC flexibility for how to get there. Congress even described its mandate as an "objective." *See* *Objective*, Merriam Webster, https://www.merriam-webster.com/dictionary/objective (last visited July 1, 2024) ("[S]omething toward which effort is directed: an aim, goal, or end of action."). Further, facilitating equal access to subscribe to broadband necessarily requires determining, and then restricting, policies and practices depriving individuals of equal access. Industry Petitioners' assertion—without citation or explanation—that this language provides no interpretive value for Paragraphs (b)(1) or (b)(2) because it is located in an umbrella paragraph, Industry Br. 31-32, flouts basic rules of construction and would render those paragraphs unintelligible. *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J., plurality) ("[N]o provision should be construed to be entirely redundant.").

Paragraph (b)(1) contains specific instructions on how to implement Congress's goal. FCC's rules must include "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." 47 U.S.C. § 1754(b)(1). Congress could have instructed FCC merely to make discrimination unlawful, but instead it required FCC to "prevent" discrimination. *See* *Prevent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/prevent (last visited July 1, 2024) (to "keep [something]

from happening or existing."). If an action is necessary to accomplish the goal of "preventing digital discrimination," FCC can take that action. *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) ("[W]here a general power is conferred or duty enjoined, every particular power necessary for the exercise of the one, or the performance of the other, is also conferred." (quoting Thomas M. Cooley, *Constitutional Limitations* 63 (1868)). Thus, even if "digital discrimination of access" only referred to disparate treatment, FCC is authorized to adopt disparate impact regulations if doing so will "prevent" disparate treatment. This reasoning was central to the Court's holding in *Inclusive Communities*:

> Recognition of disparate-impact liability under the FHA also plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment. In this way disparate-impact liability may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping.

576 U.S. at 540.

Paragraph (b)(2) further empowers FCC to achieve Congress's objective. FCC must "identify[] necessary steps ... to take to eliminate discrimination described in paragraph (1)." 47 U.S.C. § 1754(b)(2). This catchall provision is similar to those the Court relied upon in *Inclusive Communities*, *Smith*, and *Griggs*, and further demonstrates Section 60506's results-oriented structure and FCC's broad authority.

*See Inclusive Communities*, 576 U.S. at 534-35; Industry Br. 33 ("Subsection (b)(2) goes beyond the prohibition on disparate treatment in Subsection (b)(1).").

Industry Petitioners argue the phrase "discrimination ... based on" cabins FCC to prohibiting disparate-treatment discrimination. Industry Br. 26. First, the Supreme Court already has rejected that the term "because of" limited FHA, Title VII, and ADEA to disparate treatment. *See Inclusive Communities*, 576 U.S. at 535. As Industry Petitioners note, "because of" is synonymous with "based on." Industry Br. 25-26.

Second, Industry Petitioners' cases merely say that "discrimination" includes disparate treatment, not that it precludes disparate impact. *See* Industry Br. 24-25. To the contrary, *Harris* held that "discrimination" can include disparate impact. *See* 444 U.S. at 149. Indeed, Industry Petitioners' cases stem from *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), in which Justice Thomas likewise described "disparate impact" as a "form[] of 'discrimination.'" *Olmstead*, 527 U.S. at 617 n.2 (Thomas, J., dissenting) (citing *Griggs*, 401 U.S. at 431). Moreover, both the majority and Justice Stevens' concurrence reiterated the importance of congressional findings for determining the scope and meaning of the statute's use of "discrimination." *See id.* at 600; *id.* at 613 (Stevens, J., concurring) (Congressional findings "serve as a useful aid for courts to discern the sorts of discrimination with which Congress was concerned" and "have clear bearing on the issues raised in this

case."). Here, Section 60506's policy provisions demonstrate that its use of "discrimination" includes disparate impact. *See supra* Section I.B.

Finally, contrary to Industry Petitioners' argument, Industry Br. 27-30, it makes sense that Section 60506 does not use the "otherwise" clauses from other civil rights statutes. Section 60506 is structured fundamentally differently from those statutes—it does not directly regulate actors. Instead, it gives FCC broad authority to regulate to achieve a congressionally-mandated result. Gratuitously inserting that phrasing would be "awkward and unclear," *Inclusive Communities*, 576 U.S. at 535, and superfluous.

### D.    The technical and economic feasibility consideration indicates Section 60506 covers disparate impact.

Congress's inclusion of the technical and economic feasibility clause in Subsection (b)'s umbrella paragraph demonstrates disparate-impact coverage. Section 60506 states FCC "shall adopt final rules ... taking into account the issues of technical and economic feasibility presented by" the objective of facilitating equal access. 47 U.S.C. § 1754(b). Reading Section 60506 to cover only disparate treatment would render this clause superfluous.

In most disparate-treatment cases, technical and economic feasibility is irrelevant. *See Inclusive Communities*, 576 U.S. at 537-38 (exemptions would be superfluous if Title VII covered only disparate treatment); *Smith*, 544 U.S. at 238-39 (same as to "reasonable factors other than age" provision). No technical issue

could justify intentional, race-based discrimination. For example, it would be unreasonable for a provider to intentionally throttle only Black subscribers' internet speeds to maintain network stability. And while income-level discrimination may implicate economic feasibility, there is no scenario in which economic feasibility could ever justify intentional race discrimination. A provider that could only afford to upgrade infrastructure in one of two neighborhoods could not choose based on race.

Industry Petitioners respond with two arguments. First, they argue one purpose of the feasibility clause is to limit FCC's authority to "facilitate equal access" in the umbrella paragraph and to "eliminate discrimination" in Paragraph (b)(2). Industry Br. 32-33. But because the clause appears in the umbrella paragraph, it modifies both (b)(1) and (b)(2) and must make sense when applied to both. For example, FHA has a similar preamble identifying exceptions to its anti-discrimination provisions. *See* 42 U.S.C. § 3604.

Second, they assert that technical and economic feasibility can inform intentional discrimination cases that rely solely on disparate-impact theories. Industry Br. 33-34. But cases in which disparate impact alone can prove intentional discrimination are "rare," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), meaning the provision plays its "principal role" by limiting

disparate impact, *Smith*, 544 U.S. at 239 (plurality). Moreover, Industry Petitioners' argument concedes that the clause is relevant to disparate impact.

## II.   *Loper Bright* **supports deference to FCC.**

Industry Petitioners' single conclusory footnote, Industry Br. 34 n.2, is not enough to preserve the argument that FCC's interpretation of Section 60506 is not entitled to deference. *See, e.g.*, *Waters v. Madson*, 921 F.3d 725, 744 (8th Cir. 2019) (party waived issue because it failed to provide "meaningful argument"); *United States v. Paz*, 411 F.3d 906, 911 n.4 (8th Cir. 2005) ("fleeting references" insufficient to preserve issue).[2]

In any event, *Loper Bright* supports deferring to FCC's application of its authority. In overturning *Chevron*, the Court differentiated statutory ambiguities from delegations of authority. *See Loper Bright*, 2024 WL 3208360 at *13-14, 17. Where, as here, Congress "delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at *22. FCC's interpretation is also persuasive because of its "'body of experience and informed judgment,'" and because the Order was substantially "issued contemporaneously" with Section 60506. *Id.* at *13 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). FCC is entitled to deference

---

[2] Similarly, Industry Petitioners' passing reference to vagueness and nondelegation "concerns," Industry Br. 41, do not suffice to preserve those issues. Regardless, their concerns are unfounded. *See* Resp'ts' Br. 49-51.

regarding its determination of what rules are appropriate to achieve Section 60506's purpose.

### III.   The major questions doctrine does not apply.

Several factors affect whether the major questions doctrine applies. First, it only applies when agencies "assert[] highly consequential power beyond what Congress could reasonably be understood to have granted it." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724 (2022). *West Virginia* invalidated an EPA rule regulating greenhouse gases. The Court held EPA concocted "newfound power in the vague language" of an "ancillary provision," a "previously little-used backwater" of the statute that had only been used "a handful of times" since its enactment decades ago and "was designed to function as a gap filler." *Id.* at 710, 724, 730 (cleaned up). In contrast, courts have rejected application of the doctrine where Congress uses "expansive language" and "a relatively broad delegation of authority." *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 726 (10th Cir. 2024) (citation omitted).

Second, in practically all major questions cases, an agency discovers new powers in an old, modestly-used provision, or the agency fundamentally changes its statutory interpretation. *See, e.g.*, *West Virginia*, 597 U.S. at 724-26; *Biden v. Nebraska*, 600 U.S. ___, 143 S. Ct. 2355, 2372 (2023); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.* ("*NFIB*"), 595 U.S. 109, 118-

19 (2022) (per curiam). Sometimes, the agency must develop new technical and policy expertise for the rule. *See West Virgnia*, 597 U.S. at 728-29.

Third, major questions cases concern "extraordinary" issues of "vast economic and political significance." *West Virginia*, 597 U.S. at 716, 721 (citations omitted). Examples include the imposition of a nationwide carbon cap-and-trade system, *id.* at 731-32; releasing 43 million borrowers from $430 billion in student loans, *Nebraska*, 143 S. Ct. at 2372-73; ordering "84 million Americans to either obtain a COVID–19 vaccine or undergo weekly medical testing at their own expense," *NFIB*, 595 U.S. at 117; and the ability to ban tobacco products, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).

The major questions doctrine does not apply here. Section 60506 is no "gap filler" or "ancillary" provision, and its provisions are not vague. Congress understood exactly the "expansive" authority it was granting FCC, *Bradford*, 101 F.4th at 726, and stated in the statute what it was doing and why it was doing it. Section 60506 is not an old, rarely-used statute under which FCC suddenly discovered new powers or changed a prior interpretation. FCC has longstanding technical and policy expertise in ensuring equal access to telecommunications services. *See, e.g.*, 47 U.S.C. §§ 151, 202(a); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1003 (2005); *Orloff v. FCC*, 352 F.3d 415,

420-21 (D.C. Cir. 2003) (FCC rule addressing race and income discrimination by common carriers).

Though disparate-impact coverage benefits subscribers, establishing disparate-impact coverage is not an "extraordinary" issue of "vast economic and political significance." As a threshold matter, none of Industry Petitioners' arguments on economic and political significance are rooted in the administrative record. Next, the economic effects of FCC's rule extend only as far as the economic effects of policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband based on protected characteristics. *See Bradford*, 101 F.4th at 725 n.5 (holding scope of the major questions doctrine is limited to the "effects of the challenged action"). The existence of the "broadband ... industry," Industry Br. 48-49, is not at stake. Moreover, while Industry Petitioners suggest *prima facie* showings of disparate impact trigger automatic liability, *id.* at 43, providers can present defenses. And, contrary to Industry Petitioners' assertions, providers cannot be held liable for mere statistical differences in impact—disparate impact contains a "robust causality requirement." *Inclusive Communities*, 576 U.S. at 521. Industry Petitioners also speculate about potentially lost future investment. Industry Br. 49. The Court should disregard their conjecture, as FCC's advisory-opinion process allows entities to seek guidance without risking liability. *See* App. __ (Order ¶ 146).

As for political significance, Industry Petitioners' only support for "political controversy" about disparate impact are two law review articles published before *Inclusive Communities* and a news article discussing actions one administration considered but never took. Industry Br. 50. The two district court cases they cite are inapposite. *See Louisiana v. U.S. Env't Prot. Agency*, No. 2:23-CV-00692, 2024 WL 250798 (W.D. La. Jan. 23, 2024) (Spending Clause regulation); *Chamber of Com. of U.S. of Am. v. Consumer Fin. Prot. Bureau*, 691 F. Supp. 3d 730 (E.D. Tex. 2023) ("UDAAP" statute).

Finally, even if major questions does apply, Congress clearly authorized FCC to cover disparate impact. *See supra* Section I.

## IV.    The burden-shifting framework is appropriate.

Industry Petitioners' challenges to the burden-shifting framework are meritless. First, they ask this Court to subvert statutory text with a framework Congress chose not to employ. *Inclusive Communities* does not dictate a specific burden-shifting formulation and the Order is consistent with that decision. Second, their other challenges are similarly unfounded because FCC acted consistent with its statutory authority and precedent.

### A.    FCC adhered to the statutory text.

Industry Petitioners seek to replace the plain text of Section 60506 with another agency's regulations.

Industry Petitioners argue FCC should have adopted a different defense: that a respondent be allowed to "prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Inclusive Communities*, 576 U.S. at 527 (cleaned up); Industry Br. 53-56. But *Inclusive Communities* did not require this formulation; Industry Petitioners are citing procedural history recounting FHA regulations. Rather, the Court said, "An important and appropriate means of ensuring that disparate-impact liability is properly limited is to give [respondents] leeway to state and explain the valid interest served by their policies." *Inclusive Communities*, 576 U.S. at 541. The Court gave cautionary principles and upheld the FHA regulations but did not hold an identical defense was required for *all* disparate-impact regimes. *See id.* at 541-42. Indeed, the Court recognized that Title VII's rules can be different from FHA's. *See id.*

Congress chose a different formulation for the broadband context. Subsection 60506(b) states FCC must "tak[e] into account the issues of technical and economic feasibility" when composing its rules. 47 U.S.C. § 1754(b). And Congress stated its intent: "It is the policy of the United States that, insofar as technically and economically feasible," subscribers benefit from equal access to broadband. *Id.* § 1754(a). The statute does not authorize FCC to contrive additional defenses. FCC followed Congress's instructions.

Moreover, the Order's framework is consistent with *Inclusive Communities*: FCC shall determine whether there is (1) a disparate impact; (2) a genuine issue of technical and economic feasibility justifying such impact; and (3) a reasonably achievable less discriminatory alternative. App. __ (Order ¶¶ 138-40). Industry Petitioners prefer a broader defense at step two, but they do not identify any concrete example where their preferred test would produce different results. They do not show any action that a "substantial, legitimate, nondiscriminatory" defense would justify that the technical and economic feasibility defense would not also justify. Indeed, Industry Petitioners do not pinpoint any particularized harm at all. Industry Br. 55-56.

## B. The Order appropriately addresses less discriminatory alternatives and single instances.

Industry Petitioners' remaining challenges to the burden-shifting framework are similarly unfounded.

First, contrary to Industry Petitioners' argument, Industry Br. 56-57, it does not violate *Inclusive Communities* to put the burden on respondent at step three. Again, *Inclusive Communities* does not dictate a specific formulation for defenses. For example, it cited approvingly *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (per curiam), in which the Second Circuit placed the burden to show a less discriminatory alternative on the respondent. *See Inclusive*

*Communities*, 576 U.S. at 536, 539-40; *Huntington*, 844 F.2d 926, 939 (2d. Cir. 1988), *aff'd* 488 U.S. 15 (1988) (per curiam).

Second, Industry Petitioners are incorrect that FCC cannot establish rules allowing liability for "single instance[s]." Industry Br. 57 (cleaned up). Congress authorized FCC to write rules to prevent and eliminate discrimination. 47 U.S.C. § 1754(b). The Order appropriately determined that single instances need to be addressed. Courts have recognized a single instance *can* reflect a discriminatory policy. *See Inclusive Communities¸* 576 U.S. at 543; *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 619 (2d. Cir. 2016) (single decision may be an actionable policy) (collecting cases).

## CONCLUSION

The Court should uphold the Order's anti-discrimination rules.

Dated: July 3, 2024          Respectfully submitted,

By: */s/ Marc P. Epstein*
Edward G. Caspar
David Brody
Marc P. Epstein
Alizeh Ahmad
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8600
ecaspar@lawyerscommittee.org
dbrody@lawyerscommittee.org
mepstein@lawyerscommittee.org
aahmad@lawyerscommittee.org

*Counsel for Petitioners Media*
*Alliance and Great Public*
*Schools Now*

Andrew Jay Schwartzman
BENTON INSTITUTE FOR
BROADBAND & SOCIETY
525 9th Street N.W., 7th Floor
Washington, D.C. 20004
(202) 241-2408
AndySchwartzman@gmail.com

*Counsel for Petitioner Benton*
*Institute for Broadband &*
*Society*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limit set by the Court's April 2, 2024 Order, Entry ID 5379523, and by Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 4994 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.     Pursuant to Eight Circuit Local Rule 28A(h)(2), this brief, the accompanying certificates, and the addendum have been scanned for viruses, and no viruses have been detected.

Dated: July 3, 2024          */s/ Marc P. Epstein*
                                 Marc P. Epstein

**CERTIFICATE OF SERVICE**

I certify that on July 3, 2024, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

*/s/ Marc P. Epstein*
Marc P. Epstein