# In the United States Court of Appeals for the Eighth Circuit

MINNESOTA TELECOM ALLIANCE, ET AL.,
*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,
*Respondents.*

On Petition for Review from the
Federal Communications Commission
(No. 22-69, FCC 23-100)

## REPLY BRIEF FOR INDUSTRY PETITIONERS

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for Petitioner the
Chamber of Commerce of the
United States of America*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Counsel for Petitioners the
Chamber of Commerce of the
United States of America, Texas
Association of Business, and
Longview Chamber of Commerce*

*(Additional counsel on next page)*

Roman Martinez
Matthew A. Brill
Blake E. Stafford
Latham & Watkins LLP
555 Eleventh Street NW,
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioners
MCTA – The Missouri Internet
& Television Association, Ohio
Cable Telecommunications
Association, Florida Internet &
Television Association, Texas
Cable Association, and NCTA –
The Internet & Television
Association*

Michael H. Pryor
Brownstein Hyatt Farber
Schreck, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

David B. Meschke
Rosa L. Baum
Brownstein Hyatt Farber
Schreck, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202

*Counsel for Petitioner National
Multifamily Housing Council,
Inc.*

Thomas Scott Thompson
Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
(202) 434-7440
SThompson@mintz.com

*Counsel for Petitioners the
Wireless Infrastructure
Association, Power &
Communications Contractors
Association, and NATE: The
Communications Infrastructure
Contractors Association*

Thomas M. Johnson, Jr.
Jeremy J. Broggi
Michael J. Showalter
Boyd Garriott
William Turner
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

*Counsel for Petitioners
Minnesota Telecom Alliance,
Ohio Telecom Association,
USTelecom – The Broadband
Association, CTIA – The
Wireless Association, Broadband
Association of Alabama and
Mississippi, Texas Telephone
Association, and WISPA – The
Association For Broadband
Without Boundaries*

JEFFREY A. LAMKEN
RAYINER I. HASHEM
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue NW
Washington, DC 20037
(202) 556-2024
jlamken@mololamken.com

*Counsel for Petitioner ACA
Connects – America's
Communications Association*

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 416-6744
scoran@lermansenter.com

*Counsel for Petitioner WISPA –
The Association For Broadband
Without Boundaries*

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................1

ARGUMENT ......................................................................4

I.   THE COMMISSION LACKS STATUTORY AUTHORITY TO IMPOSE DISPARATE-IMPACT LIABILITY.......................................4

    A.   The Plain Text Of Section 60506(b)(1) Invokes Disparate Treatment, Not Disparate Impact .......................................4

        1.   The operative language of Section 60506(b)(1) is limited to disparate treatment .................................4

        2.   The Commission's textual arguments outside of Section 60506(b)(1) are misguided ..........................9

    B.   Other Interpretive Tools Confirm The Plain Text.......................14

        1.   The legislative history is silent about disparate-impact liability..................................................14

        2.   Congress did not silently authorize a rule with such drastic consequences ...........................................16

        3.   Congress did not silently undermine its own specific policy judgments through disparate-impact liability .........20

    C.   At A Minimum, The Rule Cannot Survive The Major-Questions Doctrine..............................................24

II.   THE COMMISSION LACKS STATUTORY AUTHORITY FOR ITS BURDEN-SHIFTING FRAMEWORK.................................27

III.   THE COMMISSION LACKS STATUTORY AUTHORITY TO REGULATE ENTITIES OTHER THAN INTERNET SERVICE PROVIDERS...........................................33

    A.   The Commission's Regulation Of Non-ISPs Finds No Support In Statutory Text, Structure, Or Precedent...................34

B.     The Major-Questions Doctrine Confirms The Commission's Lack Of Authority ............................................................... 39

IV.    THE COMMISSION LACKS STATUTORY AUTHORITY TO ENFORCE THE RULE WITH BACKWARD-LOOKING MONETARY FORFEITURES ............................................. 40

A.     The Commission Lacks Authority Under Section 60506 To Impose Monetary Forfeitures ........................................ 40

B.     The Commission Lacks Ancillary Authority Under Section 4(i) Of The Communications Act To Impose Monetary Forfeitures ......................................................... 44

V.     THE ORDER IS ARBITRARY AND CAPRICIOUS .......................... 47

A.     The Commission Failed To Justify Its Departure From The *Inclusive Communities* Burden-Shifting Framework ........ 47

B.     The Commission Failed To Justify The Rule's Costs and Coverage ............................................................. 48

CONCLUSION .................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahlberg* v. *Chrysler Corp.*,
481 F.3d 630 (8th Cir. 2007)..................................................19

*Artola* v. *Garland*,
996 F.3d 840 (8th Cir. 2021)..................................................13

*Biden* v. *Nebraska*,
143 S. Ct. 2355 (2023) .........................................................25

*Board of Education* v. *Harris*,
444 U.S. 130 (1979).............................................................6

*Brazil* v. *Auto-Owners Ins. Co.*,
3 F.4th 1040 (8th Cir. 2021) .................................................13

*Brnovich* v. *Democratic Nat'l Comm.*,
594 U.S. 647 (2021).............................................................10

*Building Owners & Managers Ass'n International* v. *FCC*,
254 F.3d 89 (D.C. Cir. 2001) .................................................36

*Chisom* v. *Roemer*,
501 U.S. 380 (1991).............................................................15

*Comcast Corp.* v. *FCC*,
600 F.3d 642 (D.C. Cir. 2010)...........................................45, 46

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009).............................................................47

*FCC* v. *Fox Television Stations, Inc.*,
567 U.S. 239 (2012).............................................................17

*FERC* v. *Electric Power Supply Ass'n*,
577 U.S. 260 (2016).............................................................22

iii

*Hanson* v. *Veterans Administration*,
    800 F.2d 1381 (5th Cir. 1986) ........................................................37

*ICC* v. *American Trucking Ass'ns*,
    467 U.S. 354 (1984) ........................................................................41

*Jackson* v. *Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ..........................................................................4

*Koons Buick Pontiac GMC, Inc.* v. *Nigh*,
    543 U.S. 50 (2004) ..........................................................................15

*Loper Bright Enterprises* v. *Raimondo*,
    144 S. Ct. 2244 (2024) ...............................................13, 14, 37, 43

*Mhany Management, Inc.* v. *County of Nassau*,
    819 F.3d 581 (2d Cir. 2016) ..........................................................32

*Mumid* v. *Abraham Lincoln High Sch.*,
    618 F.3d 789 (8th Cir. 2010) ........................................................26

*NAACP* v. *American Family Mutual Ins. Co.*,
    978 F.2d 287 (7th Cir. 1992) ........................................................37

*O'Brien* v. *Caterpillar Inc.*,
    900 F.3d 923 (7th Cir. 2018) ........................................................33

*Ohio* v. *EPA*,
    144 S. Ct. 2040 (2024) ............................................................48, 49

*Red River Valley Sugarbeet Growers Ass'n* v. *Regan*,
    85 F.4th 881 (8th Cir. 2023) ........................................................49

*Rodriguez* v. *United States*,
    480 U.S. 522 (1987) ........................................................................46

*Russello* v. *United States*,
    464 U.S. 16 (1983) ..........................................................................43

*SEC* v. *Graham*,
    823 F.3d 1357 (11th Cir. 2016) ....................................................42

*SEC* v. *Jarkesy*,
 144 S. Ct. 2117 (2024) ........................................................43

*Smith* v. *Robinson*,
 468 U.S. 992 (1984)...........................................................8, 9

*Sturgis Motorcycle Rally, Inc.* v. *Rushmore Photo & Gifts, Inc.*,
 908 F.3d 313 (8th Cir. 2018)................................................19

*Texas Department of Housing & Community Affairs* v.
 *Inclusive Communities Project, Inc.*,
 576 U.S. 519 (2015)......................................................*passim*

*United States* v. *Philip Morris USA, Inc.*,
 396 F.3d 1190 (D.C. Cir. 2005)............................................42

*West Virginia* v. *EPA*,
 597 U.S. 697 (2002)............................................................25

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................47

20 U.S.C. § 1415(*l*).....................................................................9

29 U.S.C. § 623(a)......................................................................5

42 U.S.C. § 2000e–2(a)...............................................................5

47 U.S.C.
 § 151.................................................................................25
 § 208.................................................................................44
 § 209.................................................................................44
 § 503.................................................................................44
 § 1702...............................................................................21
 § 1754........................................................................*passim*

Infrastructure Investment and Jobs Act,
 Pub. L. No. 117-58, 135 Stat. 249 ...................................24, 43

**Regulations**

47 C.F.R.
§ 16.2................................................................................................16, 29
§ 16.5................................................................................................29, 31

**INTRODUCTION**

Section 60506(b)(1) directs the Commission to prevent "digital *discrimination* of access *based on* income level, race, ethnicity, color, religion, or national origin." 47 U.S.C. § 1754(b)(1) (emphases added). The Commission does not dispute that the Supreme Court has repeatedly interpreted those terms to forbid disparate treatment, not disparate impact. That textual point alone resolves this case. The Commission offers no plausible reason why Congress would have used classic disparate-treatment language to create a disparate-impact regime, let alone an unprecedented regime in which the Commission can regulate ordinary business practices that have what the Commission deems "unjustified discriminatory effects." Br. i, 4, 13, 16, 18.

The Commission tries to shift attention to Congress's "[s]tatement of policy" that consumers should have "the equal opportunity to subscribe" to broadband, 47 U.S.C. § 1754(a)(2), but that policy goal is hardly a signal to focus on outcomes. "Equal opportunity" is more consistent with a prohibition on disparate treatment than a prohibition on disparate impact: consumers should not be blocked from subscribing to broadband by intentional discrimination based on the protected characteristics. Congress's objective of

equal opportunity in the statute's policy statement thus accords with its use of disparate-treatment language in the statute's operative text.  The Commission cannot contort the text to execute a massive power grab that Congress never intended.

The Commission strains just as much to defend the other aspects of its rule.  The Commission does not dispute that a disparate-impact regime based on income level would be unprecedented.  Far from denying the rule's broad sweep, the Commission agrees that the rule empowers it to take enforcement action against all manner of "covered entities" based on benign and commonplace business practices like marketing, discounts, and pricing.  The Commission promises to use those near-plenary powers judiciously—only going after the practices that it deems unjustified.  A promise to "trust us" is not worth much.  And more to the point, it is simply not plausible that the bipartisan Congress that enacted Section 60506 handed the Commission a blank check.

The Commission elsewhere defends a rule that its policymakers did not write.  In response to Industry Petitioners' argument that a disparate-impact regime based on income would threaten uniform pricing, the Commission insists that its rule is about only the comparability of service terms—even

though the Order says otherwise.  And in response to Industry Petitioners' argument that the Commission's burden-shifting framework deviates from the framework that the Supreme Court endorsed in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Commission ignores the rule's text and (unlike its supporting intervenors) pretends that it adopted the *Inclusive Communities* framework all along.

On remedies, the Commission attacks a strawman, insisting that Congress would not have left it powerless to enforce rules promulgated under Section 60506.  But Industry Petitioners have never argued that the Commission lacks any enforcement authority.  Instead, they have challenged the Commission's assertion of the specific authority to punish violations using backward-looking monetary forfeitures—a remedy Congress never said a word about.  On that challenge, the Commission mostly deflects.

In the end, the Commission's inability to defend its rule should not be surprising.  Congress never said a word authorizing disparate-impact liability, let alone the inventive form of disparate-impact liability that the Commission adopted here.  Congress never gave the Commission authority to extend its rules beyond Internet service providers (ISPs).  And Congress never

empowered the Commission to pursue backward-looking monetary forfeitures for violations. At a bare minimum, the APA required the Commission to provide a reasoned explanation for its decision—and it failed that, too.

## ARGUMENT

## I. THE COMMISSION LACKS STATUTORY AUTHORITY TO IMPOSE DISPARATE-IMPACT LIABILITY.

### A. The Plain Text Of Section 60506(b)(1) Invokes Disparate Treatment, Not Disparate Impact.

The Commission rests its disparate-impact rule on Section 60506(b)(1), which authorizes the Commission to promulgate rules "preventing digital discrimination of access based on" certain enumerated characteristics. 47 U.S.C. § 1754(b)(1); *see* App. __ (Order ¶¶ 33, 61). That operative text includes disparate-treatment language, to which the Commission has no real response. And it does *not* include disparate-impact language, despite the Commission's attempts to find some statutory hook in other subsections.

#### 1. The operative language of Section 60506(b)(1) is limited to disparate treatment.

a. Section 60506(b)(1)'s critical statutory term is "discrimination," and "the normal definition of discrimination is differential treatment." *Jackson* v. *Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (internal quotation marks omitted); *see* Opening Br. 24-25. The Commission has no

answer to that key point. The Commission says that, "where warranted, the Supreme Court has construed federal statutes prohibiting 'discrimination' to encompass" disparate impact. Br. 28 (citing *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971) (Title VII); *Smith* v. *City of Jackson*, 544 U.S. 228 (2005) (ADEA); *Inclusive Communities*, 576 U.S. 519 (FHA)). But even in the Commission's best trio of cases, the Court did not interpret the word "discrimination" to cover disparate effects. Instead, the Court found some *other* authorization for disparate-impact liability elsewhere in the statute.

In all three statutes, the "operative text" that the Supreme Court held to create disparate-impact liability was a distinct "results-oriented phrase": "otherwise make unavailable" or "otherwise adversely affect." *Inclusive Communities*, 576 U.S. at 534-535; *see* Opening Br. 27-29. What is more, in both Title VII and the ADEA, those results-oriented phrases followed "lengthy sentences that begin with prohibitions on disparate treatment," *Inclusive Communities*, 576 U.S. at 534-535—meaning that the Court equated the statutes' initial prohibition on "discrimination" with disparate-treatment liability. *See* 42 U.S.C. § 2000e–2(a) (Title VII); 29 U.S.C. § 623(a) (ADEA). The Supreme Court's rare disparate-impact cases thus reject the proposition for which the Commission cites them.

The Commission responds that Congress may not have "reiterate[d] Title VII's exact language" because "to do so would have made the relevant sentence awkward." Br. 30 (quoting *Inclusive Communities*, 576 U.S. at 535). But that reasoning does not work here. Congress could easily have directed the Commission to promulgate rules outlawing actions that "discriminate or otherwise adversely affect digital access based on" the listed traits. Instead, Congress chose language that courts have repeatedly understood to cover only intentional discrimination.

The Commission's citation (at 28) to *Board of Education* v. *Harris*, 444 U.S. 130 (1979), is no better. The statute at issue there, the Emergency School Aid Act, declared public schools ineligible for funding if they "had in effect any practice" that "result[ed] in the disproportionate demotion or dismissal of instructional or other personnel from minority groups . . . or otherwise engaged in discrimination" in employment decisions. *Id.* at 132-133. The Supreme Court recognized that the "engaged in discrimination" clause, on a "mere reading of th[e] language," "might be said to possess an overtone of intent." *Id.* at 138-139. But it found that the statute as a whole was "focus[ed]" "on impact, not intent," given the language expressly addressing

the "result[]" of "disproportionate demotion or dismissal."  *Id.* at 142-143.

There is nothing like that language in Section 60506.

Section 60506(b)(1) further prohibits discrimination "based on" certain protected characteristics, which confirms that it covers only disparate treatment.  After all, for discrimination to be "based on" a certain trait, that trait must be the reason for the discrimination.  Opening Br. 25-26.  The Commission points out (at 29) that the statutes that authorize disparate-impact liability—Title VII, the ADEA, and the FHA—all include the phrase "because of," which is similar to "based on."  But again, in each of those statutes, the Court concluded that some other results-oriented language established an intent to go beyond disparate treatment and reach disparate impact.

At bottom, the terms "discrimination" and "based on" set a clear default of disparate treatment.  In a handful of unusual and statute-specific circumstances over the past 50 years, the Supreme Court has found that default overcome by other effects-oriented language that Congress enacted.  There is no similar effects-oriented language in Section 60506(b)(1) to overcome Congress's use of hallmark disparate-treatment language.  So reading the statute to cover only intentional discrimination is not "implicitly

limit[ing]" "Congress's mandate," as the Commission suggests (at 24)—it is giving ordinary meaning to the words Congress chose.

b.     The Commission offers two other arguments about the text of Section 60506(b)(1), but neither works.

First, the Commission argues that Section 60506(b)(1) encompasses disparate impact because it does not mention "a specific actor," and thus asks only "whether [discrimination] happened—not how or why it happened." Br. 26-27 (alteration in original).  That just assumes the conclusion:  that "discrimination" means differences in outcomes.  If "discrimination" means what it normally does—differences in treatment—then asking "whether discrimination happened" is asking whether disparate treatment occurred, without emphasizing at whose hands.

Second, the Commission briefly notes that the definition of "prevent"— as in, "preventing digital discrimination"—means "to render (an *intended, possible, or likely* action or event) impractical or impossible."  Br. 26-27 (emphasis in original).  The implication seems to be that Congress's use of the word "preventing" somehow suggests disparate impact.  That is meritless.  It is ordinary English to speak of "preventing" an intentional action, as the Commission's preferred definition reflects.  *See, e.g.*, *Smith* v. *Robinson*,

468 U.S. 992, 1016-1017 (1984), *superseded on other grounds*, 20 U.S.C. § 1415(*l*) (Section 504 of the Rehabilitation Act, a disparate-treatment statute, "prevents discrimination on the basis of handicap").

### 2. The Commission's textual arguments outside of Section 60506(b)(1) are misguided.

a. Stuck with the unambiguous operative language in Subsection (b)(1), the Commission scours other parts of Section 60506 for text that "refers to the consequences of actions." Br. 24. It primarily seizes on its overarching mandate to promulgate "rules to facilitate equal access," which Section 60506(a)(2) defines as the "equal opportunity to subscribe" to broadband. 47 U.S.C. § 1754(a)(2), (b). "Equal opportunity," the Commission argues (at 25), "focuses on the impact of a policy or practice" "rather than intent." That argument fails twice over.

First, the phrase "equal opportunity to subscribe" would be an exceedingly odd way to convey disparate-impact liability. The concept of equal opportunity is more consistent with preventing disparate treatment than disparate impact. Opportunity, after all, is about possibilities, not outcomes—as the Commission itself notes. *See* Br. 25 n.1 (explaining that "opportunity" ordinarily means "a *good chance* for advancement or progress") (emphasis added). Indeed, only five months before Section 60506 was enacted, the

Supreme Court rejected the argument that the Voting Rights Act's requirement of an "equally open" process, in which no member of any protected class has "less opportunity than other members of the electorate to" vote, created a "disparate-impact regime." *Brnovich* v. *Democratic Nat'l Comm.*, 594 U.S. 647, 666, 674-675 (2021) (quoting 52 U.S.C. § 10301); *see id.* at 671 ("The mere fact there is *some disparity in impact* does not necessarily mean that a system . . . does not give everyone *an equal opportunity* to vote.") (emphases added). Congress would not rationally have used language that the Supreme Court had just ruled does *not* create disparate-impact liability to achieve that exact result.

The Commission responds that *Brnovich* found "the disparate-impact analysis in Title VII and [FHA] cases to be unhelpful because '[t]he text of the relevant provisions . . . differ[s] from that of' the Voting Rights Act." Br. 26 (quoting *Brnovich*, 594 U.S. at 673). True about *Brnovich*—but also true here. Both the Voting Rights Act and Section 60506 talk about equal "opportunity." That language does not appear in Title VII and the FHA, which the Court has held include other language authorizing disparate-impact liability. *Brnovich* thus supports the conclusion that Section 60506 does not encompass disparate impact.

Second, even if "equal opportunity to subscribe" indicated equal outcomes, reading "digital discrimination of access" to prohibit only intentional discrimination would still make good sense. Section 60506(b) directs the Commission to "adopt final rules to facilitate equal access [*i.e.*, the equal opportunity to subscribe]," just one category of which is rules "preventing digital discrimination of access." 47 U.S.C. § 1754(b). The Commission need not accomplish that whole goal in its digital-discrimination rules alone. And a rule that prohibits intentional discrimination is undeniably one way to "facilitate[]" equal outcomes, since it ensures that no purposeful discrimination stands in the way of that result.

b. The Commission also contends (at 31) that the statute's technical- and economic-feasibility language would be "largely superfluous" if "digital discrimination" means disparate treatment. But neither the Commission nor its intervenors argue that feasibility plays *no* role in disparate-treatment cases. *See* Br. 32 (arguing that feasibility "would do *little work*" on Industry Petitioners' view) (emphasis added); Benton Br. 16 (arguing that feasibility "*rare*[*ly*]" plays a role) (emphasis added). Disparate-treatment plaintiffs sometimes rely on a statistical disparity to make their case; in response, defendants may invoke the infeasibility of eliminating such a disparity to

explain why it reflects something other than intentional discrimination. As the Commission says, feasibility would no doubt have a *bigger* role in a disparate-impact regime. But that is not how the rule against surplusage works. So long as the feasibility language is "doing some work," then the Commission has "fail[ed] to show surplusage." *Brazil* v. *Auto-Owners Ins. Co.*, 3 F.4th 1040, 1044 (8th Cir. 2021).

Moreover, even if the statute's technical- and economic-feasibility language did *zero* work in a disparate-treatment scheme, that language would still not be surplusage. Again, the digital-discrimination rule is only one of the rules Section 60506(b) contemplates will "facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective." 47 U.S.C. § 1754(b). The feasibility language tells the Commission to account for feasibility across the board. That does not mean that feasibility must impose a significant constraint on every rule.[1]

---

[1] In a different variant on its superfluity argument, the Commission contends that a prohibition on intentional discrimination would create a "redundan[cy]" with the nondiscrimination provisions in the Digital Equity Act and Broadband Equity, Access, and Deployment (BEAD) Program. *See* Br. 37 & n.6. But Section 60506(b)(1) still does plenty of independent work. Most importantly, as the Commission acknowledges (at 35), Section 60506(b)(1)

c.      Finally, the Commission requests deference to its interpretation of Section 60506(b)(1).  It argues (at 24, 64) that it has "reasonably" interpreted the text of Section 60506, and (at 23) that its interpretations are entitled to "controlling weight" unless "manifestly contrary to the statute."  The Supreme Court recently rejected that approach to interpreting statutes, overruling *Chevron* in *Loper Bright Enterprises* v. *Raimondo*, 144 S. Ct. 2244 (2024).  The Commission also contends (at 23-24) that it is entitled to "substantial deference" "[e]ven outside the *Chevron* framework," but *Loper Bright* forecloses deference by any name, except in narrow circumstances not present here.  *See Loper Bright*, 144 S. Ct. at 2263 & n.5.

For their part, the Benton Intervenors contend (at 17) that the Commission's interpretation should receive *Skidmore* respect because the agency has a "body of experience and informed judgment."  But *Skidmore* "applies only when the statute is ambiguous," *Artola* v. *Garland*, 996 F.3d 840, 842 n.1 (8th Cir. 2021), and Section 60506(b)(1) is not.  Even if it were, there is

_____

applies to "all broadband providers, even those who do not participate in the Infrastructure Act's funding programs."   In addition, neither the Digital Equity Act nor BEAD includes income level as a protected trait, contemplates any role for the Commission in enforcement, or suggests that "consumers or other members of the public" may lodge "public complaint[s]."   47 U.S.C. § 1754(e).

no reason to give the Commission's views special weight here. After all, this is the Federal *Communications* Commission—it has no "specialized experience" in antidiscrimination law. *Loper Bright*, 144 S. Ct. at 2259 (citation omitted). Simply put, the Commission has wandered far outside its traditional lane, and it is for this Court to determine the "best reading of the statute." *Id.* at 2263. The Commission's reading is not that.

## B.    Other Interpretive Tools Confirm The Plain Text.

Several other interpretive tools confirm that Section 60506 does not authorize disparate-impact liability. *See* Opening Br. 35-46. The Commission fails to plausibly explain why a bipartisan Congress would have granted such massive new authority to the FCC, in conflict with other legislative objectives, without a word of debate or dissent.

### 1.    The legislative history is silent about disparate-impact liability.

The Commission acknowledges (at 35) that, in the entire legislative history of the IIJA, no Member of Congress ever mentioned the possibility of disparate-impact liability under Section 60506. It brushes that fact aside (at 35-36), citing cases that cast doubt on the general relevance of both legislative history and legislative silence. The Commission is right that legislative history or the lack of it cannot *contradict* plain statutory text. But the converse is not

true:  legislative silence can *confirm* statutory text.  *See Koons Buick Pontiac GMC, Inc.* v. *Nigh*, 543 U.S. 50, 63 (2004).  And it does here.

The Commission ignores two specific features of this case that make Congress's silence especially damning.  First, the Commission's rule is undisputedly novel.  No other regulatory scheme in the entire federal government imposes disparate-impact liability based on the effect of a business practice on consumers of different income levels.  If Congress had intended a scheme "so sweeping and so relatively unorthodox," one would expect at least *somebody* to have mentioned that during the legislative process.  *Chisom* v. *Roemer*, 501 U.S. 380, 396 & n.23 (1991); *see* Opening Br. 35-37.

Second, the few times that Congress has enacted a disparate-impact regime, the legislative history discussed it.  *See* Opening Br. 36-37.  This is exactly the kind of statute in which one would expect to see discussion of disparate-impact liability in the legislative history if that had been Congress's intent.  Instead, not a word.

The Commission speculates that Congress did not mention disparate-impact liability in the legislative history because it wanted the "statutory text [to do] all of the talking."  Br. 36 (citation omitted).  But if that were true, then

one would expect the statutory text to use the words "disparate impact" or other typical language associated with disparate-impact liability. *See supra*, pp. 4-7; Opening Br. 26-30. Instead, Congress wrote Section 60506 using language associated with disparate-treatment liability, *see supra*, pp. 5-7, and not a single legislator hinted that she meant to impose a different regime.

> ### 2. Congress did not silently authorize a rule with such drastic consequences.

The Commission's reading of Section 60506 is particularly implausible because its consequences are so drastic. The rule threatens a huge swath of commonplace, benign business practices—from the "use of customer credit and account history," to "[m]arketing," to "customer service." 47 C.F.R. § 16.2; *see* Opening Br. 39-40. The Commission does not dispute that the rule "entail[s] scrutiny of common business practices." Br. 38 (citation omitted). Nor does it dispute that this would be the only federal regulatory regime that prohibits business practices with differential effects based on income. Instead, the Commission has two responses: (1) trust us, and (2) not all business practices are vulnerable. Neither solves the Commission's statutory-authority problem.

First, the Commission waves away concerns about the breadth of its rule on the ground that not *every* common business practice of an ISP will be

"actionable"—only those that the Commission deems to "lack[] a justification." Br. 38; *see id.* at 40, 42, 45. But the fact that the Commission might, as a matter of "*noblesse oblige*," decline to enforce its rule against some common practices does nothing to diminish the rule's vast reach. *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 255 (2012) (citation omitted). Nor does it increase the likelihood that Congress handed the Commission sweeping, unprecedented powers through an oblique reference to "equal opportunity."

Second, the Commission contends that some of Industry Petitioners' particular concerns are overblown. As Industry Petitioners previously explained (at 40-41), the Commission's rule could even be read to prohibit ISPs from charging a uniform price for their service, because any one price would disparately affect the ability of consumers of different income levels to access the service. The Commission denies that possibility, stating (at 39) that its rule focuses on "comparability"—"whether like service is made available on like terms"—and "*not* the affordability of the same or similar terms to consumers of different income levels." The Commission thus insists (at 39) that a "uniform price" offered to all customers "would not have a discriminatory effect for purposes of the rules."

Industry Petitioners welcome that promise, but it is hard to square with the Order.  The Order expressly states that its disparate-impact rules could apply to "pricing," and it favorably cites comments arguing that "including price and affordability is necessary to combat digital discrimination of access based on income level."  App. __ (Order ¶ 102 & n.335).  The rule's express coverage of other contractual terms, like "mandatory arbitration clauses," *id.*, likewise focuses on affordability, not just comparability.  Under the Commission's current position, mandatory arbitration clauses should be unobjectionable if they appear in all customer contracts, and should be problematic only if covered entities include them for customers of one income level (or other protected characteristic) but not another.

In any event, even if the Commission's rules focus only on the "comparability" aspect of pricing, they still implicate ordinary and benign business practices like targeted discounts or promotions.  Discounts for new customers, for example, may have a disparate impact on the basis of income if existing customers on average earn higher incomes than households that do not yet subscribe to broadband service.  Promotions could similarly have a disparate impact if ISPs target certain categories of consumers—say, regular consumers of particular sports applications—for discounts or other

inducements in an effort to expand that subscriber base. There is no reason to think Congress wanted to silently ban those practices.

For related reasons, the Commission's reading of Section 60506 raises concerns under both the nondelegation and void-for-vagueness doctrines—concerns that a disparate-treatment reading would avoid. *See* Opening Br. 41; Pacific Legal Foundation Amicus Br. 4-15.[2] The Commission insists (at 50-51) that its rule does not run afoul of those doctrines simply because it is broad. The core problem, however, is not just that the rule is broad, but that it leaves covered entities without reasonable notice about what conduct is actionable. Nothing in the Commission's brief offers any clarity on that score; if anything, it further obscures matters. Thus, as a matter of constitutional avoidance, too, the statute should be construed to cover only disparate treatment.

---

[2] The Commission contends (at 49-50) that Industry Petitioners' vagueness and nondelegation arguments in their opening brief are too "fleeting" to adequately "preserve those points." But Industry Petitioners discussed at length the lack of guidance and open-ended delegation under the Commission's rules, including in a full paragraph (at 41) addressing the vagueness and nondelegation doctrines by name. The Commission relies on two cases for its forfeiture argument, but both involved far less robust preservation. *See Ahlberg* v. *Chrysler Corp.*, 481 F.3d 630, 634 (8th Cir. 2007) (argument made only "in a heading of [plaintiffs'] brief"); *Sturgis Motorcycle Rally, Inc.* v. *Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 324 (8th Cir. 2018) (argument made only with "nouns that precede each string of citations").

### 3. Congress did not silently undermine its own specific policy judgments through disparate-impact liability.

The Commission's reading of Section 60506 is especially implausible because it would conflict with two specific judgments that Congress made in pursuing the goal of facilitating broadband access. *See* Opening Br. 42-46. The Commission has no sound response to either, other than a broad (and misplaced) appeal to legislative purpose.

a.    The Commission's reading of Section 60506 could allow it to impose unfunded mandates for ISPs to build out or upgrade their networks to correct perceived disparities in service. *See* Opening Br. 42-44; National Ass'n of Mfrs. Amicus Br. 10-18.  The possibility of unfunded buildout mandates would create perverse incentives for ISPs *not* to build out or enhance their networks, lest deploying in one area make ISPs liable for not deploying elsewhere.  *See* Opening Br. 42-44.  That is the opposite of what Congress intended in the BEAD program, which sets aside tens of billions of dollars in funding for building out broadband infrastructure.  *See id.*; ICLE/ITIF Amicus Br. 9-11.[3]

---

[3] The BEAD presumption of compliance highlights that tension.  *See* Opening Br. 43-44.  The Commission responds (at 43 n.8) that BEAD recipients are subject to independent nondiscrimination requirements and so

In response to that problem, the Commission reverts to a familiar refrain: "trust us." The Commission acknowledges (at 41-42) that it "defined the elements of broadband service covered by the rules to include prospective 'deployment' of such service." And the Commission could, in its view, "impose a remedy" requiring additional deployment. Br. 42 n.7. But rest assured, the Commission insists, it is not "*required* to order deployment as a remedy for violation of the rules." *Id.* at 42 (emphasis added). ISPs take no comfort in the fact that the Commission could exercise some unconstrained discretion to decline to mandate an unfunded buildout. *See supra*, pp. 16-17. Neither should this Court.

b.     The Commission's reading of Section 60506 also would allow it to engage in backdoor rate regulation, despite robust evidence that Congress has not authorized it to do so. *See* Opening Br. 44-46. The Commission denies that the rule allows it to regulate rates, asserting again (at 43-45) that it is concerned only with comparability of service terms, not affordability. But

---

need not be covered by its digital-discrimination rules. *See* 47 U.S.C. § 1702(g)(2)(C) (requiring States distributing BEAD funds to ensure that recipients "use[] the funds in an equitable and nondiscriminatory manner"). But the BEAD nondiscrimination requirement does not prevent the disparate impacts that the Commission targets here—which is presumably why the Commission agreed that a presumption of compliance was necessary.

even if those assurances stick, the Commission's rule would allow it to question ISPs' rates in other ways. Indeed, the Commission acknowledges that it can analyze factors including "projected income" and "expected return on investment" to determine whether a challenged practice is "justified." Br. 43 (citation omitted). Assessing what is an appropriate income level or expected return on investment amounts to dictating how much money an ISP can make on a particular offering, and thus the prices that it can charge. That is still rate regulation by another name.

The Commission relies (at 44) on *FERC* v. *Electric Power Supply Ass'n*, 577 U.S. 260 (2016), but that case is inapposite. There, the Supreme Court rejected an argument that by regulating certain wholesale rates, FERC was "effectively" regulating retail rates, which the statute prohibited. The relevance of *Electric Power Supply* to this case is unclear, except perhaps that Industry Petitioners too used the word "effectively" (at 44) in explaining how the Commission's rule ushers in rate regulation. *Electric Power Supply*, however, turned on statute-specific reasoning. It held that because FERC has statutory authority over the wholesale electricity market, it can exercise that authority regardless of the effect on retail rates. 577 U.S. at 281-282. The

Court did not create some blanket rule that no agency can ever "effectively" engage in impermissible rate regulation.

c.    The Commission nevertheless insists (at 34) that its reading of Section 60506 better captures Congress's purpose.  It points to Congress's finding at the start of Division F of the IIJA that the "digital divide" "disproportionately affects" minority and low-income communities.  47 U.S.C. § 1701.  It also notes that Congress adopted a "[s]tatement of policy" declaring that "subscribers should benefit from equal access to broadband."  *Id.* § 1754(a).  From this, the Commission concludes (at 35) that Congress was clearly "concern[ed] with discriminatory effects."

None of that follows.  Just because Congress was concerned about inequities does not mean that Congress sought to address its concerns with disparate-impact liability.  In the same Division F, Congress created several massive new programs:  the $42.5 billion BEAD Program, the $2.75 billion Digital Equity Act, and the $14.2 billion Affordable Connectivity Program.  *See* Opening Br. 7-11.  Each of those programs is specifically targeted at improving broadband access and adoption, including among minority and low-income groups.  *See id.*  Having pursued its goal of closing the digital divide expressly

with a significant monetary commitment, there is no reason to infer that Congress *also* pursued it silently with disparate-impact liability.

The Commission further protests (at 35) that "[r]eading the statute to require intent" "would render the FCC's rules largely ineffective," since intentional discrimination "has not had a significant role in perpetuating the digital divide." That assumes the conclusion again: that Congress intended the "digital discrimination" rule *itself* to be highly significant, rather than a largely prophylactic prohibition on intentional wrongdoing to accompany a large federal grant. As Industry Petitioners have explained, the latter explanation is both sensible and common. Congress often adds antidiscrimination provisions to federal funding laws, including the Digital Equity Act, which is part of the IIJA. Opening Br. 37-38 (citing Pub. L. No. 117-58, § 60307(a)(1), 135 Stat. at 1231).

## C. At A Minimum, The Rule Cannot Survive The Major-Questions Doctrine.

Although the statutory language is unambiguous, the major-questions doctrine should remove any lingering doubt about whether the Commission has authority to promulgate disparate-impact rules.

1. The rule trips nearly every major-question sensor. It embraces the most politically controversial doctrine of civil liability known to American

law; it risks depressing billions in investment; it threatens liability for common business practices by entities never before regulated by the Commission; and it fundamentally transforms the nature of the Commission's power over broadband providers. Opening Br. 47-51; *see* TechFreedom Amicus Br. 9-18. The Commission "discover[s]" the authority for this "unheralded" regime in a paragraph buried in a 1,000-page omnibus spending bill enacted without debate. *West Virginia* v. *EPA*, 597 U.S. 697, 724 (2002). In short, nearly every "indicator[] from [the Supreme Court's] previous major questions cases [is] present here." *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2374 (2023) (citations omitted).

The Commission does not acknowledge most of this. It says only three things. First, it denies (at 46) that the rule brings about a "substantial overhaul" of its authority, because it has long been responsible for ensuring that communications services are available "without discrimination." But neither of the provisions it cites is remotely akin to the rule here. The preamble of the Communications Act of 1934 mentions discrimination but confers no enforceable authority, and is plainly discussing disparate treatment anyway. *See* 47 U.S.C. § 151. And the universal-service provision of Title II requires common carriers to subsidize low-income users, *see* *id.*

§ 254(b)(4)-(5)—a requirement at odds with the Commission's current view that all terms be offered equally to everyone at all income levels, *see* Br. 39.

Next, the Commission claims that the rule is no big deal because, "[a]s employers," covered entities "should be familiar" with Title VII's disparate-impact regime. Br. 47 (internal quotation marks omitted). But that is like saying that the regulation in *West Virginia* was not major because power plants were already "familiar" with pollution regulation, or that the vaccine mandate in *NFIB* was not major because employers were already "familiar" with OSHA safety mandates. Yes, Industry Petitioners are subject to other disparate-impact schemes in other contexts. But that does not make *this* disparate-impact scheme any more familiar, or any less revolutionary.

Finally, and relatedly, the Commission contends that "many" entities covered by the rule must "already comply with the nondiscrimination requirements associated with the receipt of federal funds." Br. 47 (citing Order ¶ 129). But the Commission never says what "requirements" it is talking about, either in its brief or in the Order itself. To the extent it means Title VI of the Civil Rights Act, that "prohibits only intentional discrimination." *Mumid* v. *Abraham Lincoln High Sch.*, 618 F.3d 789, 794 (8th Cir. 2010).

2.    The Commission also contends (at 47-48) that, if the major-questions doctrine applies, the Commission has the requisite clear congressional authorization for its rule.   The Commission points out that Congress, "in no uncertain terms," gave it authority to promulgate rules "preventing digital discrimination" and imposed a specific deadline.   *Id.*   But the whole question is what "preventing digital discrimination" means.   If the Commission wants to read that language to authorize the dramatic step it has taken here, the text must be clear.   Far from clearly allowing the Commission's interpretation, the text clearly forecloses it.

## II.    THE COMMISSION LACKS STATUTORY AUTHORITY FOR ITS BURDEN-SHIFTING FRAMEWORK.

Even if Section 60506 could be read to authorize disparate-impact liability, it does not authorize the aberrant disparate-impact regime the Order sets up.   The Order departs from the settled framework for disparate-impact claims adopted in *Inclusive Communities* in three significant ways:   (1) it limits the scope of legitimate business interests; (2) it shifts the burden to defendants to prove the absence of a less discriminatory alternative; and (3) it allows liability for individual incidents rather than policies.   *See* Opening Br. 55-58.   If Congress buried an entire disparate-impact scheme in the word

"opportunity," at a minimum it buried a traditional disparate-impact scheme rather than a novel one.

The Commission appears to accept the premise. It does not dispute Industry Petitioners' argument that *if* Congress authorized the imposition of disparate-impact liability under Section 60506, the *Inclusive Communities* model is the only form of disparate-impact liability Congress could have meant. Nor does the Commission dispute that the standard framework is "necessary to protect potential defendants against abusive disparate-impact claims." *Inclusive Communities*, 576 U.S. at 544. Instead, the Commission's brief simply rewrites its Order, insisting (at 53) that its "framework parallels the instructions provided by the Supreme Court in *Inclusive Communities*." But three significant departures from the *Inclusive Communities* framework appear on the face of the rule.

A. First, as Industry Petitioners have explained, a critical aspect of the *Inclusive Communities* framework is that a defendant may meet its burden by presenting any "substantial, legitimate, nondiscriminatory interest" served by the challenged practice. Br. 55-56 (quoting *Inclusive Communities*, 576 U.S. at 527). The Commission, however, has fashioned a much narrower defense: a defendant must instead explain why its "policy or

practice is justified by genuine issues of technical or economic feasibility." 47 C.F.R. § 16.5(b). To show economic feasibility, covered entities will typically need to demonstrate "prior success by covered entities under similar circumstances," *id.* § 16.2—a burden that will be particularly onerous for smaller ISPs that lack the resources to obtain information about their competitors' "prior success[es]."

The Commission's economic-feasibility requirement excludes legitimate business interests that the *Inclusive Communities* framework would allow. *Inclusive Communities* explained that "regulated entities" must be "able to make . . . practical business choices and profit-related decisions." 576 U.S. at 533. A defendant may therefore avoid liability for decisions made to avoid economic losses. *See id.* at 541, 544; Opening Br. 56 n.4 (citing cases). By contrast, the Commission's rule expressly states that "a policy or practice will be considered economically feasible if relevant economic variables"—including "projected income, projected expenses, net income, expected return on investment, competition, cash flow, market trends, and working capital requirements"—"fall within *acceptable ranges* based on past industry practice." App. __ (Order ¶ 71) (emphasis added). And that "acceptable range[]" may entail substantial economic losses. As the Commission made

clear, the "costliness of a particular business path does *not*, in itself, answer the question of whether that path is feasible," App. __ (Order ¶ 73 n.219) (emphasis added), and it is *not* sufficient for a defendant to point to "differences in the profitability" of one business practice over a proposed alternative, App. __ (Order ¶¶ 27, 58).

The Commission insists (at 54) that its economic-feasibility standard does not affect industry's "ability" to make "profit-related decisions." That is impossible to square with the language just quoted, which the Commission ignores. The Commission likewise claims that Industry Petitioners are "mistaken that economic infeasibility cannot be shown based on 'differences in . . . profitability.'" *Id.* (citation omitted). But in support, it cites part of the Order that expressly *rejected* an effort to "limit the Commission to considering 'profitability'" in assessing a covered entity's practices. App. __ (Order ¶ 58). Indeed, the intervenors in support of the Commission embrace the fact that the rule's affirmative defense is written more narrowly than the *Inclusive Communities* affirmative defense. Benton Br. 22-23.

If the Commission is now retreating to the *Inclusive Communities* framework, Industry Petitioners are glad to hear it. But the Commission cannot seriously claim (at 54) that the Order "interpret[s] the categories of

'technical' and 'economic' feasibility broadly to encompass any legitimate business impediment." The plain text of the Order, whether consciously or unintentionally, departs from *Inclusive Communities*, and is thus unlawful.

B. Second, under *Inclusive Communities*, after a defendant has shown the existence of a valid interest, the burden shifts to the plaintiff to show an alternative, less discriminatory policy that achieves the same interest. That does not happen under the Commission's rule; instead, the defendant must *disprove* the existence of any such alternative. *See* Opening Br. 56-57.

The Commission contests that point (at 55), but it is not clear on what ground. The rule is again crystal clear that "[c]overed entities have the burden of proving to the Commission that a policy or practice under investigation is justified," which "may include proof that available, less discriminatory alternatives were not reasonably achievable." 47 C.F.R. § 16.5(c); *see* App. __ (Order ¶ 50). The Commission's brief does not engage with that controlling language.

The Commission observes that *it* "will determine whether a less discriminatory alternative . . . was reasonably available." Br. 55 (citing App. __ (Order ¶ 140)). Of course the Commission will make that determination, but the question is who bears the burden of production (to come up with such

alternatives) and proof (to persuade the Commission of their reasonable availability). By imposing those burdens squarely on defendants, the Order obliterates yet another "safeguard" present in every other disparate-impact regime. *Inclusive Communities*, 576 U.S. at 544.

C. Finally, whereas *Inclusive Communities* requires that a "policy or policies" resulted in a disparate impact, and warns against liability for a "one-time decision," 576 U.S. at 542-543, the Commission's rule states that a "single instance" of either an "action[]" or "omission[]" may give rise to a digital-discrimination claim. App. __ (Order ¶ 102). The Commission's only response is to state the obvious: that "a one-time decision . . . might (or might not) express a policy." Br. 56. But the critical question is whether such a policy is required, or whether the one-time decision can be a source of liability on its own. The Commission now says the former, but the Order says the latter.

No court has ever suggested that a single act is enough to warrant disparate-impact liability—much less that a single "omission" is enough. The Commission tries to bolster its position with *Mhany Management, Inc.* v. *County of Nassau*, 819 F.3d 581 (2d Cir. 2016), but the Second Circuit there simply noted that a policy that expresses itself as a "repeated course of conduct" can often "be traced back to a single decision." *Id.* at 619. As the

Seventh Circuit has likewise explained, a "single event" that "applies the same rules to hundreds" of cases "is an actionable policy," but "a single, isolated decision," without more, is not. *O'Brien* v. *Caterpillar Inc.*, 900 F.3d 923, 929 (7th Cir. 2018). That is not what the Order contemplates here. Instead, the Commission's rule imposes liability without regard to whether a single action or omission gives rise to a "repeated course of conduct."

## III. THE COMMISSION LACKS STATUTORY AUTHORITY TO REGULATE ENTITIES OTHER THAN INTERNET SERVICE PROVIDERS.

The Commission relies on a now-familiar move to defend its expansive regulation of entities other than ISPs: it promises to use awesome power responsibly. It asks this Court to ignore that the Order empowers it to regulate a whole host of industries and entities that it has never touched before, because it plans to take action against only those entities whose conduct it deems closely related to the provision of broadband service. *See* Br. 57-64. The Commission's theory has no support in text, structure, or precedent. And if any doubt remained, the major-questions doctrine forecloses the Commission's overreach.

### A. The Commission's Regulation Of Non-ISPs Finds No Support In Statutory Text, Structure, Or Precedent.

As Industry Petitioners have explained, Section 60506 does not permit the Commission to create digital-discrimination rules for entities other than ISPs. *See* Opening Br. 58-65. The Commission offers responses based on the statutory text, structure, and precedent, but it is wrong about all three. The Commission's efforts to minimize the sweep of its rule are also unavailing.

1. The Commission first contends (at 58) that it may regulate entities other than ISPs because the operative language of Section 60506(a) focuses on "prohibited acts and their effects," rather than "limiting discrimination to specific actors." Congress *did*, however, make clear textually that it was limiting its focus to specific actors. ISPs and their subscribers are the only actors specified in Section 60506, and broadband is the only service mentioned. *See* 47 U.S.C. § 1754(a)(1). The statute speaks of "subscribers," which are subscribers of an ISP's service. *Id.* It discusses their access to "an offered service that provides comparable speeds," "latency," and other metrics of service that only ISPs can offer. *Id.* § 1754(a)(2). In short, the statute is replete with references to broadband providers and subscribers that make sense only if the Commission's rules are limited to ISPs.

The Commission also has no persuasive response to the key point that Congress focused on the goal of equal access "within the service area of a provider of [broadband internet access] service"—a geographic limitation that makes sense only if ISPs are the entities being regulated. *See* Opening Br. 60 (citing 47 U.S.C. § 1754(a)(1)). The Commission deflects, pointing out that *other* language in the statute defines "equal access" as the equal opportunity to subscribe to an offered service "in a given area." Br. 60 n.14 (citation omitted). But even that other language does not help the Commission. Although the Commission has promised to determine the appropriate "given area" on a case-by-case basis, App. __ (Order ¶ 165), the best reading of that phrase is that it also refers to an ISP's service area—not some other entity's service area, or an individual building that a landlord owns.

2. The Commission attempts to spin a nearby provision in its favor, but again its argument does not work. The Commission points out (at 59) that in 47 U.S.C. § 1754(d), Congress directed the Commission to create model policies for States and municipalities to ensure that "broadband internet access service providers" do not engage in digital discrimination. But the express mention of ISPs in Subsection (d) does not imply that Congress meant for the rest of the rule to apply to any other entity with a remote connection to

35

the provision of broadband. Instead, the mention of ISPs in the provision regarding model rules for States and localities is a strong indicator that the same limitation should apply in the federal rules, as Congress presumably wanted the rules to be consistent. *See* Opening Br. 60-61.

3.      The Commission also seeks support in precedent, but none of its cases justifies its expansive theory. First, the Commission cites *Building Owners & Managers Ass'n International* v. *FCC*, 254 F.3d 89, 91 (D.C. Cir. 2001), which upheld a Commission regulation that imposed restrictions on certain over-the-air reception devices and extended those restrictions to building owners as well as ISPs. In *Building Owners*, however, Congress had instructed the Commission to "prohibit restrictions on" antennas, and building owners had "directly furnishe[d] those restrictions." *Id.* at 96. Moreover, the legislative history specifically confirmed Congress's intent that the Commission regulate property owners. *Id.* at 95 (citing H.R. Rep. No. 104-204 at 123-124 (1995)). None of that applies here. *Building Owners* thus represented a narrow carve-out from the general rule that "the real estate industry . . . is normally outside the Commission's scope of authority." *Id.* at 94; *see* National Apartment Ass'n Amicus Br. 7-19.

The Commission also relies (at 61-62) on precedents from the housing context, but those are likewise inapposite. One case, *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 291 (7th Cir. 1992), involved efforts by the Department of Housing and Urban Development (HUD) to regulate entities other than building owners under the Fair Housing Act. But *NAACP* was decided under a *Chevron* framework that no longer applies. The court deferred to HUD's interpretation, citing *Chevron* and reasoning that the statute was "sufficiently pliable that its text can bear the [agency's] construction." *Id.* at 300. In *Loper Bright*, the Supreme Court specifically rejected the assumption that "statutory ambiguities"—let alone silences— "are implicit delegations to agencies." 144 S. Ct. at 2265. The Commission thus cannot apply that same approach here.

The Commission also invokes *Hanson* v. *Veterans Administration*, 800 F.2d 1381, 1386 (5th Cir. 1986), which held that an appraiser could violate the Fair Housing Act's prohibition on "mak[ing] unavailable or deny[ing]" housing because of a protected characteristic. *Hanson*, however, did not involve an agency's effort to sweep a new industry under its purview. And in any event, there is a close nexus between homeowners, which are traditionally covered by the Fair Housing Act, and property appraisers. By contrast, the

Commission's digital-discrimination regulation sweeps in industries that it has either never regulated or regulated in only very limited ways. *See* Opening Br. 58-65.

4. Finally, in a familiar move, the Commission again tries to downplay the effects of its unprecedented expansion of authority. It insists (at 62-63) that its Order requires "robust causality" between the challenged conduct and the provision of broadband, and thus not *all* actions by *all* potential covered entities will be actionable.

This is chillingly cold comfort for non-ISPs attempting to predict whether their policies and practices with an indirect effect on broadband access will be punished. *See* App. __ (NMHC Ex Parte at 4-6). It is not difficult to come up with examples. An owner of affordable housing with aging infrastructure and small margins may have a policy requiring ISPs to pay for facility upgrades, and which ISPs agree to pay could result in a discriminatory impact. Or a wireless-tower company's policy not to build out in an unserved area absent direction from an ISP may leave some customers without broadband access. *See* App. __ (WIA Reply Comments 5). It is far from clear whether the "robust causality" test will spare those benign practices from liability. Moreover, the Commission lacks expertise on the technical or

economic feasibility of those policies and practices of non-ISPs, adding to the unpredictability that non-ISPs face.

## B. The Major-Questions Doctrine Confirms The Commission's Lack Of Authority.

The major-questions doctrine confirms that the Commission does not have the authority to regulate non-ISPs. *See* Opening Br. 62-65. The Commission resists the doctrine's application. It sees "nothing dramatic and novel," Br. 63 (internal quotation marks omitted), about its decision to "sweep[] entire industries within the FCC's jurisdiction for the first time in the agency's 90-year history," App. __ (Carr Dissent 220). And it insists that because the rules require "a direct and significant connection between an entity's policies and practices and the provision of broadband service," the Order draws upon the FCC's "core expertise," even with respect to non-ISPs. Br. 63-64 (internal quotation marks omitted). That misses the point. The Order implicates the doctrine because it asserts authority over massive swaths of American industry for the first time—industries the Commission knows nothing about. All indications are that Congress did not intend to confer the jurisdictional breadth the Commission asserts. *See* Opening Br. 62-65.

## IV. THE COMMISSION LACKS STATUTORY AUTHORITY TO ENFORCE THE RULE WITH BACKWARD-LOOKING MONETARY FORFEITURES.

Even if the substance of its novel rule were permissible, the Commission lacks its asserted authority to penalize violations using its "full suite" of remedies under the Communications Act, including monetary forfeitures. App. __ (Order ¶ 141); *see* Opening Br. 65-72. The Commission fails to identify any authority in Section 60506 for those backward-looking remedies, and its alternative appeal to its ancillary jurisdiction under the Communications Act falls short.

### A. The Commission Lacks Authority Under Section 60506 To Impose Monetary Forfeitures.

1. The Commission starts by fighting a straw man. It insists that without *some* enforcement mechanism, Section 60506 would be rendered a "nullity." Br. 66 (citation omitted). Industry Petitioners never have argued that the Commission is "powerless to enforce the rules that it implements pursuant to Section 60506." Opening Br. 67. On the contrary, Industry Petitioners have acknowledged that, by authorizing the Commission to "prevent" and "eliminate" digital discrimination, Congress may have implicitly authorized the Commission "to take certain forward-looking enforcement actions, like imposing cease-and-desist orders." *Id.* at 65, 67. But because

Section 60506 is silent on enforcement authority, the power to order backward-looking monetary forfeitures cannot be claimed as a necessary and implicit part of the statutory scheme. *Id.* at 65-66.

The Commission's response (at 68) is that Congress's silence amounts to a blank check, allowing it broad discretion to pursue monetary forfeitures. Bizarrely, the Commission contends that this discretion flows from Section 60506's supposedly "expansive language." *Id.* (citation omitted). But Section 60506 includes no language whatsoever about remedies—let alone broad, discretion-conferring language. In the face of such silence, an agency can take at most those enforcement actions that are "directly and closely tied to" the agency's "specific statutory mandate." *ICC* v. *American Trucking Ass'ns*, 467 U.S. 354, 367 (1984). Here, the Commission's mandate is to "prevent" and "eliminate" digital discrimination, so any remedy must be "directly and closely tied" to those commands. *See* Opening Br. 67.

The closest that the Commission comes to attempting to meet that test is arguing (at 66-67) that forfeitures can "prevent" discrimination "by deterring action in the first place." That argument would gut *American Trucking*. The Commission notes (at 65) that "prevent" means "to keep from happening," and "eliminate" means "to get rid of," but both verbs address

41

continuing or future discriminatory conduct. *See* Opening Br. 67. Neither is a backward-looking verb like "compensate," "penalize," or "redress." So for any implicit enforcement authority to be "directly and closely tied" to the terms "prevent" and "eliminate," it must be at least predominantly forward-looking. *See United States* v. *Philip Morris USA, Inc.*, 396 F.3d 1190, 1198, 1200 (D.C. Cir. 2005) (concluding that a statute authorizing district courts to "prevent and restrain" RICO violations did not authorize backward-looking remedies).[4] Although penalties and forfeitures may have an incidental deterrent effect, they are fundamentally backward-looking remedies responding to past wrongs. *See SEC* v. *Graham*, 823 F.3d 1357, 1361, 1363 (11th Cir. 2016). Their incidental effect on future behavior is the opposite of "directly and closely tied."

The Commission likewise brushes aside the powerful statutory evidence that Congress *deliberately* omitted a forfeiture remedy. In a neighboring

---

[4] The Commission attempts to distinguish (at 67) *Philip Morris*. It contends that the D.C. Circuit read the phrase "prevent and restrain" to focus on forward-looking remedies because the statute at issue also listed specific forward-looking remedies. That is not correct. The court in *Philip Morris* first interpreted the phrase "prevent and restrain" to be forward-looking, and then confirmed that reading by referring to the list of specific available remedies. 396 F.3d at 1199-1200. And it nowhere suggested that an agency gets *more* remedial authority when Congress has not given it *any* express remedial authority.

provision of the IIJA, Congress expressly authorized the Commission to "impose forfeiture penalties under section 503 of the Communications Act." Pub. L. No. 117-58, § 60502(a)(3)(B)(ii), 135 Stat. at 1240. The obvious implication is that Congress knew how to authorize monetary forfeitures but chose not to for violations of rules promulgated under Section 60506. *See Russello* v. *United States*, 464 U.S. 16, 23 (1983). The Commission has no answer to that specific point. It generally contends that "in the administrative-law context," silence may suggest an implicit delegation "to leave the question to agency discretion," Br. 71-72 (citation omitted)—but that contention is no longer viable after *Loper Bright*. Moreover, this Court should be especially reluctant to infer the authority to impose civil penalties from congressional silence, given the significant constitutional concerns about the Commission's ability to impose such penalties without the protections provided by an Article III court and jury. *See SEC* v. *Jarkesy*, 144 S. Ct. 2117, 2135-2136 (2024).

2.     The Commission is left to rest (at 68-70) on a single "indication in the text" that monetary forfeitures are authorized: Congress directed the Commission to "revise its public complaint process." 47 U.S.C. § 1754(e). That procedural direction cannot support the Commission's substantive claim.

Complaints serve several functions other than prompting specific remedies, including allowing the Commission to gather information for future rulemaking purposes. *See* Opening Br. 70. And even if Congress contemplated that the Commission would use the complaint process to resolve violations, that says nothing about which remedies the Commission may employ when it finds a violation. The Commission insists (at 69-70) that it should be able to pursue monetary forfeitures because at the end of the Communications Act complaint process, the Commission may punish a violation using its usual suite of remedies, including forfeitures. But that conclusion does not logically follow. The forfeiture remedy is not part of the complaint process, but rather is authorized in a different subchapter of the Communications Act. *Compare* 47 U.S.C. §§ 208, 209, *with id.* § 503. Congress's direction to "revise" the complaint process thus does not speak to the remedies that the Commission can impose after an investigation triggered by that process. *See* Opening Br. 70.

### B. The Commission Lacks Ancillary Authority Under Section 4(i) Of The Communications Act To Impose Monetary Forfeitures.

The Commission alternatively argues (at 72-75) that it has ancillary authority to impose monetary forfeitures under Section 4(i) of the Communications Act, 47 U.S.C. § 154(i). To begin with, the Commission may

not exercise its ancillary jurisdiction to fulfill Section 60506's directives, because Congress did not make Section 60506 part of the Communications Act. *See* Opening Br. 71. The Commission disagrees that ancillary jurisdiction extends only to the Communications Act, asserting that Section 4(i) does not expressly mention any such limitation. Section 4(i) authorizes the Commission to "make such rules and regulations . . . not inconsistent with this chapter , as may be necessary in the execution of [the Commission's] functions." Br. 74 (emphasis omitted). On its face, that language allows the Commission to make rules under the relevant "chapter"—that is, the Communications Act. It is not a freewheeling grant of power to the Commission to supplement any authority in future statutes. Had Congress wanted ancillary jurisdiction to be available here, it could have made Section 60506 part of the relevant chapter.

The Commission cites *Comcast Corp.* v. *FCC*, 600 F.3d 642 (D.C. Cir. 2010), in arguing that it may invoke ancillary jurisdiction to fulfill other statutory directives beyond the Communications Act. But in *Comcast*, the D.C. Circuit *declined* to allow the Commission to exercise ancillary jurisdiction to fulfill Section 706 of the Telecommunications Act of 1996, another provision outside the Communications Act. *Id.* at 658-659. The Court rejected the Section 706 argument because the Commission had previously concluded that

Section 706 "grants no regulatory authority." *Id.* at 659. By rejecting the Commission's argument on other grounds, the D.C. Circuit was not *endorsing* the proposition that ancillary jurisdiction runs to provisions other than those in the Communications Act.

The Commission's ancillary-jurisdiction argument also fails for the separate reason that monetary forfeitures are not reasonably ancillary to the Commission's functions under Section 60506. *See* Opening Br. 71-72. The Commission protests (at 75) that forfeitures are "indispensable" to fulfilling its mandate. But the Commission fails to substantiate that characterization. The Commission also asserts that forfeitures are important for enforcing against *intentional* discrimination, and questions why under Industry Petitioners' disparate-treatment reading of the statute, Congress would not have authorized a forfeiture remedy. *See* Br. 73 n.19. "[N]o legislation pursues its purposes at all costs," *Rodriguez* v. *United States*, 480 U.S. 522, 525-526 (1987), and Congress may have believed that, in this context, orders to stop discriminating suffice. Whatever the reason, Congress did not authorize the Commission to enforce Section 60506 using monetary forfeitures. If the Commission disagrees with that judgment, it must take it up with Congress.

## V. THE ORDER IS ARBITRARY AND CAPRICIOUS.

The Order is also arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A). The Commission continues not to acknowledge, much less explain, its departure from the *Inclusive Communities* three-step burden-shifting framework. And the Commission did not consider the effect that disparate-impact liability will have on broadband investment or on the wide swath of "covered entities" that are subject to its novel regime.

### A. The Commission Failed To Justify Its Departure From The *Inclusive Communities* Burden-Shifting Framework.

As discussed, the Order departs markedly from the three-step burden-shifting framework approved by the Supreme Court in *Inclusive Communities*. *See* Opening Br. 52-58; *supra*, pp. 27-33. And neither the Order nor the Commission's brief here explains that departure. In response, the Commission simply notes (at 56 n.13) that the Order "discussed at length the relationship between *Inclusive Communities* and the agency's analytical framework." But no matter how long that discussion may be, the Order never provides a "reasoned explanation" for its departures from *Inclusive Communities*. *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That problem is underscored here by the Commission's denial that it departed

from *Inclusive Communities* at all.  That is the opposite of reasoned decision-making.

**B.     The Commission Failed To Justify The Rule's Costs and Coverage.**

An "agency cannot simply ignore 'an important aspect of the problem'" when it promulgates a rule.  *Ohio* v. *EPA*, 144 S. Ct. 2040, 2053 (2024) (citation omitted).  The Commission has done so twice over.

First, as Industry Petitioners highlighted in their comments, applying disparate-impact liability to broadband has real costs.  It will reduce investment incentives, particularly in areas served by small and rural ISPs.  Opening Br. 74 (citing comments).  The Commission "offered no reasoned response," *Ohio*, 144 S. Ct. at 2054, other than "just assert[ing] that the disparate impact standard will not chill investment."  App. __ (Carr Dissent 226).  The Commission addresses this shortcoming not by pointing to any assessment of these costs in the Order, but by cataloguing (at 76-78) the purported benefits of disparate-impact liability and reciting the several ways in which it attempted to "cabin[]" its rule.  Addressing *other* "important aspect[s] of the problem" cannot discharge the Commission's duty to assess the magnitude of its rule's effect on investment.  Put differently, the Commission cannot simply load up one side of the scale and ignore what is on

the other side.  By considering only those factors that weigh in favor of disparate-impact liability, the Commission "predetermined the outcome," rendering its Order arbitrary and capricious.  *Red River Valley Sugarbeet Growers Ass'n* v. *Regan*, 85 F.4th 881, 888 (8th Cir. 2023).

Second, the Commission likewise ignored comments from a wide swath of "covered entities" that raised concerns about the excessive new compliance costs they would face.  *See* Opening Br. 74-75 (citing comments).  In response, the Commission asserts (at 78) that its "analysis of the costs and benefits of its rules encompassed 'covered entities.'"  Yet it cites nothing in the record to justify that assertion, except the rule's definition of covered entities.  No doubt the Commission concluded that its rule was "the most cost-effective means to accomplish" its goals.  Br. 78 (citing Order ¶ 81).  "But if there is an explanation" for that conclusion, "it does not appear in the final rule."  *Ohio*, 144 S. Ct. at 2054.  On top of its myriad other flaws, the Order is therefore arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should hold unlawful and set aside the Commission's Order.

Respectfully submitted,

 s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
*Counsel for Petitioners Chamber
of Commerce of the United States
of America, Texas Association of
Business, and Longview Chamber
of Commerce*

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
*Counsel for Petitioner Chamber of
Commerce of the United States of
America*

ROMAN MARTINEZ
MATTHEW A. BRILL
BLAKE E. STAFFORD
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com
*Counsel for Petitioners MCTA – The
Missouri Internet & Television
Association, Ohio Cable
Telecommunications Association,
Florida Internet & Television
Association, Texas Cable Association,
and NCTA – The Internet &
Television Association*

THOMAS SCOTT THOMPSON
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
(202) 434-7440
SThompson@mintz.com
*Counsel for Petitioners the
Wireless Infrastructure
Association, Power &
Communications Contractors
Association, and NATE: The
Communications Infrastructure
Contractors Association*

MICHAEL H. PRYOR
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

DAVID B. MESCHKE
ROSA L. BAUM
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202

*Counsel for Petitioner National
Multifamily Housing Council, Inc.*


JEFFREY A. LAMKEN
RAYINER I. HASHEM
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2024
jlamken@mololamken.com

*Counsel for Petitioner ACA Connects
– America's Communications
Association*

THOMAS M. JOHNSON, JR.
JEREMY J. BROGGI
MICHAEL J. SHOWALTER
BOYD GARRIOTT
WILLIAM TURNER
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

*Counsel for Petitioners Minnesota
Telecom Alliance, Ohio Telecom
Association, USTelecom – The
Broadband Association, CTIA –
The Wireless Association,
Broadband Association of
Alabama and Mississippi, Texas
Telephone Association, and
WISPA – The Association For
Broadband Without Boundaries*


STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW | Suite 400 |
Washington, DC 20036
(202) 416-6744
scoran@lermansenter.com

*Counsel for Petitioner WISPA –
The Association For Broadband
Without Boundaries*

JULY 26, 2024

# CERTIFICATE OF COMPLIANCE

This reply complies with Federal Rule of Appellate Procedure 32(a) and this Court's order of April 2, 2024 because it contains 9,949 words.

This reply also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface in Microsoft Word 2016, version 16.0.5443.1000.

Pursuant to Eighth Circuit Rule 28A(h), the electronic version of this brief was scanned for viruses and is virus-free.

s/ Jeffrey B. Wall
JEFFREY B. WALL

JULY 26, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2024, I electronically filed the foregoing reply with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

JULY 26, 2024