# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

MINNESOTA TELECOM ALLIANCE, ET AL.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

Jonathan S. Kanter
  *Assistant Attorney General*

Robert B. Nicholson
Robert J. Wiggers
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

William J. Scher
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

# CASE SUMMARY AND REQUEST FOR ORAL ARGUMENT

These cases concern the Federal Communications Commission's implementation of a Congressional mandate to adopt rules preventing discrimination in the provision of access to broadband service. The FCC interpreted the statute, section 60506 of the Infrastructure and Jobs Act of 2021 (codified as 47 U.S.C. § 1754) to authorize rules prohibiting practices with unjustified discriminatory effects as well as discrimination that is intentional. Contrary to industry petitioners' contentions, the FCC's interpretation is consistent with the statute's text, context, and purpose, as well as judicial precedent. The FCC's decision also is reasonable and reasonably explained.

Because the subject matter in this case is complex, oral argument may assist the Court. We respectfully request that the Court afford respondents and their supporting intervenors time to present oral argument equal to the total time to be shared by both petitioner groups.

# TABLE OF CONTENTS

**Page**

CASE SUMMARY AND REQUEST FOR ORAL ARGUMENT ..............i

TABLE OF AUTHORITIES ...............................................iv

INTRODUCTION .........................................................1

JURISDICTIONAL STATEMENT.......................................3

STATEMENT OF THE ISSUES ..........................................4

STATEMENT OF THE CASE.............................................5

    A.    Statutory and Regulatory Background ...................5

    B.    The Order on Review .......................................12

SUMMARY OF THE ARGUMENT.......................................16

STANDARD OF REVIEW ................................................23

ARGUMENT ..............................................................24

I.    THE COMMISSION REASONABLY INTERPRETED SECTION 60506 TO REACH PRACTICES WITH UNJUSTIFIED DISCRIMINATORY EFFECTS. ........................24

    A.    The Statutory Text, Context, and Purpose Support the Commission's Interpretation. ................................24

    B.    Industry Petitioners' Policy Concerns Are Unfounded. .......38

    C.    The Major Questions Doctrine Does Not Foreclose the Commission's Interpretation. ................................45

    D.    Industry Petitioners' Constitutional Avoidance Argument Has Been Waived and Lacks Merit In Any Event.....................................................49

II.    THE COMMISSION ADOPTED A VALID FRAMEWORK FOR INVESTIGATING DISPARATE-IMPACT COMPLAINTS. ..............................................51

III.    THE COMMISSION'S RULES APPROPRIATELY REACH NON-BROADBAND PROVIDERS WHOSE ACTIONS DEPRIVE CONSUMERS OF EQUAL ACCESS TO BROADBAND SERVICE...........................................57

IV. THE COMMISSION REASONABLY INTERPRETED
SECTION 60506 TO AUTHORIZE THE AGENCY'S
TRADITIONAL ENFORCEMENT REMEDIES. ........................ 64

    A. The Commission Has Express Enforcement Authority. ...... 65

    B. Alternatively, the Commission Has Ancillary Authority
       Under Section 4(i) of the Communications Act. ................... 72

V. THE COMMISSION ADEQUATELY CONSIDERED THE
COSTS AND BENEFITS OF ITS RULES. ................................... 75

VI. BENTON PETITIONERS' CHALLENGES ARE
UNPERSUASIVE. ......................................................................... 79

    A. The Commission Rationally Declined to Adopt Formal
       Complaint Procedures. ............................................................ 79

    B. The FCC Gave Ample Notice For, and Reasonably
       Explained, Its Presumption of Compliance For BEAD
       Program Participants. .............................................................. 87

CONCLUSION ..................................................................................... 93

CERTIFICATE OF COMPLIANCE ..................................................... 94

CERTIFICATE OF DIGITAL SUBMISSION ...................................... 95

# TABLE OF AUTHORITIES[*]

## Cases

*Ad Hoc Telecomm. Users Comm. v. FCC*, 572 F.3d 903 (D.C. Cir. 2009) .................................................................................. 78

*Agape Church, Inc. v. FCC*, 738 F.3d 397 (D.C. Cir. 2013) ................... 91

*Ahlberg v. Chrysler Corp.*, 481 F.3d 630 (8th Cir. 2007) ...................... 49

*Am. Library Assn. v. FCC*, 406 F.3d 689 (D.C. Cir. 2005) .................... 73

*Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214 (1998) ............ 34

*AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) ............................... 72

*Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155 (D.C. Cir. 2015) ........... 81

*AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018) ............................... 6

*Barber v. Thomas*, 560 U.S. 474 (2010) ................................................. 37

*Bartenwerfer v. Buckley*, 598 U.S. 69 (2023) ......................................... 27

*Bd. of Educ. v. Harris*, 444 U.S. 130 (1979) ..................................... 28, 34

*Bldg. Owners and Mgrs. Ass'n Int'l v. FCC*, 254 F.3d 89 (D.C. Cir. 2001) ................................................................................ 4, 61

*Blum v. Bacon*, 457 U.S. 132 (1982) ...................................................... 24

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281 (1974) ............................................................................... 82

*Brennan v. Dickson*, 45 F.4th 48 (D.C. Cir. 2022) ................................. 42

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) ................... 26

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) ...................................... 37

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Burlington N. R.R. Co. v. State of Minn.*, 882 F.2d 1349 (8th Cir. 1989) ................................................................. 5, 87, 89

*Catawba Cnty., N.C. v. EPA*, 571 F.3d 20 (D.C. Cir. 2009) .................. 71

*Cheney R.R. Co. v. ICC*, 902 F.2d 66 (D.C. Cir. 1990) ........................... 72

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ..................... 23

*China Telecom (Ams. ) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022) . 5, 81

*Cinnamon Hills Youth Crisis Ctr., Inc.* v. *Saint George City*, 685 F.3d 917 (10th Cir. 2012) ....................................................... 29

*Citizens Telecom. Co. of Minn. v. FCC*, 901 F.3d 991 (8th Cir. 2018) ................................................................... *passim*

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ...................................... 68

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) .................. 5, 73, 74

*ConocoPhillips Co. v. U.S. E.P.A.*, 612 F.3d 822 (5th Cir. 2010)............ 48

*Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021) ............................... 5, 68, 72

*Dean v. United States*, 556 U.S. 568 (2009) ..................................... 27, 58

*Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235 (6th Cir. 2019) ...................................................................... 31

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ................... 5, 82

*Encino Motorcars, LLC v. Navarro*, 584 U.S. 79 (2018) ........................ 36

*FCC v. American Broad. Co.*, 347 U.S. 284 (1954)................................. 70

*FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502 (2009) .............................. 81

*FCC v. Schreiber*, 381 U.S. 279 (1965) .................................................. 81

(v)

*FERC v. Elec. Power Supply Assn.*, 577 U.S. 260 (2016).................44, 45

*Fowler v. United States*, 563 U.S. 668 (2011)..........................27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ....................................................66

*Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420 (2022) .................59

*Glob. Crossing Telecom., Inc. v. FCC*, 259 F.3d 740 (D.C. Cir. 2001) .....................................................81

*Glover v. Standard Fed. Bank*, 283 F.3d 953 (8th Cir. 2002).................23

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)....................................50

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)..........................25, 28, 29

*Hanson v. Veterans Admin.*, 800 F.2d 1381 (5th Cir. 1986) ..................62

*Hudson v. United States,* 522 U.S. 93 (1997) ..........................................66

*Jama v. Immigr. & Customs Enf't*, 543 U.S. 335 (2005) ........................60

*Little Sisters of the Poor v. Pa.* , 591 U.S. 657 (2020) ............................68

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................68, 72, 81

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) .......56

*Mourning v. Fam. Publ'n Serv., Inc.*, 411 U.S. 356 (1973) ..............66, 71

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019)........................5, 73, 75

*Murray v. UBS*, 601 U.S. 23 (2024) ........................................................28

*NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992)..........61

*Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105 (D.C. Cir. 2022)...........78

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) .................................................................. 74

*Nebraska ex rel. Bruning v. U.S. Dept. of Interior*, 625 F.3d 501 (8th Cir. 2010) .......................................................... 50

*Northport Health Serv. v. DHHS*, 14 F.4th 856 (8th Cir. 2021)............. 82

*Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003) ......................................... 45

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. ___, 139 S. Ct. 1881 (2019) ................................................................ 70

*Pugin v. Garland*, 599 U.S. 600 (2023)................................................... 71

*Reynolds v. Spears*, 93 F.3d 428 (8th Cir. 1996) .................................... 36

*Riverkeeper, Inc. v. EPA*, 358 F.3d 174 (2d Cir. 2004) ........................... 48

*Ross v. Blake*, 578 U.S. 632 (2016)........................................................ 38

*Russellville Legends LLC v. United States Army Corps of Eng'rs*, 24 F.4th 1192 (8th Cir. 2022) ............................................... 23

*SEC v. Murphy*, 50 F.4th 832 (9th Cir. 2022) ........................................ 67

*Simmons v. Smith*, 888 F.3d 994 (8th Cir. 2018)................................... 23

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ............................... *passim*

*Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313 (8th Cir. 2018)..................................................... 49

*Sw Bell Tel. Co. v. FCC*, 153 F.3d 523 (8th Cir. 1998)........................... 41

*Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519 (2015) ................................................... *passim*

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) ........ 72

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. Telecom Ass'n. v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ................... 50

*United States v. Philip Morris USA, Inc.*, 396 F.3d 1190 (D.C. Cir. 2005) ....................................................................... 67, 68

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ................................ 47

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ...................................... 65

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ....................................................................... 32

*Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759 (8th Cir. 2004) ...... 86

*W. Coal Traffic League v. United States*, 694 F.2d 378 (5th Cir. 1982) ....................................................................... 48

*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989) ............... 63

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) .................... 28

*Watson v. United States,* 552 U.S. 74 (2007) ......................................... 58

*Watt v. GMAC Mortg. Corp.*, 457 F.3d 781 (8th Cir. 2006) ................... 59

*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................. 46, 47, 48

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ......................... 51

*Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685 (2022) ............................ 33

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81 (2007) ......... 36

## Statutes

5 U.S.C. § 553 ............................................................................... 87, 89

5 U.S.C. § 706 .................................................................................... 23

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

28 U.S.C. § 2342.................................................................3

29 U.S.C. § 623.........................................................25, 29

42 U.S.C. § 2000e-2.................................................25, 29

42 U.S.C. § 3604..............................................................61

47 U.S.C. §§ 151, *et seq*..................................................5

47 U.S.C. § 151................................................................46

47 U.S.C. § 152................................................................73

47 U.S.C. § 154.....................................................72, 74, 81

47 U.S.C. § 201................................................................44

47 U.S.C. § 202.........................................................44, 45

47 U.S.C. § 254............................................................6, 46

47 U.S.C. § 402..................................................................3

47 U.S.C. § 503................................................................52

47 U.S.C. § 504................................................................52

47 U.S.C. § 618................................................................86

47 U.S.C. § 1302................................................................7

47 U.S.C. § 1701.......................................................9, 34, 76

47 U.S.C. § 1702.....................................................10, 37, 92

47 U.S.C. § 1754...........................................................*passim*

52 U.S.C. § 10301............................................................26

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

American Recovery and Reinvestment Act of 2009, Pub. L. No.
111-5, 123 Stat. 115 (2009) ................................................. 7

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135
Stat. 429 (2021) ........................................................... *passim*

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56
(1996) ................................................................. 7, 74

**Regulations**

47 C.F.R. § 1.717 ............................................................ 84, 85

47 C.F.R. § 1.720 ............................................................ 84

47 C.F.R. § 1.721 ............................................................ 84

47 C.F.R. § 14.38 ............................................................ 84

47 C.F.R. § 16.2 ............................................................ 14, 58, 79

47 C.F.R. § 16.3 ............................................................ 40

47 C.F.R. Part 1, Subpart E ................................................ 84

**Administrative Materials**

*Forfeiture Policy Statement*, 12 FCC Rcd 17087 (1997) ..................... 67

*In the Matter of Cont'l Airlines*, 21 FCC Rcd 13201 (2006) ................ 61

*Report on the Future of the Universal Service Fund*, 36 FCC Rcd
18006 (2021) ............................................................. 6

*Safeguarding and Securing the Open Internet*, FCC No. 24-52,
2024 WL 2109860, 88 Fed. Reg. 45404 (rel. May 7, 2024) ........... 85, 86

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

## Legislative Materials

167 Cong. Rec. S5247 (daily ed. Aug. 1, 2021)......................................36

## Other Materials

American Heritage Dict. of the English Language (5th ed. 2011) ..................................................................................65

Merriam-Webster Online Dictionary.......................................................25

No. 24-1179 (and consolidated cases)

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

MINNESOTA TELECOM ALLIANCE, ET AL.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

## INTRODUCTION

Section 60506 of the Infrastructure and Jobs Act of 2021 directs the
Commission to adopt rules to "facilitate equal access to broadband
internet access service," including by "preventing digital discrimination
of access based on income level, race, ethnicity, color, religion or national
origin." 47 U.S.C. § 1754(b). To fulfill this broad mandate, the FCC in the
Order on review adopted rules that prohibit practices with unjustified

discriminatory effects on access to broadband service, as well as those motivated by discriminatory intent.

Raising a host of interpretative arguments and policy concerns, petitioners Minnesota Telecom Alliance, *et al.* ("Industry Petitioners") contend that the Commission overreached by not limiting its rules to intentional discrimination. But as we show, this aspect of the FCC's rules reflects the best reading of the statute's text, context, and purpose, and Industry Petitioners' policy concerns are unfounded.

Industry Petitioners fare no better in their arguments that: (1) the Commission's standards for investigating complaints are inconsistent with Supreme Court precedent; (2) the FCC's rules should be limited to broadband service providers (rather than any entity that impedes equal access to service); and (3) one of the FCC's primary tools for enforcement—monetary forfeitures—should be shelved. There is no basis for so hobbling the agency's ability to carry out Congress's commands.

Petitioners Benton Institute for Broadband & Society, *et al.* ("Benton Petitioners"), by contrast, contend that the Commission did not go far enough in two respects: first, because the agency did not adopt a formal, adjudicatory process for resolving digital-discrimination complaints; and second, because it established a presumption of

compliance with the rules for entities that participate in an independent funding program for broadband network deployment with its own, complementary nondiscrimination requirements. Those criticisms likewise fail.

As we explain, the Commission's measured approach faithfully implements Congress's antidiscrimination mandate, comports with judicial precedent, and is administrable and fair. The FCC's rules are also reasonable and reasonably explained. The Court should deny the petitions for review.

## JURISDICTIONAL STATEMENT

The Order on review, *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, Report and Order, GN Docket No. 22-69, 2023 WL 8614401 (rel. Nov. 20, 2023) ("Order"), was published in the Federal Register on January 22, 2024. 89 Fed. Reg. 4128. Petitions for review were timely filed in this and other circuits. The cases were consolidated and assigned to this Court by the Judicial Panel on Multidistrict Litigation. Jurisdiction rests on 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).

# STATEMENT OF THE ISSUES

1. Whether the Commission reasonably interpreted section 60506 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 60506, 135 Stat. 429 (2021) ("Infrastructure Act"), codified as 47 U.S.C. § 1754, which directs the agency to adopt rules "preventing digital discrimination of access," to address unjustified discriminatory effects as well as discriminatory intent. *Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519 (2015).

2. Whether the Commission's framework for investigating disparate-impact complaints is reasonable and consistent with Supreme Court precedent in related contexts. *Id.*; 47 U.S.C. § 1754(b)(1).

3. Whether the Commission appropriately declined to exempt from its rules entities that do not provide broadband service but whose conduct deprives consumers of equal access to such service. *Bldg. Owners and Mgrs. Ass'n Int'l v. FCC*, 254 F.3d 89 (D.C. Cir. 2001); 47 U.S.C. § 1754.

4. Whether the Commission has authority to enforce its rules by employing its full suite of remedies, including monetary forfeitures.

*Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021); *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010); 47 U.S.C. § 1754.

5. Whether the Commission adequately considered the costs and benefits of its rules. *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019); *Citizens Telecom. Co. of Minn. v. FCC*, 901 F.3d 991 (8th Cir. 2018).

6. Whether the Commission a) rationally declined to adopt formal complaint procedures and b) gave sufficient notice for and reasonably explained its presumption of compliance for participants in a funding program with its own nondiscrimination requirements. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016); *China Telecom (Ams. ) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022); *Burlington N. R.R. Co. v. State of Minn.*, 882 F.2d 1349 (8th Cir. 1989); 47 U.S.C. § 154(j).

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

**1**. Providing equal access to telecommunications service has been a central goal of the Commission since its inception. Section 1 of the Communications Act of 1934, as amended ("Communications Act"), 47 U.S.C. §§ 151, *et seq.*, directs the FCC "to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient,

Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges."

To fulfill this "core mission," the Commission "aims to achieve 'universal service' by ensuring that critical communications technologies are made available throughout the United States." *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1241 (D.C. Cir. 2018). The FCC's universal-service subsidy programs authorized by section 254 of the Communications Act, 47 U.S.C. § 254, benefit millions of Americans by, among other things, ensuring that low-income consumers and those in "high-cost" rural areas have access to telecommunications services that are reasonably comparable to those available in urban areas. App. 6 (Order n.14 & accompanying text) (citing *Report on the Future of the Universal Service Fund*, 36 FCC Rcd 18006 (2021)) (describing the various FCC universal-service programs).

Section 254 "makes clear" that the concept of "universal service" is "dynamic" and must "keep pace with technological advancements, need, use, and the public interest." *AT&T*, 886 F.3d at 1241. Consistent with that requirement, section 706 of the Telecommunications Act of 1996 ("1996 Act") requires the Commission to report annually on whether

broadband "is being deployed to all Americans in a reasonable and timely fashion." Pub. L. No. 104-104, 110 Stat. 56, § 706, codified at 47 U.S.C. § 1302. And as directed by the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2), 123 Stat. 115, 516 (2009), the FCC in 2010 released a National Broadband Plan "to ensure that all people of the United States have access to broadband capability."

**2.a**. Despite the efforts of Congress and the Commission, many Americans continue to lack access to broadband service. App. 7-8 (Order ¶ 10). This "digital divide"—"the divide between those with access to new technologies and those without"—"has underpinnings in the country's historical segregation and redlining practices in housing." App. 2, 6 (*id.* n.2, ¶ 9). *See Inclusive Communities*, 576 U.S. at 528 (the "vestiges" of "[d]e jure residential segregation by race" "remain today, intertwined with the country's economic and social life") (quotation marks omitted).

"This history has carried forward to broadband access, as researchers have found that access to broadband in the home can decrease in tandem with historical residential risk classifications, and such differences in broadband access vary depending on income levels, race, and ethnicity." App. 7 (Order ¶ 9); App. 12-13 (*id.* n.59 &

accompanying text). "Lack of equal access to broadband is not limited to historically redlined urban communities, but also encompasses and acutely affects both rural and urban low-income communities, other rural communities, and Tribal areas." App. 8 (*id.* ¶ 11). Indeed, results from detailed surveys of computer and Internet use in the United States "have persistently shown that historically disenfranchised populations, including many of those specified in the statute that prompted this proceeding, are disproportionally less likely to use the Internet at all, and are also less likely to have the same level of devices and services as their counterparts." App. 538 (National Telecommunications and Information Admin. ("NTIA") Comments at 3 n.5); App. 25 (Order n.137 & accompanying text).

"The global COVID-19 pandemic compounded the problem of unequal access" in the United States by increasing Americans' dependence on broadband service "to meet basic needs such as working from home, distance learning, accessing public benefits and services, telehealth, job-hunting, remote worship activities, remote family and social connections, and other daily activities." App. 8 (*id.* ¶ 12). "Overall, research and data indicate that during the pandemic, entrenched

disparities in broadband internet access service in low-income, rural, and minority households adversely affected all aspects of daily life, including accessing education, seeking housing and employment online, accessing telehealth medical care, and applying for services." App. 9 (*id.* ¶ 13); App. 13 (*id.* ¶ 21).

**b**. On November 15, 2021, the Infrastructure Act was enacted. In Division F of the Act, entitled "Broadband," Congress found that, among other things:

> (1) Access to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States.
>
> (2) The persistent 'digital divide' in the United States is a barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education.
>
> (3) The digital divide disproportionately affects communities of color, lower-income areas, and rural areas, and the benefits of broadband should be broadly enjoyed by all.

Pub. L. No. 117-58, § 60101, 135 Stat. 1182, codified at 47 U.S.C. § 1701.

The Infrastructure Act set in motion a broad range of efforts by the Commission and other federal agencies aimed at achieving universal deployment, adoption, and effective use of broadband service. Congress provided $65 billion in funding to address barriers to digital equity. This funding fell into seven major programs, including the Broadband Equity,

Access, and Deployment ("BEAD") program ($42.45 billion) administered by NTIA, *see* Pub. L. No. 117-58, § 60102(b), 47 U.S.C. § 1702(b), and the Affordable Connectivity Program ($14.2 billion) administered by the FCC. *See id.* § 60502.

Congress paired these funding programs with the mandate that the Commission adopt rules preventing discrimination of access to broadband service. Section 60506 of the Infrastructure Act announces "the policy of the United States that, insofar as technically and economically feasible," "subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service." Pub. L. No. 117-58, § 60506(a)(1), 135 Stat. 1245, codified at 47 U.S.C. § 1754(a)(1). The statute defines "equal access" to mean "the equal opportunity to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions." *Id.* § 1754(a)(2). Congress further declared that "the Commission should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service." *Id.* § 1754(a)(3).

Section 60506 also directed the Commission, "[n]ot later than two years after November 15, 2021," to "adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including—

> (1) preventing digital discrimination of access based on income level, ethnicity, color, religion, or national origin; and
>
> (2) identifying necessary steps for the Commission to take to eliminate discrimination described in paragraph (1).

*Id.* § 1754(b). In addition, the statute requires that the FCC "revise its public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination." *Id.* § 1754(e).

**c**. On March 17, 2022, the Commission released a Notice of Inquiry regarding implementation of section 60506. App. 236 (*Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, 37 FCC Rcd 4198 (2022)). Among other things, the FCC asked whether the statute requires proof of "discriminatory intent" in determining whether any "discrimination of access" has occurred. App. 244 (*id.* ¶ 22). The FCC also asked for comment on the "entities," including "entities other than broadband providers," to which

the statute applies. App. 246 (*id.* ¶ 25).

In response to the Notice of Inquiry, the Commission "received substantial comment" from "a range of stakeholders." App. 263 (*Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, 37 FCC Rcd 15274 (2022), ¶ 10). On December 22, 2022, the FCC released a Notice of Proposed Rulemaking "seek[ing] further, focused comment on the statutory language and proposals . . . in the record" in order to "create a framework for addressing digital discrimination." App. 259 (*id.* ¶ 2). The FCC again asked whether the statute should be read to prohibit only conduct motivated by discriminatory intent, or alternatively, whether its prohibition of "discrimination of access" also authorizes a "'discriminatory effects' or disparate impact test." App. 269 (*id.* ¶ 22). The FCC also asked what revisions, if any, are necessary to its complaint process to comply with the statute, and whether it has "authority to enforce rules adopted" pursuant to section 60506. App. 288, 297 (*id.* ¶¶ 52, 71).

## B. The Order on Review

After reviewing "more than 1,400 pages of record comments . . .

from a wide range of stakeholders," App. 15 (Order ¶ 26), on November 15, 2023, the Commission adopted the Order on review implementing section 60506.

**1**. In the Order, the Commission read the statutory term "digital discrimination of access" to cover business practices that have unjustified discriminatory effects based on the protected characteristics as well as intentional discrimination. App. 16-17 (*id.* ¶ 33). The FCC emphasized that the statute's definition of "access" as the "opportunity to subscribe," and its admonition that "consumers should 'benefit' from equal access to broadband," "focus[] on the impact of the policy or practice on the consumer's chance or right to obtain service rather than intent." App. 20 (*id.* ¶¶ 41-42). *See* App. 23 (*id.* at ¶ 44).

The Commission found further support for its statutory reading in "Congress's directive in section 60506(b) that [the agency] take into account issues of technical and economic feasibility." App. 32 (*id.* ¶ 63). Not only does that directive "represent[] a formulation of the traditional [business justification] test" for disparate-impact claims "as tailored to the specific context of section 60506," the Commission explained, but considerations of technical and economic feasibility would be "largely

superfluous" to complaints of "intentional discrimination of access." *Id.*

The Commission also found "little or no evidence" "that impediments to broadband internet access service are the result of intentional discrimination." App. 25 (*id.* ¶ 47). Accordingly, restricting the reading of digital discrimination "to conduct motivated by discriminatory intent would not fully accomplish" Congress's mandate "to facilitate equal access to broadband service and prevent discrimination." App. 29 (*id.* ¶ 55). The FCC concluded that it must "adopt rules that address the problems that do exist rather than those that do not." App. 29 (*id.* ¶ 56).

**2.** The Commission defined the entities subject to its digital-discrimination rules to include not only broadband internet access service providers ("broadband providers"), but also other entities whose practices could impede access to broadband service on a discriminatory basis. 47 C.F.R. § 16.2; App. 44-46 (Order ¶¶ 85-88). In examining the practices of entities that are not themselves broadband providers, the FCC stated that it "will consider, among other things, the closeness of the relationship between that entity's policies and practices and the provision of broadband service." App. 45 (*id.* ¶ 87).

**3**. Pursuant to section 60506(e), the Commission also revised its informal complaint process to accept complaints alleging digital discrimination. App. 58-61 (*id.* ¶¶ 107-18). Under the revised process, investigations will be initiated at the discretion of the FCC staff, based on data gathered through the complaint process and elsewhere. App. 59, 66 (*id.* ¶¶ 111, 132). This staff-initiated investigative framework is designed to "afford[] the Commission necessary flexibility," while minimizing burdens on covered entities and complainants alike. App. 61 (*id.* ¶ 119); App. 43, 58-60 (*id.* ¶¶ 84, 109, 113). The FCC stated that it will conduct investigations using its standard "enforcement toolkit, which ranges from letters of inquiry to remedial orders to forfeiture proceedings." App. 61 (*id.* ¶ 119).

The Commission also made clear that it will require robust evidence that a practice causes the alleged discriminatory effect, and, as required by the statute, provide the opportunity to show that a practice with discriminatory effects is justified by genuine "issues of technical and economic feasibility." 47 U.S.C. § 1754(b); App. 25-30 (Order ¶¶ 49-50); App. 69, 76 (*id.* ¶¶ 140, 157). The FCC "anticipate[d] that such justification will include proof that there is not a reasonably available

and achievable alternative policy or practice that would serve the entity's legitimate business objectives with less discriminatory effect." App. 26 (*id.* ¶ 50). Finally, "the Commission will determine whether a less discriminatory alternative policy or practice was reasonably available and achievable  and identify any such alternative." App. 69 (*id.* ¶ 140).

## SUMMARY OF THE ARGUMENT

**I**. To fulfill Congress's broad mandate in section 60506 to adopt rules "preventing digital discrimination of access," 47 U.S.C. § 1754(b)(1), the Commission reasonably determined that its rules must encompass broadband service-related practices and policies with unjustified discriminatory effects. That decision, which dutifully carries out Congress's command, reflects the best reading of the statutory text, context, and purpose.

**A.1**. Section 60506 defines "discrimination of access" in terms of the "opportunity to subscribe," 47 U.S.C. § 1754(a)(2), (b)(1), and thus "refers to the consequence of actions" rather than "the mindset of actors." *Inclusive Communities*, 576 U.S. at 533. The statute's focus on "preventing digital discrimination of access" without respect to a specific actor and, therefore, without respect to any actor's intent, likewise indicates that it does not require proof of intent. 47 U.S.C. § 1754(b)(1).

**2**. The statutory context further supports the Commission's reading, which gives full effect to Congress's direction that the digital-discrimination rules account for "technical and economic feasibility." *Id.* § 1754(b). Feasibility considerations operate as an important limitation on rules barring discriminatory effects, while they have little bearing on claims of discriminatory treatment. The FCC's reading also aligns with its longstanding responsibility to promote nondiscrimination, regardless of motive, in the telecommunications sector.

**3**. The statutory purpose supports the Commission's interpretation as well. Congress's findings in the Infrastructure Act confirm its concern with the effects, not only the purpose, of discriminatory conduct related to the provision of broadband service. Congress's concern with discriminatory effects is substantiated by the record before the agency, which reflects that intentional discrimination has not played a significant role in perpetuating the digital divide.

Neither silence in section 60506's legislative history regarding discriminatory effects nor the post-enactment statements of individual legislators is entitled to interpretive weight. And the FCC's construction of section 60506 ensures that its digital-discrimination rules will have real and substantial effect. By contrast, Industry Petitioners' reading

reduces the statute to a redundant protection against intentional discrimination that they themselves do not believe will occur.

**B.** Industry Petitioners' policy arguments are directed at an expansive regulatory framework that the Commission specifically rejected. The digital-discrimination rules are confined to practices with *unjustified* discriminatory effects, and to the comparability of broadband service offered to consumers; they do not bar ordinary business practices. The FCC reasonably predicted that requiring providers to ground their practices in sound and neutral business objectives will not discourage rapid and efficient deployment of broadband service. Routine buildout and upgrade decisions are protected from baseless complaints under the FCC's robust requirements for identifying disparate impacts that warrant investigation. Claims that the rules will lead to unfunded mandates and rate regulation are groundless.

**C**. Nor does the major questions doctrine prohibit the agency from carrying out its congressionally-mandated task. Congress's extension of longstanding universal-service and nondiscrimination goals to combating digital discrimination neither transforms the Commission's regulatory authority nor risks fundamentally altering the landscape of the telecommunications industry. In any case, Congress's legislative

command is unmistakable. Section 60506 is a clear mandate to the FCC to prevent discrimination in the provision of access to broadband service.

**II**. The Commission's rules and procedures for investigating digital-discrimination complaints are reasonable and align with the Supreme Court's instructions for adjudicating disparate-impact claims in related contexts. The FCC's feasibility standard takes into consideration any substantial, legitimate business objective. The FCC itself will identify any less discriminatory, alternative practice that is reasonably available. The FCC's regulations provide leeway for broadband providers to make practical business choices and profit-related decisions.

**III**. The Commission's rules properly reach entities that do not provide broadband service but whose conduct deprives consumers of equal access to service. Section 60506(b)(1) does not limit discrimination to specific actors. Precedent from other contexts supports the FCC's authority over parties that directly restrict access to a communications service. And the robust causality requirement imposed by the FCC's rules ensures that entities with merely a tangential relationship to the provision of broadband service will not be subject to rule enforcement.

**IV.A**. There is no basis in the statute to limit the Commission's enforcement authority to "forward-looking" measures alone. Industry Br. 65. Congress's mandate to adopt rules *preventing* discrimination logically presupposes authority to enforce the rules effectively. And the statutory direction to "revise" the FCC's "complaints process," 47 U.S.C. § 1754(e), demonstrates Congress's expectation that the FCC would use the remedies available to it under the Communications Act to enforce the rules. The FCC's conclusion that its full suite of enforcement tools, including monetary forfeitures, is needed to carry out its statutory mandate was well within the agency's broad discretion under section 60506.

**B**. Alternatively, the Commission properly exercised its ancillary authority under section 4(i) of the Communications Act. Broadband service is covered by the FCC's general authority over wire and radio communications, and the FCC's traditional enforcement tools are necessary to effective performance of its responsibilities under section 60506.

**V**. The Commission adequately considered the costs that its rules may impose on broadband providers and other covered entities. The

FCC evaluated the administrative and compliance burdens on covered entities in light of the structural protections provided in the rules and its staff-initiated, non-adjudicatory investigation process, as well as the costs to unserved and underserved communities (and the Nation as a whole) imposed by unequal access to broadband service. The FCC's judgment that the rules are the most cost-effective means to accomplish its statutory responsibilities deserves deference.

**VI**. While Industry Petitioners contend that the FCC overreached, Benton Petitioners contend that the agency failed to go far enough by refusing to adopt formal complaint procedures, and by establishing a presumption of compliance with the rules for BEAD fund recipients who comply with that program's nondiscrimination requirements. These objections also lack merit.

**A.** The Commission rationally declined to adopt formal, adjudicatory procedures for digital-discrimination complaints, at least for the time being, while it gains experience with administering the new rules. Informal procedures provide flexibility for the FCC staff to determine when investigation is warranted, allowing the agency to husband its resources and minimizing burdens on covered entities. This

measured, incremental approach was well within the FCC's broad discretion to structure its procedures.

**B.** The Commission provided adequate notice that it was considering a presumption of compliance with the rules for participants in the BEAD program. The FCC's Notice of Proposed Rulemaking invited comment on whether to adopt a presumption of compliance when certain conditions are met, such as those associated with funding programs. That notice reasonably informed interested parties that such a presumption might be adopted for BEAD program participants. And the FCC reasonably explained its decision to establish a presumption— subject to rebuttal by contrary evidence—of compliance with the digital-discrimination rules for BEAD program participants, given that program's complementary nondiscrimination regulations.

\* \* \*

In sum, the Commission conscientiously carried out the broad task that Congress set out for it in section 60506 of the Infrastructure Act— to adopt rules that "facilitate equal access" to broadband service, and that prohibit discrimination of access "based on income level, race,

ethnicity, color, religion, or national origin." 47 U.S.C. § 1754(b). The FCC's Order adhering to Congress's directives should be upheld.

## STANDARD OF REVIEW

The Court finds agency action unlawful only where it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'" or in excess of statutory authority based on "'a reasonable interpretation'" of the agency's statutes. *Simmons v. Smith*, 888 F.3d 994, 998 (8th Cir. 2018) (quoting 5 U.S.C. § 706(2)(A)). "To set aside an agency's decision as arbitrary or capricious, we must determine that the agency acted outside the bounds of reasoned decisionmaking." *Russellville Legends LLC v. United States Army Corps of Eng'rs*, 24 F.4th 1192, 1196 (8th Cir. 2022) (quotation marks omitted).

Where, as here, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," the Court gives the regulations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Glover v. Standard Fed. Bank*, 283 F.3d 953, 961 (8th Cir. 2002) (quoting *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984)). Even outside the *Chevron* framework, "the interpretation of an agency charged with the

administration of a statute is entitled to substantial deference." *Blum v.*

*Bacon*, 457 U.S. 132, 141 (1982).

## ARGUMENT

## I. THE COMMISSION REASONABLY INTERPRETED SECTION 60506 TO REACH PRACTICES WITH UNJUSTIFIED DISCRIMINATORY EFFECTS.

Congress directed the FCC to "adopt final rules to facilitate equal access," including rules "preventing digital discrimination of access." 47 U.S.C. § 1754(b), (b)(1). To fulfill that broad mandate, the FCC has determined that its rules must encompass business practices with unjustified discriminatory effects on access to broadband service. Industry Petitioners fail to show that Congress's mandate is implicitly limited to rules preventing only intentional discrimination. On the contrary, the FCC's interpretation reflects the best reading of the statutory text, context, and purpose.

### A. The Statutory Text, Context, and Purpose Support the Commission's Interpretation.

**1.a**. The Commission's interpretation reflects the best reading of section 60506's text. The statutory language "refers to the consequences of actions." *See Inclusive Communities*, 576 U.S. at 533 ("antidiscrimination laws must be construed to encompass disparate-

impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with the statutory purpose."). App. 18-21 (Order ¶¶ 39-42). The statute mandates "rules to facilitate equal access," including "preventing digital discrimination of access." 47 U.S.C. § 1754(b), (b)(1). By defining "equal access" "as the '*opportunity* to subscribe,'" the statutory "text focuses on the impact of a policy or practice on the consumer's chance or right to obtain service rather than intent." App. 20 (Order ¶ 41) (quoting 47 U.S.C. § 1754(a)(2)).[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(2), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)(2)—two statutes the Supreme Court has interpreted to authorize disparate-impact liability— similarly protect employment "opportunities." App. 20 (Order n.98 & accompanying text). *See Smith v. City of Jackson*, 544 U.S. 228, 235 (2005); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971).

---

[1] The ordinary meaning of "opportunity" is "'a good chance for advancement or progress.'" App. 20 (Order n.100 ) (quoting Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/opportunity).

That the term "equal opportunity" does not specifically appear in the provision directing the Commission to adopt rules "preventing digital discrimination of access," 47 U.S.C. § 1754(b)(1), *see* Industry Br. 31, is of no moment. That direction must be read together with the statute's express statement of purpose, which is "to facilitate equal access." 47 U.S.C. § 1754(b). And section 60506 expressly defines "equal access" to mean "the equal opportunity to subscribe" to broadband. *Id.* § 1754(a)(2). *See* App. 28 (Order n.156).[2]

**b**. In addition, section 60506 requires the FCC to adopt rules "preventing digital discrimination of access based on" the protected characteristics. 47 U.S.C. § 1754(b)(1). This provision "focus[es] on an event that occurs without respect to a specific actor, and therefore without respect to any actor's intent or culpability." *Dean v. United*

---

[2] Industry Petitioners are incorrect that *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021), "rejected the idea that 'equal opportunity' guarantees justify a disparate-impact analysis." Industry Br. 31. *Brnovich* addressed a Voting Rights Act provision that requires voting processes to be "'equally open'" to minority and non-minority groups. 594 U.S. at 668 (quoting 52 U.S.C. § 10301(b)). The parties did not dispute that the provision "does not demand proof of discriminatory purpose." *Id.* at 674. The Court found the disparate-impact analysis in Title VII and Fair Housing Act cases to be unhelpful because "[t]he text of the relevant provisions … differ[s] from that of" the Voting Rights Act. *Id.* at 673.

*States*, 556 U.S. 568, 572 (2009) (statutory sentencing enhancement "if the firearm is discharged" did not require separate proof of intent); *Bartenwerfer v. Buckley*, 598 U.S. 69, 75 (2023) (statute barring discharge of debt "for money . . . obtained by . . . false pretenses, a false representation, or actual fraud" did not require proof of intent). Congress's direction to "prevent[] digital discrimination of access" without respect to a specific actor reflects that "[i]t is whether [discrimination] happened—not how or why it happened—that matters." *Dean*, 556 U.S. at 572.

**c**. Reading the statute to limit its reach to intentional discrimination also would be inconsistent with the ordinary meaning of the word "prevent[]," 47 U.S.C. § 1754(b)(1), which "the dictionary defines … as 'to render (an *intended, possible, or likely* action or event) impractical or impossible by anticipatory action.'" *Fowler v. United States*, 563 U.S. 668, 675 (2011) (emphasis in original) (quoting OED Online (Mar. 2011)). The Commission could not "fully accomplish [its] mandate from Congress," App. 29 (Order ¶ 55), if it could not reach all forms of actions that restrict consumer access to broadband service on the basis of the statute's listed characteristics. *See Watson v. Fort Worth*

*Bank & Trust*, 487 U.S. 977, 990 (1988) ("a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices.").

**d.i**. Industry Petitioners' contrary textual arguments are unsound. They contend (Br. 24-25) that the word "discrimination" in subsection (b)(1) refers only to intentional discrimination. But it is well-settled that actions not animated by discriminatory intent can be "discriminatory in operation." *Griggs*, 401 U.S. at 431. Thus, where warranted, the Supreme Court has construed federal statutes prohibiting "discrimination" to encompass claims that policies have an impermissible disparate impact. *Inclusive Communities*, 576 U.S. at 534; *Smith*, 544 U.S. at 235; *Griggs*, 401 U.S. at 431. *See Bd. of Educ. v. Harris*, 444 U.S. 130, 139-141 (1979) (discriminatory-impact test for federal funds eligibility).[3]

---

[3] *Murray v. UBS*, 601 U.S. 23 (2024), is inapposite. *See* Industry Br. 25. *Murray* addressed whether a whistleblowing employee needs to show that his employer acted with "retaliatory intent" to recover for discriminatory treatment under the Sarbanes-Oxley Act's whistleblower-protection provisions. 601 U.S. at 26. The Supreme Court focused on the requirements for a claim of intentional discrimination under that statute, and did not address whether discrimination under the statute encompassed disparate-impact claims.

**ii**. The Supreme Court's precedents also dispose of Industry Petitioners' argument (Br. 25-26) that the phrase "based on" in subsection (b)(1) (providing for rules "preventing digital discrimination based on" the listed characteristics) requires discriminatory intent. In *Inclusive Communities*, the Court concluded that the Fair Housing Act authorized disparate-impact liability even though the statute similarly prohibits discrimination "because of race, color, religion, familial status, or national origin." 576 U.S. at 533-34 (quoting 42 U.S.C. §§ 3604(a), 3605(a)). *See also City of Jackson*, 544 U.S. at 233 (statute prohibiting deprivation of employment opportunities or adversely affecting employee status "because of" age) (quoting 29 U.S.C. § 623 (a)(2)); *Griggs*, 401 U.S. at 426 n.1 (statute prohibiting same "because of" race, color, religion, sex, or national origin) (quoting 42 U.S.C. § 2000e-2(a)(2)). The phrase "based on" in section 60506(b)(1) is most naturally read to identify the required causal link between a listed characteristic and the allegedly discriminatory effect. That link can exist, and can reliably be established, even if the covered entity adopted the practice for reasons unrelated to its allegedly discriminatory effect. *Cf. Cinnamon Hills Youth Crisis Ctr., Inc.* v. *Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012) (Gorsuch, J.)

(explaining that a blind tenant who relies on a guide dog and is subject to a "no pets" policy, and a paraplegic individual precluded from living in a first-floor apartment, are unable "to live in those housing facilities . . . *because* of conditions created by their disabilities").

**iii**. Industry Petitioners (Br. 26-30) point out that section 60506 does not contain the term "otherwise," which the Supreme Court relied on in reading Title VII, the Age Discrimination in Employment Act, and the Fair Housing Act to authorize disparate-impact liability. But Congress is not required to use any specific verbal formulation to authorize rules covering discriminatory effects. *See Inclusive Communities*, 576 U.S. at 535 ("It is true that Congress did not reiterate Title VII's exact language in the [Fair Housing Act], but that is because to do so would have made the relevant sentence awkward and unclear."). The term "otherwise" in those statutes "signal[s] a shift in emphasis from an actor's intent to the consequences of his actions," because the provisions in question "begin with prohibitions on disparate treatment" and end with "phrases looking to consequences." *Id.* at 534-535. No such shift in emphasis is needed here because section 60506 does not begin with any specific prohibition on disparate treatment but, rather,

expresses Congress's desire to prohibit all "discrimination *of access.*" *See* App. 23 (Order ¶ 44) ("Congress chose words appropriate to the statute's purpose of promoting equal access to broadband internet service).[4]

**2.a**. The statutory context supports the Commission's reading as well. Congress's mandate that the FCC's rules account for the "issues of technical and economic feasibility" presented by the goal of equal access, 47 U.S.C. § 1754(b), makes far more sense under a reading of the statute that permits the agency to prohibit practices that, in effect but not on purpose, deny protected individuals equal opportunity to obtain broadband service. App. 32 (Order ¶ 63) (feasibility provision is "largely superfluous" to the problem of intentional discrimination). Feasibility considerations capture the kinds of legitimate business justifications that are "[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited" under section 60506. *See Inclusive Communities*, 576 U.S. at 541 (discussing disparate-impact analysis under the Fair Housing Act). In contrast, "[t]here is no valid 'technical'

---

[4] *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241-42 (6th Cir. 2019), did not hold that omission of the word "otherwise" is "dispositive." Industry Br. 29-30. The Sixth Circuit held that section 504 of the Rehabilitation Act of 1973 does not authorize disparate-impact claims based on statutory text different from that here. 926 F.3d at 242.

reason why the race of a subscriber should affect the metrics of their service. There is no valid 'economic' reason why people of one religion should have to pay more than people of another religion." App. 459-60 (Lawyers' Committee Comments at 14-15) (cited in App. 32 (Order n.189)). The FCC's reading thus gives full effect to section 60506's feasibility provision, which would do little work if the statute were limited to complaints of intentional discrimination. App. 33 (Order ¶ 65). *See Smith*, 544 U.S. at 238-39 (reasoning that the Age Discrimination in Employment Act's Reasonable Factor Other than Age provision supported the availability of disparate-impact liability because an employer may defeat liability in most intentional discrimination cases *without* reference to the provision).

Industry Petitioners contend (Br. 34) that feasibility arguments could play some indirect role "even to rebut charges of intentional discrimination." In most disparate-treatment cases, however, evidence of "impact alone is not determinative, and the Court must look to other evidence." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The feasibility provision "plays its principal role by precluding liability" for discriminatory effects in cases where such effects

are not reasonably avoidable. *Smith*, 544 U.S. at 239. *See Inclusive Communities*, 576 U.S. at 539 ("A similar logic applies [under the Fair Housing Act]."). Its presence, therefore, supports the FCC's reading.

Industry Petitioners also argue (Br. 32-33) that the feasibility condition could serve a function with respect to rules "to facilitate equal access" generally, 47 U.S.C. § 1754(b)), or rules adopted pursuant to subsection (b)(2) of the statute. But the statute specifies that the feasibility condition applies equally to the rules authorized under subsection (b)(1) to "prevent[] digital discrimination of access." If those rules are interpreted to encompass only intentional discrimination, the feasibility condition serves little purpose with respect to that important provision. App. 32 (Order ¶ 63). *Cf., e.g., Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) ("[W]e must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'").

**b**. The FCC's statutory reading also "aligns with the Commission's longstanding obligation to promote nondiscrimination in the telecommunications sector," which requires no showing of intent. App. 24 (Order n.134 & accompanying text). *See Am. Tel. & Tel. Co. v. Cent.*

*Off. Tel., Inc.*, 524 U.S. 214, 223 (1998) ("Regardless of the carrier's motive—whether it seeks to benefit or harm a particular customer—the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services. It is that antidiscriminatory policy which lies at the heart of the common-carrier section of the Communications Act.") (quotation marks omitted).

**3.a**. The statutory purpose further supports the Commission's reading. Congress found the digital divide to be "'a barrier to the … equitable distribution of essential public services'" that "'disproportionately affects communities of color, lower-income areas, and rural areas.'" App. 10 (*id.* ¶ 14 (quoting 47 U.S.C. § 1701)). Accordingly, section 60506(a) establishes "the policy of the United States" that "subscribers should benefit from equal access" to broadband service and that "the Commission should take steps to ensure that all people of the United States benefit from equal access." 47 U.S.C. § 1754(a)(1), (3). This policy "looks to effect, not purpose." *Bd. of Educ. v. Harris*, 444 U.S. at 141 (policy of national uniformity with respect to "conditions of segregation by race" in schools focused "on actual effect, not on

discriminatory intent") (quotation marks omitted). *See* App. 23-24 (Order ¶ 45).

Congress's concern with discriminatory effects is confirmed by the record before the agency, which did not show that the "digital divide" in broadband access was substantially caused by intentional discrimination on the part of industry participants. App. 33 (*id.* ¶ 65); App. 25 (*id.* ¶ 47). Reading the statute to require intent to discriminate would render the FCC's rules largely ineffective by limiting them to conduct that has not had a significant role in perpetuating the digital divide. As the FCC recognized, it "is obligated to … adopt rules that address the problems that do exist rather than those that do not." App. 29 (*id.* ¶ 56).

And while Congress in the Infrastructure Act adopted funding measures to facilitate equal access to broadband, there is nothing to suggest that it intended such measures to be the *only* method of achieving that goal—indeed, the statutory directive in section 60506(b) shows otherwise. The FCC's reading, moreover, prevents digital discrimination by all broadband providers, even those who do not participate in the Infrastructure Act's funding programs.

**b**. Although Industry Petitioners correctly observe that there is no reported legislative history on the subject of discriminatory effects, they incorrectly argue that this absence proves that Congress did not intend to authorize rules encompassing such effects (Br. 35-37).[5] As the Supreme Court has warned, "silence in the legislative history, 'no matter how 'clanging,' cannot defeat the better reading of the text and statutory context.'" *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018). *See Reynolds v. Spears*, 93 F.3d 428, 434 (8th Cir. 1996) ("our hesitation to draw inferences [from legislative history] is not assuaged when there is no history at all"). Here, the silence in the legislative history is just that: silence. "The only fair inference from Congress's silence is that Congress had nothing further to say, its statutory text doing all of the talking." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 121 (2007) (Scalia, J., dissenting).

---

[5] The bill for the Infrastructure Act approved by the United States House of Representatives (H.R. 3684) and referred to the Senate contained no provision regarding digital discrimination of access. Section 60506 was added by the Senate as part of a comprehensive amendment replacing the text of the House bill, 167 CONG. REC. S5247 (daily ed. Aug. 1, 2021), but without generating a legislative record.

Industry Petitioners also point (Br. 36-37) to statements by individual Senators after the Infrastructure Act was enacted that section 60506 was not intended to authorize rules that reach discriminatory effects. But those same Senators acknowledged that *other* Senators say it *was* meant to reach discriminatory effects. In any event, "whatever interpretive force one attaches to legislative history, the Court normally gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law." *Barber v. Thomas*, 560 U.S. 474, 485-86 (2010); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").

Ultimately, Industry Petitioners' reading turns the statute into a redundant protection against intentional discrimination that they themselves do not believe will occur.[6] By contrast, the Commission's

---

[6] Discrimination in connection with broadband funding programs is independently prohibited under the Infrastructure Act. Pub. L. No. 117-58, § 60307(a)(1), 135 Stat. at 1231 (no person may "be subjected to discrimination under any program or activity that is funded with" Digital Equity Act funds "on the basis of" certain characteristics). *See* 47 U.S.C. § 1702(g)(2)(C)(i)-(ii) (requiring that states distribute BEAD funds "in an equitable and nondiscriminatory manner" and ensure that subgrantees "use[] the funds in an equitable and nondiscriminatory manner.").

interpretation ensures that Congress's digital-discrimination prohibition will have "real and substantial effect." *See Ross v. Blake*, 578 U.S. 632, 641-42 (2016) ("When Congress amends legislation, courts must presume it intends [the change] to have real and substantial effect.") (quotation marks omitted).

## B. Industry Petitioners' Policy Concerns Are Unfounded.

**1**. Industry Petitioners claim that "ordinary business practices are off limits" under the Commission's rules "if they have different effects on consumers of different income levels." Br. 17; *id.* 38-41. The rules, they say, "could even be read to bar [broadband providers] from charging a uniform price for their services," as the same price "will necessarily be more difficult for a low-income customer to afford." *Id.* at 40. But the rules are far more circumscribed than Industry Petitioners contend.

For starters, the rules bar only *unjustified* discriminatory effects. To find a rule violation, the Commission must determine that a practice causes significant discriminatory effects and is not justified by a valid business objective. App. 26, 32-33, 69 (Order ¶¶ 50, 63, 140). To the extent that the rules entail "scrutiny of common business practices for their differential effect on customers of varying income levels," Industry

Br. 2, they do so to discourage practices that arbitrarily perpetuate the digital divide. *See* App. 24-25 (Order ¶ 46). The rules do not make any practice with allegedly disparate effects actionable, only those lacking a justification.

Industry Petitioners also mistakenly conflate comparability of service with affordability. *See* Industry Br. 41 ("the power [to] determine whether prices are 'comparable' . . . is the power to determine which price is appropriate") (quotation marks omitted). The function of the FCC's broad definition of covered service elements is to ensure like-to-like comparison in evaluating "whether the consumer has the equal opportunity to obtain and utilize" broadband service. App. 75 (Order ¶ 155); App. 52-54, 56-57 (*id.* ¶¶ 102-03, 105). In other words, the rules look to whether like service is made available on like terms, *not* the affordability of the same or similar terms to consumers of different income levels.

Taking Industry Petitioners' example (Br. 40), a "uniform price" for the same service in an area would be comparable by definition—it would be the same for low- and high-income consumers alike. That same price might not be equally *affordable* to all, but provided that it is offered to

all, it would not have a discriminatory effect for purposes of the rules. Moreover, a provider would be free to show that such a uniform price is justified by considerations of "technical or economic feasibility." 47 C.F.R. § 16.3(b).

**2**. The Commission also reasonably rejected Industry Petitioners' claim (Br. 42-44) that the agency's interpretation will discourage deployment of broadband service, particularly in light of the "historic funding incentives" provided elsewhere in the Infrastructure Act "to spur broadband investments in unserved and underserved communities throughout the United States." *See* App. 26 (Order ¶ 52). The FCC's rules guard against unfounded complaints by requiring a significant threshold determination of discriminatory effects. App. 25 (*id.* ¶ 49). A violation will be found only if a covered entity cannot justify its discriminatory practice on feasibility grounds, or if its valid objectives can be achieved by other, less discriminatory means. App. 26-27 (*id.* ¶¶ 50, 52). In addition, the FCC's "self-initiated investigation process" will limit enforcement to complaints that are, at the outset, supported by evidence of unlawful discrimination. App. 66 (*id.* ¶ 132).

Further, the FCC explained that many covered entities "must already comply with the nondiscrimination requirements associated with the receipt of federal funds." App. 65 (*id.* ¶ 129). Complying with those requirements has not prevented broadband providers from rapidly and efficiently deploying and providing service to customers.

To be sure, the rules "will require greater diligence by covered entities in determining and documenting the reasons for access gaps in their service areas." App. 27 (*id.* ¶ 52). But that modest burden is "in furtherance of the statutory goal of equal access." *Id.* Accordingly, the FCC was "not persuaded that adoption of a disparate impact standard will disincentivize economic investments in networks." App. 27 (*id.* ¶ 52). That predictive judgment deserves deference. *See Citizens Telecom*, 901 F.3d at 1010 ("[J]udicial deference to agency action is 'especially important' when [an] agency's judgments are 'predictive.'") (quoting *Sw Bell Tel. Co. v. FCC*, 153 F.3d 523, 547 (8th Cir. 1998) (quotation marks omitted)).

**3**. Industry Petitioners (Br. 42-43) also contend that the Commission's decision to entertain complaints based on discriminatory effects will lead to unfunded mandates to deploy or upgrade broadband

networks. The Commission reasonably rejected such concerns. App. 30 (Order ¶ 57 n.171). It found that section 60506 does *not* authorize retroactive liability, including "imposition of [deployment] requirements in response to historical wrongs." App. 66 (*id.* ¶ 130 & n.425). Although the FCC defined the elements of broadband service covered by the rules to include prospective "deployment" of such service, App. 52 (*id.* ¶ 102), the Order nowhere suggests that the FCC would be required to order deployment as a remedy for violation of the rules.[7]

Industry Petitioners (Br. 43) claim that providers will fear rolling out new broadband service incrementally, "lest deploying *anywhere* create liability for not investing *everywhere*." As stated above, however, the FCC's investigation process will be limited to complaints that the staff determines are supported by evidence of unlawful discrimination of access. App. 66 (Order ¶ 132). "Because no ISP can deploy everywhere at once," Industry Br. 43, routine deployment and upgrade decisions are

---

[7] If the Commission were to impose a remedy that Industry Petitioners view as unlawful in the future, then they could bring an as-applied challenge. *See Brennan v. Dickson*, 45 F.4th 48, 61 (D.C. Cir. 2022) ("Where a challenged rule does not exceed statutory authority and comports with the APA, we will uphold the provision and preserve the right of complainants to bring as-applied challenges against any alleged unlawful applications.") (quotation marks omitted).

unlikely to give rise to an investigation. And even if they do, the rules "allow the Commission to consider what is reasonably achievable for the particular entity under investigation." App. 41 (Order ¶ 77); App. 32-33 (*id.* ¶ 63).[8]

**4**. Industry Petitioners (Br. 44-46) further argue that the Commission's statutory reading "ushers in rate regulation and common-carrier treatment for ISPs." The FCC stated, however, in no uncertain terms, that the rules it adopted "do not set rates" or "institute rate regulation," and explained that it "need not *prescribe* prices" for broadband service "in order to determine whether prices are 'comparable' within the meaning of the equal access definition." App. 56 (Order ¶ 105).

Instead, the FCC will "analyze factors like 'projected income, projected expenses, net income, expected return on investment, competition, cash flow, market trends, and working capital requirements,'" Br. 44-45 (quoting App. 37 (Order ¶ 71)), to determine

---

[8] The presumption of compliance with the rules for recipients of BEAD program funds does not reflect "tension" with the Infrastructure Act's objective of encouraging broadband deployment. Industry Br. 43-44. *See* App. 69-70 (Order ¶ 142). Rather, the presumption reflects that BEAD program funds are subject to independent nondiscrimination requirements. *See* § VI.B *infra*.

whether a challenged practice with discriminatory effects is justified by issues of economic feasibility. App. 37 (Order ¶ 71) (defining "economically feasible" to mean "reasonably achievable as evidenced by prior success by covered entities … or demonstrated new economic conditions."). Analyzing economic feasibility is different from determining "whether a charged rate is appropriate." Industry Br. 45 (quotation marks omitted).[9]

The difference is illustrated by *FERC v. Electric Power Supply Association*, 577 U.S. 260, 281-84 (2016), where the Supreme Court rejected the argument that a Federal Energy Regulatory Commission regulation of the wholesale electricity market "effectively"—and unlawfully—regulated retail rates due to its natural consequences at the retail level. "To set a retail electricity rate," the Court explained, is "to establish the amount of money a consumer will hand over in exchange

---

[9] Industry Petitioners highlight the Commission's statement that section 60506 "aligns with" the obligations established by 47 U.S.C. § 202, App. 24 (Order n.134), "the very provision of Title II that establishes the basic common carrier obligation." Industry Br. 45 (quotation marks omitted). The FCC described the two statutes as aligned insofar as section 202 "requires no showing of discriminatory intent," App. 24 (Order n.134), *not* with regard to the obligation to charge just and reasonable rates under section 201(b). 47 U.S.C. § 201(b). Section 60506 imposes no such obligation, and the FCC did not interpret it that way.

for power." *Id.* Nothing in the governing statute or the Court's caselaw "suggest[ed] a more expansive notion." *Id.*

Just so here. When the Commission analyzes pricing and other broadband service elements in carrying out its charge to prevent digital discrimination, it will not be regulating the rates of broadband providers, "effectively" or otherwise. Industry Br. 44. Providers remain free to set prices and use sale incentives to attract customers or retain existing ones. The FCC's rules will prevent, however, excluding customers from such prices and incentives based on the characteristics protected by the statute, absent a legitimate justification. *Cf. Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003) (individualized discounts do not violate 47 U.S.C. § 202(a), but service cannot be refused based on "race or income bracket"). Industry Petitioners maintain that broadband providers are better off without accountability for any practices with unjustified discriminatory effects, but that is no basis for overturning the agency's reasonable interpretation of a statute that targets those very effects.

### C. The Major Questions Doctrine Does Not Foreclose the Commission's Interpretation.

Industry Petitioners contend (Br. 46-52) that even if the statute does not foreclose the Commission's reading, the "major questions

doctrine" does. But that doctrine is reserved for "extraordinary cases" involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (quotation marks omitted). Here, the FCC's rules were enacted pursuant to a statute that expressly requires the agency to adopt rules "preventing digital discrimination of access." 47 U.S.C. § 1754(b)(1). Since the text, structure, and purpose of the statute show that Congress authorized rules that reach practices with unjustified discriminatory effects, and not merely intentional discrimination, the major questions doctrine does not stand in the FCC's way.

**1.** The Commission has long carried out Congress's goal of ensuring that communications services are made "available so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151. *See also* 47 U.S.C. § 254(b)(2) (requiring policies for "the preservation and advancement of universal [communications] service" "in all regions of the Nation"). The extension of those goals by Congress to combating digital discrimination thus "does not reflect a substantial overhaul of the

Commission's enforcement mission." App. 65 (Order ¶ 129). *Compare West Virginia v. EPA*, 597 U.S. at 724 (applying major questions doctrine to case involving a "transformative expansion" of the agency's "regulatory authority").

The Commission's Order also does not "risk fundamentally altering the landscape of the telecommunications industry." *Id.* As employers, broadband providers and other entities covered by the rules should be "familiar with the standards and processes for establishing [disparate-impact] liability under Title VII," and many of them "must already comply with the nondiscrimination requirements associated with the receipt of federal funds." App. 65 (Order ¶ 129).

**2.** In any event, even where major questions are concerned, the agency may regulate where Congress has provided "clear … authorization" for it to do so. *West Virginia v. EPA*, 597 U.S. at 732 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Congress did so here. Section 60506 directs the Commission, in no uncertain terms, to adopt "final rules to facilitate equal access to broadband internet access service," including "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin."

47 U.S.C. § 1754(b) & (b)(1). This legislative command is unmistakable, and Congress sought to ensure that the FCC would fulfill its responsibility by imposing a specific deadline—"[n]ot later than 2 years" from the date of enactment—for the agency to accomplish its task. Section 60506 is thus hardly an "ancillary" or "gap filler" provision, and it is anything but "subtle." *West Virginia v. EPA*, 597 U.S. at 723, 724 (quotation marks omitted). Instead, it is a broad mandate to the agency to prevent discrimination in the provision of access to broadband service.[10]

The Commission's decision to adopt rules encompassing unjustified discriminatory effects as well as discriminatory treatment poses no additional concerns. Discriminatory effects are frequently encompassed by federal antidiscrimination statutes, as with Title VII, the Age Discrimination in Employment Act, and the Fair Housing Act. *See* pg. 28

---

[10] Industry Petitioners note (Br. 52 ) that section 60506 is "just over 300 words" in length. "But brevity does not necessarily imply ambiguity. "When a statute is clear, we should read it to mean what it says, however succinctly." *W. Coal Traffic League v. United States*, 694 F.2d 378, 391 (5th Cir. 1982). Here, the statute's relative brevity "reflects an intention to delegate significant rule making authority" to the agency. *ConocoPhillips Co. v. U.S. E.P.A.*, 612 F.3d 822, 835 (5th Cir. 2010) (citing *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 186 (2d Cir. 2004).

*supra*. With that background (of which Congress was well aware), Congress left it to the FCC to adopt rules to "prevent[] digital discrimination of access" in the course of "facilitat[ing] equal access" to broadband. 47 U.S.C. § 1754(b), (1). For reasons explained in the Order, the ability to entertain complaints that business practices have unjustified discriminatory effects faithfully carries out that congressional charge.

### D. Industry Petitioners' Constitutional Avoidance Argument Has Been Waived and Lacks Merit In Any Event.

Industry Petitioners refer, in one sentence (Br. 41), to constitutional "vagueness" and "nondelegation" concerns that, in their view, could be avoided by limiting section 60506 to complaints of intentional discrimination. That fleeting mention is insufficient to preserve those points. *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 634 (8th Cir. 2007) ("points not meaningfully argued in an opening brief are waived"). *See Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 324 (8th Cir. 2018) ("a litigant may not advert perfunctorily to an argument, hoping that we will do its work for it"). Nor should the Court accept the invitation of amici to address these issues. *Nebraska ex rel.*

*Bruning v. U.S. Dept. of Interior*, 625 F.3d 501, 512 n.10 & accompanying text (8th Cir. 2010) (declining to consider an issue raised by an amicus and not the parties) (citing cases).

In any event, there are no constitutional concerns to avoid. "[A] regulation is not impermissibly vague because it is 'marked by flexibility and reasonable breadth, rather than meticulous specificity.'" *U.S. Telecom Ass'n. v. FCC*, 825 F.3d 674, 737 (D.C. Cir. 2016) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Moreover, the Commission established an advisory-opinion process for covered entities to avoid inadvertent infractions by seeking guidance on the permissibility of specific practices under the rules. App. 72 (Order ¶ 146); App. 72-73 (*id.* ¶¶ 147-51). *See U.S. Telecom Assn.*, 825 F.3d at 738-39 (in upholding the open Internet rules against a due process challenge, finding that an advisory-opinion process cured "any potential lingering constitutional deficiency").

And to the extent that section 60506 could be understood to implicate the nondelegation doctrine, it passes muster because it contains an "intelligible principle" for the exercise of the Commission's authority for digital-discrimination rules. *Whitman v. Am. Trucking*

*Ass'ns*, 531 U.S. 457, 472 (2001). The statute instructs the FCC to adopt rules to prevent digital discrimination based on the characteristics listed by Congress. 47 U.S.C. § 1754(b)(1). That task is part of the agency's charge to facilitate equal access to broadband service, *id.* § 1754(b), defined as the equal opportunity to subscribe to an offered service providing "comparable speeds, capacities, latency, and other quality of service metrics in a given geographic area for comparable terms and conditions," *id.* § 1754(a)(2), and taking into account considerations of technical and economic feasibility. *Id.* § 1754(b). Congress's detailed instructions to the agency amply satisfy constitutional requirements.

## II. THE COMMISSION ADOPTED A VALID FRAMEWORK FOR INVESTIGATING DISPARATE-IMPACT COMPLAINTS.

The Commission chose not to adopt formal, adjudicatory procedures for digital-discrimination complaints, a choice that broadband providers and their allies strongly supported. App. 70-71 (Order ¶ 143). Instead, the FCC adopted a process in which agency staff has discretion to initiate an investigation based on informal complaints and other information. App. 66 (*id.* ¶ 132). In the course of an investigation, FCC staff will collect relevant evidence, determine whether there is an apparent violation of

the rules and, if so, decide whether to pursue a monetary forfeiture or other remedies. App. 66, 71 (*id.* ¶¶ 132, 144).[11]

Where the Commission investigates complaints that provider practices have unlawful discriminatory effects on consumers, it will first determine whether "the identified … practice … is causing the discriminatory effect," as well as "the nature of the disparate impact that is being complained about." App. 68 (*id.* ¶ 139). It will then "determine whether genuine issues of technical and economic feasibility support and give substantial, legitimate justification for the … practice … being investigated." App. 69 (*id.* ¶ 140). In doing so, "the entity under investigation will have the burden of proving to the Commission that the … practice in question is justified by" those issues. App. 41 (*id.* ¶ 78).

---

[11] If, after investigation, the Commission staff determines that a monetary forfeiture would be appropriate, "the factual and legal bases for any proposed liability determination" are ordinarily "set forth in a notice of apparent liability" to which the recipient "has an opportunity to respond" before any final determination is made by agency staff. App. 69 (Order n.442); 47 U.S.C. § 503(b)(4)(C). These staff decisions are subject to plenary Commission review. Collection of an  unpaid forfeiture order is through a civil suit in the name of the United States in federal district court, which conducts a "trial de novo" before entering judgment. 47 U.S.C. § 504(a).

Finally, "the Commission will determine whether a less discriminatory alternative policy or practice was reasonably available and achievable and identify any such alternative." App. 69 (*id.* ¶ 140). "If such an alternative was available …, the policy or practice causing the differential impact will not be deemed justified by genuine issues of technical or economic feasibility." *Id.*

The Commission's framework parallels the instructions provided by the Supreme Court in *Inclusive Communities* for the evaluation of disparate-impact claims under the Fair Housing Act: it imposes a robust causality requirement, *see* 576 U.S. at 542; allows a covered entity to show, in accordance with section 60506, that discontinuing the challenged practice would be infeasible, *see id.* at 541; and requires a determination—here made by the FCC—whether there is a less discriminatory alternative that could equally satisfy the covered entity's interests before an apparent rule violation can be found. *See id.* at 527.

Industry Petitioners, however, argue (Br. 55-58) that the Commission's analytical framework departs from *Inclusive Communities* in three respects. Their arguments lack merit.

*First*, Industry Petitioners' claim that the feasibility standard "takes some substantial, legitimate interests off the table" is unfounded. Br. 19; *id.* 55 (arguing that the Commission "unduly limits" business justifications). The Commission "interpret[ed] the categories of 'technical' and 'economic' feasibility broadly to encompass any legitimate business impediment to achievement of equal access." App. 37 (*id.* ¶ 72); App. 25 (*id.* ¶ 48 n.141). *See* App. 32 (*id.* ¶ 63) ("a covered entity will be allowed to present … any legitimate business impediment to the use of less discriminatory alternatives.").

Industry Petitioners also are mistaken that economic infeasibility cannot be shown based on "'differences in … profitability.'" Br. 56 (quoting App. 30 (Order ¶ 58)). The FCC declined to "define digital discrimination" in terms of differences in profitability. App. 30 (*id.* ¶ 58). The feasibility standard asks whether equal access is "*reasonably* achievable." App. 34 (*id.* ¶ 66) (emphasis added). The standard does not "displace the ability of industry participants to make 'practical business choices and profit-related decisions.'" App. 38 (*id.* ¶ 73) (quoting *Inclusive Communities*, 576 U.S. at 533).

*Second*, Industry Petitioners argue that the Commission's rules put the burden on a covered entity "to prove a negative: that there is no less discriminatory alternative policy that could satisfy its interests." Br. 19; *id.* 56-57. That is also incorrect. The burden is on covered entities only to prove that a challenged practice is "justified by genuine issues of technical and economic feasibility," App. 41 (Order ¶ 78)—which is both fair and sensible, because "as a practical matter, it is the entity providing the justifications … that has access to the necessary information." *Id.* To be sure, feasibility justifications "will usually involve arguments and evidence that technical or economic constraints limit the availability of less discriminatory alternatives." *Id.* Based on the evidence, however, the FCC "will determine whether a less discriminatory alternative … was reasonably available and achievable and identify any such alternative" before it can find an apparent rule violation. App. 69 (*id.* ¶ 140).[12]

---

[12] The Commission established an investigative process to evaluate digital-discrimination complaints, not an adjudicatory proceeding with a plaintiff and defendant. App. 70-71 (Order ¶¶ 143-44). There is thus no plaintiff on whom the burden of showing a less discriminatory alternative could be placed.

*Third*, Industry Petitioners challenge the Commission's statement that its rules "'cover both actions and omissions, whether recurring or a *single instance*,'" arguing that an "isolated incident does not suffice" to show "a *policy* causing a disparate impact" under *Inclusive Communities*. Br. 56 (quoting App. 54 (Order ¶ 102)). But as the Supreme Court explained, a one-time decision, such as a site selection, might (or might not) express a policy. *Inclusive Communities*, 576 U.S. at 543. *See Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 619 (2d Cir. 2016) (expressly declining to distinguish between "one-off" zoning decisions and a zoning "policy" in Fair Housing Act case alleging discriminatory disparate impact); *id.* ("in the Title VII and ADEA contexts, courts have permitted cases dealing with disparate impact challenges to single decisions of employers.") (citing cases) (quotation marks omitted).[13]

In sum, the FCC's standards will "not displace the ability of industry participants to make 'practical business choices and profit-

---

[13] Industry Petitioners contend (Br. 72-73) that the Order is arbitrary because the Commission failed to acknowledge or explain its departure from the burden-shifting framework articulated in *Inclusive Communities*. But as we have shown, the FCC discussed at length the relationship between *Inclusive Communities* and the agency's analytical framework. App. 68-69 (Order ¶¶ 138-40); App. 70-71 (*id.* ¶¶ 143-44).

related decisions.'" App. 38 (Order ¶ 73) (quoting *Inclusive Communities*, 576 U.S. at 533). Instead, the standards "are designed to ensure that industry participants … consider[] the potential discriminatory impacts of their policies and practices, and that they seek to minimize any such discriminatory impacts" in their provision of access to broadband service. *Id.*

## III. THE COMMISSION'S RULES APPROPRIATELY REACH NON-BROADBAND PROVIDERS WHOSE ACTIONS DEPRIVE CONSUMERS OF EQUAL ACCESS TO BROADBAND SERVICE.

In the Order, the Commission recognized that "[c]onduct by entities other than broadband providers might impede equal access to broadband internet access service on the bases specified in the statute." App. 45 (Order ¶ 87). Although the agency "reached no conclusion whether" any of the examples of conduct involving non-broadband providers in the record "would be covered by [its] rules," it found that "there could be situations—now or in the future—in which non-providers could impede equal access to broadband internet access service based on the [statute's] listed characteristics." *Id.* Thus, the FCC concluded, "to the extent that entities outside the communications industry provide services that facilitate and affect consumer access to broadband, they may be in

violation of our rules if their policies and practices impede equal access to broadband . . . service as specified in the rules." *Id. See* 47 C.F.R. § 16.2 (defining "covered entity"). In examining such policies and practices, the FCC made clear that it would "consider, among other things, the closeness of the relationship between [the outside] entity's policies and practices and the provision of broadband service." App. 45 (Order ¶ 87).

Industry Petitioners argue (Br. 58-65) that Congress did not authorize the Commission to adopt antidiscrimination rules for entities other than broadband providers. The statute belies that contention.

**A.1.** Section 60506 directs the Commission to adopt rules "to facilitate equal access," defined as "the equal opportunity to subscribe to an offered service," including rules "preventing digital discrimination of access." 47 U.S.C. § 1754(a)(2), (b), (b)(1). Rather than limiting discrimination to specific actors, the text focuses on prohibited acts and their effects. *See Dean*, 556 U.S. at 572 (statutory language that "focuses on an event that occurs without respect to a specific actor" "reflects 'agnosticism about who'" the actor is) (quoting *Watson v. United States,* 552 U.S. 74, 81 (2007)). In addition, the statutory "definition of 'equal access'" "focuses on consumers' opportunity to receive and effectively

utilize an offered service." App. 45 (Order ¶ 87). *See* pgs. 24-25 *supra*. The most natural reading of the statute thus reaches all entities with the power to deprive consumers of "the equal opportunity to subscribe to an offered service." 47 U.S.C. § 1754(a)(2).

The surrounding text supports this reading. Unlike subsection (b)(1), subsection (d) specifically directs the Commission to "develop model policies and best practices that can be adopted by States and localities to ensure that *broadband internet access service providers* do not engage in digital discrimination." 47 U.S.C. § 1754(d) (emphasis added). Congress could likewise have directed the FCC, in subsection (b)(1), to adopt rules preventing digital discrimination of access only by "broadband internet access service providers," but it did not do so. That Congress did not specify an actor in subsection (b)(1) reflects that it did not intend to so limit the rules. *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 431 (2022) ("[W]e must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others."). *See Watt v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006) ("[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is

even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.") (quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005)).

Industry Petitioners argue (Br. 61) that "[t]here is no reason why Congress would have wanted" model state policies to have a different scope than adopted rules. Since Congress plainly used different language in the two provisions, and the language speaks for itself, there is no need for inquiry into Congress's possible motives. But Congress could reasonably have intended for the FCC to develop model state policies for the mine-run of cases while authorizing federal rules broad enough to capture new or unusual cases. *See* App. 45 (Order ¶ 86) (the FCC's rules "must be able to address future technological evolutions that may affect or interfere with broadband internet access.").[14]

---

[14] Industry Petitioners argue (Br. 60) that Congress's goal of equal access "within the service area" of "a provider of such service," 47 U.S.C. § 1754(a)(1), "makes sense only if [broadband providers] are the entities being regulated." But the statute defines "equal access" as "the equal opportunity to subscribe to an offered service … in a given area," *id.* § 1754(a)(2), which, the Commission explained, is best determined on a case-by-case basis, and is not limited to provider service areas, App. 79 (Order ¶ 165)—a reading that Industry Petitioners do not challenge.

**2**. Precedent from other contexts also supports the Commission's reading. The D.C. Circuit has affirmed the Commission's authority to extend to landlords its regulations protecting access to direct-to-home satellite broadcasts. *Bldg. Owners and Mgrs.*, 254 F.3d at 96. "Where the Commission has been instructed by Congress to prohibit restrictions on the provision of a regulated means of communication, it may assert jurisdiction over a party that directly furnishes those restrictions." *Id. See In the Matter of Cont'l Airlines*, 21 FCC Rcd 13201, 13221 (2006) (determining that airport restrictions on the use of unlicensed Wi-Fi antennas violated the access protections of the FCC's over-the-air reception device rule). Depending on "the closeness of the relationship between" an entity and the provision of service, App. 45 (Order ¶ 87), an entity that is not itself a broadband provider may well have the power to deprive consumers of equal access to broadband service.

In addition, courts have consistently held that non-housing providers may "make unavailable or deny" housing for purposes of the Fair Housing Act. 42 U.S.C. § 3604(a). For example, in *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 291 (7th Cir. 1992), the NAACP alleged that an insurer violated the Fair Housing Act

by charging higher rates and declining to write insurance for people who lived in certain areas. The Court agreed that the refusal to provide insurance makes a dwelling unavailable under the statute because lenders require borrowers to secure property insurance. *Id.* at 297. "No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable." *Id. Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (holding that a discriminatory appraisal may effectively make housing unavailable). Likewise, an entity whose actions impede access to a prerequisite for broadband service may deprive consumers of the equal opportunity to subscribe to the service. App. 45 (Order ¶ 87).

**3**. This does not mean that non-broadband providers are subject to the digital-discrimination rules if they merely "have some *indirect* impact on whether a consumer can subscribe to broadband." Br. 61; *id.* 58-61. The robust causality requirement imposed by the FCC's rules, App. 25, 68-69 (Order ¶¶ 49, 139); *see Inclusive Communities*, 576 U.S. at 542, ensures that entities whose conduct has only an attenuated relationship to the provision of broadband service will not be subject to rule enforcement. Robust causality requires a close relationship between the

practice that is challenged and the alleged discriminatory impact. *See Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989) (the plaintiffs must "demonstrate that the disparity they complain of is the result of one or more of the [] practices that they are attacking …, specifically showing that each challenged practice has a significantly disparate impact" on the protected class). And in generally evaluating complaints involving non-providers, the Commission made clear that it "will consider … the closeness of the relationship between that entity's policies and practices and the provision of broadband service." App. 45 (Order ¶ 87). Accordingly, there is no reason to think that enforcement of the digital-discrimination rules threatens "the bank that does not permit direct debits" or "the local government that restricts zoning for towers." Industry Br. 61.

**B**. The Commission's application of its rules to non-broadband providers who can "impede equal access to broadband internet access service" does not implicate the major questions doctrine. App. 45 (Order ¶ 87). There is nothing "dramatic and novel" here. Industry Br. 63. As we have explained, the rules require a direct and significant connection between an "entity's policies and practices and the provision of

broadband service." App. 45 (Order ¶ 87). Thus, even with respect to entities that are not broadband providers, the rules draw upon the FCC's "core expertise" (Br. 63) in the provision of communications service.

**C**. Finally, Industry Petitioners' contention that the Commission did not identify a "rational connection" (Br. 75) in support of its decision to extend its rules to entities other than broadband providers that "facilitate and meaningfully affect consumer access to broadband internet access service," App. 44 (Order ¶ 85), is contradicted by the Order. App. 44-45 (*id.* ¶¶ 85-87). As the FCC stated, entities with a "close[] … relationship" to "the provision of broadband service" may have the power to "impede equal access" to such service. App. 45 (*id.* ¶ 87).

## IV. THE COMMISSION REASONABLY INTERPRETED SECTION 60506 TO AUTHORIZE THE AGENCY'S TRADITIONAL ENFORCEMENT REMEDIES.

Industry Petitioners argue that, apart from "certain forward-looking enforcement actions, like . . . cease-and-desist orders" (Br. 65), the Commission lacks authority to enforce its rules. *Id.* 65-72. But section 60506 broadly directs the FCC to adopt rules "preventing digital discrimination of access" to broadband service. 47 U.S.C. § 1754(b)(1). It leaves to the FCC the content of those rules, including the remedies

necessary to make them meaningful. There is no basis in the statute to impose a strict, atextual limitation on the FCC's authority to ensure compliance with the rules that Congress directed the agency to adopt.

## A.    The Commission Has Express Enforcement Authority.

**1.** Section 60506 directs the Commission to adopt rules "preventing digital discrimination of access," 47 U.S.C. § 1754(b)(1), and "identifying necessary steps … to eliminate [such] discrimination." *Id.* § 1754(b)(2). "[T]he words 'prevent' and 'eliminate' constitute strong medicine." App. 62 (Order ¶¶ 122). "Prevent" means "to keep from happening." AMERICAN HERITAGE DICT. OF THE ENGLISH LANG. 1395 (5th ed. 2011). "Eliminate" means "to get rid of, remove." *Id.* at 579. By employing those terms, Congress invested the agency with "a broad mandate for the Commission to take the necessary measures to fully eradicate digital discrimination of access." App. 62 (Order ¶ 122).

Congress's mandate to adopt rules *preventing* discrimination logically presupposes authority to effectively enforce the rules. *See Verizon v. FCC*, 740 F.3d 623, 638 (D.C. Cir. 2014) ("one might reasonably think that Congress, in directing the Commission to undertake certain acts, necessarily invested the Commission with the statutory authority

to carry out those acts."). The FCC could not adequately carry out its charge to prohibit digital discrimination of access "merely through suggestion." App. 63 (Order ¶ 125). As the agency explained, "preventing digital discrimination of access requires some kind of 'stick' in addition to 'carrots'"—reading out enforcement authority "would render much of section 60506 a nullity." App. 64 (*id.* ¶ 125) (citation omitted). *See Mourning v. Fam. Publ'n Serv., Inc.*, 411 U.S. 356, 376 (1973) ("In light of the emphasis Congress placed on agency rule making …, we cannot conclude that Congress intended those who failed to comply with regulations to be subject to no penalty or to criminal penalties alone.").

Industry Petitioners contend (Br. 67) that the ordinary meanings of the words "prevent" and "eliminate" in section 60506(b) "call for prospective, forward-looking action" and not "monetary forfeitures, which are backward-looking penalties." But one can "prevent" by deterring action in the first place, and monetary forfeitures serve an important deterrent function. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("We have recognized on numerous occasions that 'all civil penalties have some deterrent effect.'") (quoting *Hudson v. United States,* 522 U.S. 93, 102 (1997)); *SEC*

*v. Murphy*, 50 F.4th 832, 847 (9th Cir. 2022) ("[C]ivil penalties are designed to deter the wrongdoer from similar violations in the future") (citation omitted); *Forfeiture Policy Statement*, 12 FCC Rcd 17087 (1997) ("The legislative history of Section 503 of the [Communications] Act demonstrates that[] Congress recognized the need to authorize the Commission to impose forfeitures sufficiently high to deter violations"). And "eliminating" an action's effects can often require remedial steps.

The reliance that Industry Petitioners place (Br. 68-69) on *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005), is misplaced. The RICO statute at issue in that case authorized courts to "prevent and restrain" violations by issuing appropriate orders, followed by a list of specific types of relief expressly aimed at deterring future violations. Applying the canons of *noscitur a sociis* and *ejusdem generis,* the D.C. Circuit stated that it would "expand on the remedies explicitly included in the statute only with remedies similar in nature." *Id.* As disgorgement was "a quintessentially backward-looking remedy," *id.* at 1198, it was fundamentally different from the remedies listed in the statute. There is nothing comparable in the text or structure of section 60506 that provides a "necessary and inescapable inference" that

Congress intended to deprive the FCC of authority to impose monetary forfeitures. *Id.* at 1200.

Section 60506 does not spell out *how* the Commission's rules are to prevent digital discrimination. Congress set out the FCC's responsibility in general terms so as "'to confer the flexibility necessary' for" the FCC to carry out its mandate. *Corbett v. TSA*, 19 F.4th 478, 488 (D.C. Cir. 2021) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007)). "Congress could have limited [the agency's] discretion in any number of ways, but it chose not to do so." *Little Sisters of the Poor v. Pa.*, 591 U.S. 657, 677 (2020) (when Congress uses "expansive language" in a statute, courts cannot "impose[e] limits on an agency's discretion that are not supported by the text"). *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.").

**2.** There is an additional indication in the text of the statute that supports the Commission's reading. Section 60506 directs the FCC to "revise its public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination." 47 U.S.C. § 1754(e). As the FCC explained, "there would be little point for

Congress to direct the Commission to accept complaints of digital discrimination of access if we lacked any of our traditional powers to act on them." App. 62 (Order ¶ 122). Subsection (e) of the statute is thus another indication of Congress's understanding that its mandate to adopt rules in subsection (b)(1) includes the power to enforce them.[15]

The Commission reasonably interpreted Congress's mandate to "revise" the "complaints process," 47 U.S.C. § 1754(e), to reflect Congress's intent that the FCC use the remedies available to it under the Communications Act to enforce the rules, including monetary forfeitures. As Congress was presumably well aware, "[t]he existing 'public complaints process' serves the agency's general authority to enforce the Communications Act." App. 62 (Order ¶ 122). The direction to the FCC to revise that process in light of the charge to prevent digital discrimination embodies Congress's assumption that the agency's traditional enforcement toolkit would be at hand in carrying out the legislative instruction. *Cf. Parker Drilling Mgmt. Servs., Ltd. v. Newton*,

---

[15] Industry Petitioners' speculation (Br. 70) that Congress may have wanted the FCC to revise its complaint process only to gather data "about whether . . . [digital discrimination [is] occurring" is farfetched. The complaint process has always operated in service of rule enforcement beyond data gathering.

587 U.S. ___, 139 S. Ct. 1881, 1890 (2019) ("It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'"). The FCC concluded that those traditional tools are "indispensable" in fulfilling its statutory obligation to prevent digital discrimination. App. 61 (Order ¶ 120). That conclusion was well within the agency's broad discretion under section 60506.[16]

**3**. Industry Petitioners' contention that "penal statutes are to be construed strictly," Br. 68 (citing *FCC v. American Broad. Co.*, 347 U.S. 284, 298 (1954)), is unavailing. That case (and the correct cite for the quote is 347 U.S. at 296, not 298) involved the Commission's civil enforcement of the federal criminal statute aimed at lotteries. Section 60506, of course, is not a criminal statute. Here, the FCC's determination to use its "normal suite of enforcement mechanisms," App. 62 (Order ¶ 122), including monetary "forfeiture orders," App. 62 (*id.* ¶ 121), carries out the task Congress set before the agency to prevent digital discrimination. Moreover, the rule of lenity is founded on a principle of

---

[16] That section 60506 is not itself part of the Communications Act is beside the point. *See* Industry Br. 66. Subsections (b)(1) and (e), 47 U.S.C. § 1754(b)(1), (e), provide the agency with "express authority to enforce [the statute's] mandates." App. 62 (Order ¶ 122).

fair warning that is not applicable where, as in the case of the FCC's implementing regulations, the language of a provision is reasonably clear. *Pugin v. Garland*, 599 U.S. 600, 610 (2023) (rule of lenity applies only where, after employing all tools of construction, "there remains 'grievous ambiguity'" in the statute or regulation); *Mourning*, 411 U.S. at 375. *See* note 11 *supra*.

Industry Petitioners contend that because, in another part of the Infrastructure Act, Congress expressly authorized the Commission to employ the Communications Act's monetary-forfeiture provisions to enforce compliance with the requirements of the Affordable Connectivity Program, *see* Industry Br. 65-66 (citing Pub. L. No. 117-58, § 60502(a)(3)(B)(ii), 135 Stat. at 1240), Congress must have intended to deprive the FCC of the power to impose monetary forfeitures to enforce the digital-discrimination rules. But in the administrative-law context, courts have "consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.*, to leave the question to agency discretion.'" *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69

(D.C. Cir. 1990)) (emphasis in original). Here, Congress stated the FCC's responsibility in general terms in section 60506 so as "'to confer the flexibility necessary' for [the agency]" to carry out its mandate. *Corbett*, 19 F.4th at 488 (quoting *Massachusetts v. EPA*, 549 U.S. at 532).[17]

### B. Alternatively, the Commission Has Ancillary Authority Under Section 4(i) of the Communications Act.

Section 4(i) authorizes the FCC to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." 47 U.S.C. § 154(i); App. 64 (Order ¶ 127). There is a two-part test for the FCC's exercise of this ancillary authority: "(1) the Commission's general jurisdictional grant under Title I [of the Communications Act] covers the regulated subject and (2) the regulations are reasonably ancillary to the

---

[17] *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021), *see* Industry Br. 66, is not to the contrary. The statute in that case established two enforcement regimes, one for monetary penalties following agency proceedings and one for prospective injunctive relief. The Supreme Court held that the latter did not encompass monetary penalties given the statutory language and context. 593 U.S. at 75. *See Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 19 (1979) ("it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). By contrast, section 60506 leaves the establishment of appropriate remedies to the Commission.

Commission's effective performance of its statutorily mandated responsibilities." *Comcast Corp.*, 600 F.3d at 646 (quoting *Am. Library Assn. v. FCC*, 406 F.3d 689, 691-92 (D.C. Cir. 2005)).

Here, the Commission's authority under Title I of the Communications Act, which applies to "all interstate and foreign communication by wire or radio," 47 U.S.C. § 152(a), covers the regulated subject of broadband service. 47 U.S.C. § 1754(b)(1). *See Mozilla Corp.*, 940 F.3d 1 (upholding the FCC's classification of broadband service as a Title I information service).[18] And enforcement authority is "indispensable" to effective performance of the FCC's responsibilities under section 60506: "a prohibition without enforcement cannot reasonably be expected to affect conduct in a meaningful way." App. 62, 64 (Order ¶¶ 122, 126).[19]

---

[18] The Commission recently reclassified broadband service as a Title II telecommunications service. *See* n. 23 *infra*.

[19] Industry Petitioners do not challenge the Commission's determination that section 60506 covers intentional discrimination of broadband access. Br. 16 (section 60506 "contains the hallmarks of a disparate-*treatment* regime") (emphasis added). Under the logic of their argument, however, FCC authority to prevent even intentional discrimination would be limited to forward-looking measures. Industry Petitioners cannot explain why Congress could conceivably have intended to establish such a limited enforcement regime, even in cases involving intentional discrimination.

Industry Petitioners (Br. 71) argue that section 4(i) authorizes the Commission only to exercise authority that is ancillary to delegated powers under the Communications Act, not freestanding statutory obligations. By its terms, section 4(i) authorizes the FCC to perform "any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, *as may be necessary in the execution of its functions*." 47 U.S.C. § 154(i) (emphasis added). There is no limitation in section 4(i). The decision on which Industry Petitioners rely simply explains that the exercise of section 4(i) authority must be ancillary to an express statutory delegation of authority. *Comcast*, 600 F.3d at 653 (discussing *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601, 606 (D.C. Cir. 1976)). Indeed, *Comcast* recognized section 706 of the 1996 Act—which like section 60506 Congress left as a freestanding provision of federal law, *see* Telecommunications Act of 1996, § 1(b), 110 Stat. 56— as a possible source of ancillary authority. *See* 600 F.3d at 658-59 (concluding that section 706 did not provide a statutory basis for the exercise of ancillary jurisdiction because the FCC previously had concluded "that section 706 grants no regulatory authority").

Industry Petitioners (Br. 71-72) also argue that the use of monetary forfeitures is not reasonably ancillary to the Commission's statutory functions under section 60506. This argument too is unpersuasive. Monetary forfeitures are one of the FCC's principal enforcement tools, and the FCC rationally concluded that they are "indispensable" to fulfilling Congress's mandate to adopt rules preventing digital discrimination. App. 63 (Order ¶ 124).

## V. THE COMMISSION ADEQUATELY CONSIDERED THE COSTS AND BENEFITS OF ITS RULES.

**A**. Industry Petitioners next argue (Br. 73-75) the Commission did not adequately consider the costs its rules may impose on broadband providers and other covered entities. Although some commenters argued that rules prohibiting practices with unjustified discriminatory effects would discourage broadband investment, no commenter offered a quantitative analysis. In the absence of such an analysis, the FCC justifiably engaged in a qualitative analysis of costs and benefits. *See Mozilla*, 940 F.3d at 71-72 (affirming qualitative approach to analyzing costs and benefits where empirical support for the relevant harms was "slim" and the FCC made a reasonable case that its regulations were conducive to innovation).

The Commission's qualitative analysis did not consist of a "conclusory statement" that the rules will not discourage investment, as Industry Petitioners contend. Br. 73 (citing Order ¶ 52). The FCC emphasized that the burdens on broadband providers are cabined by numerous structural protections in the rules: there can be no violation of the rules unless "(1) there is a differential in access to broadband service;" (2) "caused by a specific policy or practice of the covered entity"; and (3) that differential in access "is [not] justified on genuine technical or economic grounds." App. 27 (Order ¶ 52). "When providing broadband access to a particular area is impeded by genuine issues of technical or economic feasibility," there is no reason why a covered entity cannot "explain those issues and offer substantial evidence to support them." *Id.* Whatever increased "diligence" in "determining and documenting the reasons for access gaps in their service areas" might be required of covered entities, the FCC must also take account of the fact that "unequal access to broadband service imposes significant costs on unserved and underserved communities, and on the Nation as a whole." App. 42 (Order ¶ 81). *See* 47 U.S.C. § 1701(2) (codifying Congress's expressly enacted finding that "[t]he persistent 'digital divide' in the United States is a

barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education"); App. 10 (Order ¶ 14).

The Commission also emphasized that it had reduced the potential burdens of its rules by adopting a "low-cost approach" employing an "informal complaint process" supporting "self-initiated investigations," App. 42 (*id.* ¶ 81), rather than a "formal complaint process" involving administrative adjudication that was criticized by some commenters as imposing undue "burden[s]" both on "Commission staff" and "covered entities." App. 70-71 (*id.* ¶ 143). *See* App. 60 (*id.* ¶ 113) ("The informal complaint process requires no complicated legal procedures, has no filing charge, and does not require the complaining party to appear before the Commission").

Finally, the agency noted, Congress in the Infrastructure Act provided "historic funding incentives" aimed at "spur[ring] broadband investments in unserved and underserved communities throughout the United States." App. 26 (*id.* ¶ 52). Especially in light of this funding and the "statutory goal of equal access," the Commission was not persuaded

that its rules would be "overly burdensome" or would otherwise "disincentivize investment in broadband networks." *Id.*

Accordingly, while recognizing that the "rules will require greater diligence by covered entities," the FCC reasonably concluded that they are "the most cost-effective means to accomplish" section 60506's objectives. App. 42 (*id.* ¶ 81). That judgment deserves this Court's deference. *See Citizens Telecom.*, 901 F.3d at 1010; *accord Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1110 (D.C. Cir. 2022) ("when an agency's decision is primarily predictive . . . [the court] require[s] only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive.") (quotation marks omitted); *Ad Hoc Telecomm. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (Administrative Procedure Act review is "particularly deferential" in matters implicating "predictive market judgments").[20]

**B**. Industry Petitioners also argue (Br. 74-75) that the Commission did not consider the costs its rules would impose on entities that are not

---

[20] Contrary to Industry Petitioners' argument (Br. 74-75), the Commission did not ignore effects on smaller broadband providers. *See* App. 118 (Order, App. B ¶ 23) (the FCC lacks "sufficient information on the record to quantify the cost of compliance for small entities," but the regulations will minimize burdens on them).

broadband providers. But there was no evidence before the agency, and Industry Petitioners have proffered none, that the rules will impose large costs on such entities. The Commission's analysis of the costs and benefits of its rules encompassed "covered entities," which include broadband providers and entities that "otherwise affect consumer access to broadband internet access service." 47 C.F.R. § 16.2.

## VI. BENTON PETITIONERS' CHALLENGES ARE UNPERSUASIVE.

While Industry Petitioners challenge the Commission for overreaching, Benton Petitioners contend that the FCC did not go far enough, in two respects. First, they argue (Br. 23-36) that the FCC did not adequately explain its decision not to adopt a formal, adjudicatory process for digital-discrimination complaints. Second, they argue (*id.* at 36-40) that the FCC did not provide sufficient notice of its compliance presumption for broadband providers that participate in the BEAD funding program, and that the presumption is unreasonable. Both objections are unconvincing.

### A. The Commission Rationally Declined to Adopt Formal Complaint Procedures.

Although it did not "foreclose the possibility of adopting a structured formal complaint process in the future," the FCC reasonably

concluded that an informal complaint process is the most appropriate means of implementing its new rules while it "gains experience" investigating digital-discrimination complaints. App. 71 (Order ¶ 143).

**1**. Unlike formal complaints, "[t]he informal complaint process requires no complicated legal procedures, has no filing charge, and does not require the complaining party to appear before the Commission, making it an easy and efficient method for consumers to bring issues to the Commission's attention." App. 60 (*id.* ¶ 113). Informal complaints need not be adjudicated in adversary proceedings. Instead, they provide flexibility for the FCC staff to determine when investigation is warranted, allowing the agency to husband its resources and minimizing compliance and administrative burdens on broadband providers and other covered entities. *See* App. 42 (*id.* ¶ 81). The FCC predicted that informal complaints, together with "self-initiated investigations," would enable it "to enforce the statute in a cost-effective manner, while bringing the undeniable benefits of expanded broadband access." *Id.*

The Commission did "not foreclose the possibility of adopting a [formal] complaint process in the future." App. 71 (*id.* ¶ 143) ("As the Commission gains experience …, our approach may evolve, leading us to

revisit this issue in the future."). For the present, however, the FCC concluded that "the informal complaint process satisfies the requirements of section 60506 and provides the necessary functionality for the Commission to carry out its duties." *Id.*

This measured approach was well within the Commission's broad discretion to structure its own procedures. Congress has expressly authorized and entrusted the Commission to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j). *See Glob. Crossing Telecom., Inc. v. FCC*, 259 F.3d 740, 748-49 (D.C. Cir. 2001). That authority adds further weight to the "established principle" of administrative law that "agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *China Telecom (Ams.) Corp.*, 57 F.4th at 265 (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)). "'Nothing prohibits federal agencies from moving in an incremental manner.'" *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1170 (D.C. Cir. 2015) (quoting *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 522 (2009)). *See Massachusetts v. EPA*, 549 U.S. at 524 ("Agencies, like legislatures, do not generally

resolve massive problems in one fell regulatory swoop. They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed.").

**2.a**. Benton Petitioners argue (Br. at 27) that the Commission "offered only an unsupported conclusory assertion" in favor of its choice not to adopt a formal complaint process. But the requirement "that an agency must give adequate reasons for its decisions … is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC*, 579 U.S. at 221 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974)); *Northport Health Serv. v. DHHS*, 14 F.4th 856, 873 (8th Cir. 2021). Here, the rationale for the FCC's choice is apparent in its discussion of the relative merits of the informal complaint process, including that is "a low-cost approach," App. 42 (Order ¶ 81), "requires no complicated legal procedures," App. 60 (*id.* ¶ 113), and both "satisfies the requirements of section 60506 and provides the necessary

functionality for the Commission to carry out its duties." App. 71 (*id.* ¶ 143).[21]

**b**. Benton Petitioners also contend (Br. at 27-31) that the Commission arbitrarily failed to address comments advocating formal complaint procedures. But as we have explained, the FCC reasonably decided that informal procedures would be an effective and efficient means of implementing the rules. The comments that Benton Petitioners cite did not challenge that premise; instead, they argued that formal procedures would have additional benefits. Commenters supporting a formal process also did "not articulate the reasons for its necessity" given the "self-initiated investigatory approach" the FCC preferred, App. 71 (Order ¶ 143), and the lesser relative burdens associated with informal complaint procedures. App. 42, 60 (*id.* ¶¶ 81, 113).

---

[21] The Commission thus did not simply "g[i]ve up" even though it "could have done more." Br. 35. Instead, the FCC explained why it concluded that the appropriate course was to adopt informal procedures, without "foreclos[ing] the possibility of adopting a structured complaint process in the future," as it "gains experience investigating digital discrimination … complaints." App. 71 (Order ¶ 143). To be sure, as Benton Petitioners observe (Br. 36), the FCC "has decades of experience … adjudicating formal complaints." But the salient point is that the agency currently lacks experience administering its new digital-discrimination rules.

**c**. Benton Petitioners argue (Br. at 32-34) the Commission arbitrarily departed "from its practice of allowing complainants under 47 C.F.R. § 1.717 to file formal complaints." That is incorrect.

Before the Order on review, section 1.717 of the FCC's rules governed informal complaints involving *common carriers*. *See* 47 C.F.R. Part 1, Subpart E (Complaints, Applications, Tariffs, and Reports Involving Common Carriers). Under section 1.717, the FCC forwards a complaint to the appropriate carrier for investigation, and the carrier's failure to satisfy the complaint is a condition precedent to the filing of a formal complaint under section 1.721, which likewise governs complaints against common carriers. *Id.* §§ 1.717, 1.721.[22] Consumers may file informal complaints involving other communications services that the agency regulates, but that process is largely uncodified, and does not necessarily precede formal procedures. *See* FCC Consumer Guide: Filing an Informal Complaint (filing_an_informal_complaint.pdf).

---

[22] Section 1.720 also governs pole attachment complaints under 47 U.S.C. § 224 and formal disability access complaints under 47 U.S.C. §§ 255, 617, and 619. 47 C.F.R. §§ 1.720, 14.38. It does not authorize complaints involving other services.

Before implementing Congress's mandate in section 60506, the Commission obviously had no specific procedure for filing digital-discrimination complaints. The FCC concluded that a clear and consistent procedure would "make it easier for consumers to file informal complaints related to digital discrimination of access, . . . and allow the Commission to better analyze such complaint data." App. 58 (Order ¶ 109); App. 58-59 (*id.* ¶¶ 107-12). Accordingly, the FCC revised section 1.717 to provide such a procedure. 47 C.F.R. § 1.717 (applying the rule's informal complaint procedures "to all covered entities as defined in § 16.2."). At the same time, consistent with its decision not to authorize formal complaints involving digital discrimination, the FCC revised the rule to clarify that formal complaint procedures under section 1.720 are not available for digital-discrimination complaints. Thus, the Order did not "affirmatively carve[] out the ability of digital discrimination complainants to pursue a formal complaint." Benton Br. at 32. They had no such right before the Order on review, and the FCC explained why it decided (at least for the time being) against a formal complaint process.[23]

---

[23] In a May 7, 2024 declaratory ruling, *Safeguarding and Securing the Open Internet*, FCC No. 24-52, 2024 WL 2109860, 88 Fed. Reg. 45404, the

(cont'd)

Benton Petitioners emphasize that the Commission was "authorized" to adopt a formal complaint process, and even claim—in passing—that the statute "mandate[s]" such a process. Br. at 34. But Congress simply directed the FCC to "revise its public complaint process to accept [digital discrimination] complaints from consumers or other members of the public." 47 U.S.C. § 1754(e). Congress did not specify that the process was to be revised in any particular way, even though it knows how to specify a formal complaint process when that is what it intends. *See, e.g.*, 47 U.S.C. § 618(a) (directing the FCC, *inter alia*, to "establish regulations that facilitate the filing of formal and informal complaints

---

Commission reclassified broadband providers as common carriers subject to the provisions of Title II of the Communications Act. Benton Petitioners complain (in a May 17, 2024 letter pursuant to Fed. R. App. P. 28(j)) that the declaratory ruling means that the formal complaint process will be available for "the vast majority of disputes involving broadband providers, but will not be available for digital discrimination disputes." But "judicial review under the [Administrative Procedure Act] is limited to the administrative record that was before the agency when it made its decision." *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004). In any case, the declaratory ruling "only concerns the open Internet rules" and does not address the digital-discrimination rules. 2024 WL 2109860, at *224 ¶ 592. Formal complaint proceedings involving the open Internet rules "are likely to be rare and unlikely to be particularly burdensome." *Id.*

that allege a violation of section 255, 617, or 619 of this title"). As the FCC found, the "informal consumer complaint process … is a long-standing, free and efficient way for consumers to raise issues with their service providers and bring problems to the attention of the Commission." App. 58 (Order ¶ 107).

### B. The FCC Gave Ample Notice For, and Reasonably Explained, Its Presumption of Compliance For BEAD Program Participants.

Benton Petitioners argue that the Commission did not provide adequate notice that it was considering a presumption of compliance with the digital-discrimination rules for participants in the BEAD program (Br. at 37-39), and did not justify its decision to adopt such a presumption. *Id.* at 40-41. Neither argument has merit.

**1**. The Administrative Procedure Act requires an agency to provide notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). An agency's notice "need not contain every precise proposal … [the agency] may ultimately adopt as a rule," *Burlington N. R.R. Co.*, 882 F.2d at 1355 (quotation marks omitted), so long as the notice is "sufficiently descriptive of the subjects and issues involved so that interested parties

may offer informed criticism and comments." *Citizens Telecom.*, 901 F.3d at 1005 (quotation marks omitted).

Here, the Notice invited comment on whether to adopt a "presumption of nondiscrimination when certain conditions are met," App. 275 (Notice ¶ 34), and how to implement such a presumption. App. 275-78 (*id.* ¶¶ 34-36). The Commission observed that, in response to the earlier Notice of Inquiry, "some commenters argue[d] that providers should have a … presumption of nondiscrimination when certain conditions are met," and cited T-Mobile's comments advocating a presumption for Affordable Connectivity Program participants because they are subject to that program's nondiscrimination rules. App. 275 (Notice ¶ 34 & n.128). The FCC also asked if a presumption would "be appropriate when a provider acted in reliance on … funding commitments, such as … those associated with … build-out," again citing T-Mobile's comments. App. 277 (*id.* ¶ 36 & n.137).

It was reasonably foreseeable from these questions that a presumption of compliance for BEAD program participants was a possibility. And indeed NTIA responded to the Notice of Proposed Rulemaking by advocating just such a presumption, App. 539-42 (NTIA

Comments at 10-13), eliciting support from others. App. 452 (Free State Foundation Comments at 3); App. 487-88 (US Telecom Comments at 6-7); App. 498-99 (WISPA Comments at 7-8). The Commission responded by adopting a presumption of compliance for BEAD program participants. App. 69 (Order ¶ 142). *See Burlington N. R.R. Co.*, 882 F.2d at 1355 (finding that "interested parties understood that the proposed rules would affect" an issue because, *inter alia*, "they submitted comments … specifically addressing" the issue). Hence, interested parties were informed of the "subjects and issues involved" in the rulemaking and had ample opportunity to comment. 5 U.S.C. § 553(b)(3).

Benton Petitioners rely heavily on *Citizens Telecom. Co. of Minn. v. FCC*, 901 F.3d 991, 1004-05 (8th Cir. 2018), in which this Court held that a notice was insufficient because the Commission did an about-face, proposing a regulation for two types of services but adopting a final rule that was a "complete deregulation" of one of them. By contrast, the FCC adopted what it proposed here: a presumption of compliance.[24]

---

[24] That presumption is not conclusive, and may be overcome with evidence. It is not "an exemption" or "'complete deregulation' for BEAD recipients." Benton Br. 38. *See* App. 69-70 (Order ¶ 142).

Benton Petitioners suggest (Br. 38) that the Commission misled commenters by asking elsewhere in the Notice of Proposed Rulemaking whether and how to strengthen nondiscrimination requirements for BEAD program participants. That question, which asks *whether* the FCC should "coordinate with other agencies to ensure" its digital-discrimination requirements "apply to other federal funding programs," including "BEAD," cannot fairly be understood as a signal that a presumption of compliance for BEAD recipients was off the table. *See* App. 304 (Notice ¶ 85).

Benton Petitioners further suggest (Br. 39) that the Notice of Proposed Rulemaking was more deficient than in *Citizens Telecom.* because there "the Commission at least forecasted its final rule accurately with its sunshine draft" (the public draft of a proposed order that is released three weeks in advance of the Commission meeting at which it will be considered), whereas here it rejected proposals for a presumption of compliance for BEAD recipients in that draft. But the advance public draft of an FCC order is just that—a draft—that is subject to revision as the FCC continues to consider the item, and as parties

continue to address contested issues.[25] Where the parties to the proceeding have had adequate notice that an issue is in play, a change from the sunshine draft to the final order does not render adequate notice insufficient. *Cf. Agape Church, Inc. v. FCC*, 738 F.3d 397, 422 (D.C. Cir. 2013) (an agency may reconsider its proposals following public comment and examination of the record).

**2**. Finally, the Commission's explanation for the presumption of compliance for BEAD recipients was sufficient to satisfy the Administrative Procedure Act. The FCC explained that the BEAD program "exist[s] to remedy current inequities in broadband deployment" and is "consistent with section 60506 and our rules adopted today to facilitate equal access to broadband internet service," citing the Infrastructure Act's requirement that "'eligible entities' distributing BEAD funds must" do so "'in an equitable and nondiscriminatory manner' and 'ensure … that each subgrantee uses the funds in an

---

[25] When the advance draft of the Order was made publicly available, it was accompanied by the following disclaimer on the Commission's website: "This is not a final, adopted action. This has been circulated for tentative consideration by the Commission at its Open Meeting. The issues referenced and the Commission's ultimate resolution of those issues are subject to change." https://www.fcc.gov/document/preventing-digital-discrimination-broadband-internet-access.

equitable and nondiscriminatory manner.'" App. 69 (Order ¶ 142 & n.446 (quoting 47 U.S.C. § 1702(g)(2)(C)(i)-(ii)). In its comments, NTIA urged the FCC "to recognize the consistency between BEAD and" section 60506, "and accordingly to treat actions taken in strict compliance with BEAD program requirements as presumptively also compliant with digital discrimination rules." App. 540 (NTIA Comments at 11) (quoted in App. 39 (Order n.232)).[26]

Benton Petitioners argue (Br. 40) that consistency "is not an explanation," but it was reasonable for the FCC to establish a presumption—subject to contrary evidence—of compliance with its digital-discrimination rules based on a broadband provider's compliance with the independent non-discrimination requirements imposed by the BEAD program, which cover the same ground.

---

[26] NTIA also explained that its Notice of Funding Opportunity for the BEAD program effectuates the statutory mandate to facilitate equal access in numerous ways, such as requiring coordination with local and Tribal governments, community organizations, and others that must result in "full representation and inclusion of unserved, underserved, and underrepresented communities throughout the planning and deployment processes." App. 541-42 (NTIA Comments at 12-13).

## CONCLUSION

The petitions for review should be denied.

Dated: August 16, 2024

Respectfully submitted,

/s/ *William J. Scher*

P. Michele Ellison
   *General Counsel*

Jonathan S. Kanter
   *Assistant Attorney General*

Jacob M. Lewis
   *Deputy General Counsel*

William J. Scher
   *Counsel*

Robert B. Nicholson
Robert J. Wiggers
   *Attorneys*

FEDERAL COMMUNICATIONS
   COMMISSION

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent*
   *United States of America*

*Counsel for Respondent Federal*
   *Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App.
    P. 32(a)(7)(B), and the Court's order, issued April 2, 2024, because,
    excluding the parts of the document exempted by Fed. R. App. P.
    32(f) and Eighth Circuit Rule 32A(b):

    ☒   this document contains <u>18,115</u> words, *or*

    ☐   this document uses a monospaced typeface and contains ____
        lines of text.

2.  This document complies with the typeface requirements of Fed. R.
    App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced
        typeface using <u>Microsoft Word for Office 365</u> in <u>14-point</u>
        <u>Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced
        typeface using _____ with _____.

<u>/s/  William J. Scher</u>
William J. Scher
*Counsel for Respondents*

**CERTIFICATE OF DIGITAL SUBMISSION**

I, William J. Scher, hereby certify that with respect to the foregoing:

    (1) all required privacy redactions have been made;

    (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

    (3) the digital submissions have been scanned for viruses with the most recent version of Microsoft Windows 11 Security, last updated on August 16, 2024, and according to the program are free of viruses.

                                */s/ William J. Scher*
                                William J. Scher
                                *Counsel for Respondents*

## CERTIFICATE OF FILING AND SERVICE

I, William J. Scher, hereby certify that on August 16, 2024, I filed the foregoing FINAL Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ William J. Scher*

William J. Scher
Counsel

Federal Communications
Commission
Washington, D.C. 20554
(202) 418-1740