# In the United States Court of Appeals for the Eighth Circuit

MINNESOTA TELECOM ALLIANCE, ET AL.,
*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,
*Respondents.*

On Petition for Review from the
Federal Communications Commission
(No. 22-69, FCC 23-100)

## FINAL BRIEF FOR INDUSTRY PETITIONERS

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for Petitioner the
Chamber of Commerce of the
United States of America*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Counsel for Petitioners the
Chamber of Commerce of the
United States of America, Texas
Association of Business, and
Longview Chamber of Commerce*

*(Additional counsel on next page)*

ROMAN MARTINEZ
MATTHEW A. BRILL
BLAKE E. STAFFORD
LATHAM & WATKINS LLP
555 Eleventh Street NW,
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioners
MCTA – The Missouri Internet
& Television Association, Ohio
Cable Telecommunications
Association, Florida Internet &
Television Association, Texas
Cable Association, and NCTA –
The Internet & Television
Association*

MICHAEL H. PRYOR
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

DAVID B. MESCHKE
ROSA L. BAUM
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202

*Counsel for Petitioner National
Multifamily Housing Council,
Inc.*

THOMAS SCOTT THOMPSON
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
(202) 434-7440
SThompson@mintz.com

*Counsel for Petitioners the
Wireless Infrastructure
Association, Power &
Communications Contractors
Association, and NATE: The
Communications Infrastructure
Contractors Association*

THOMAS M. JOHNSON, JR.
JEREMY J. BROGGI
MICHAEL J. SHOWALTER
BOYD GARRIOTT
WILLIAM TURNER
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

*Counsel for Petitioners
Minnesota Telecom Alliance,
Ohio Telecom Association,
USTelecom – The Broadband
Association, CTIA – The
Wireless Association, Broadband
Association of Alabama and
Mississippi, Texas Telephone
Association, and WISPA – The
Association For Broadband
Without Boundaries*

Jeffrey A. Lamken
Rayiner I. Hashem
MoloLamken LLP
The Watergate, Suite 500
600 New Hampshire Avenue NW
Washington, DC 20037
(202) 556-2024
jlamken@mololamken.com

*Counsel for Petitioner ACA
Connects – America's
Communications Association*

Stephen E. Coran
Lerman Senter PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 416-6744
scoran@lermansenter.com

*Counsel for Petitioner WISPA –
The Association For Broadband
Without Boundaries*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

These consolidated petitions challenge a Federal Communications Commission rule implementing Section 60506(b)(1) of the Infrastructure Investment and Jobs Act. Section 60506(b)(1) directs the Commission to issue rules "preventing digital discrimination of access" to broadband internet "based on income level, race, ethnicity, color, religion, or national origin." The challenged rule interprets "digital discrimination" to mean not only intentional discrimination but also actions with a disparate impact. Disparate-impact liability is rare, and every interpretive clue here confirms that Congress did not intend to impose it. The Commission has nevertheless created the first-ever regime prohibiting business practices that cause a disparate impact "based on income level." Petitioners here (Industry Petitioners) contend that the rule exceeds the Commission's statutory authority and that the Order is arbitrary and capricious under the Administrative Procedure Act.

Given the many complex and novel questions presented and the fact that these cases involve two distinct, nonaligned groups of petitioners, Industry Petitioners respectfully request that the Court afford an hour of oral argument time, with the precise division to be determined after the briefing.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Industry Petitioners make the following disclosures:

ACA Connects – America's Communications Association has no parent corporation and no publicly held corporation owns 10% or more of its stock, pays 10% or more of its dues, or possesses or exercises 10% or more of the voting control of ACA Connects.

The Broadband Association of Alabama and Mississippi is a non-profit 501(c)(6) organization that has no parent company, and no publicly held company has a 10% or greater ownership interest in the Broadband Association of Alabama and Mississippi.

The Chamber of Commerce of the United States of America has no parent corporation, and no publicly held company owns 10% or more of its stock.

CTIA – The Wireless Association has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Florida Internet & Television Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

Longview Chamber of Commerce has no parent corporation, and no publicly held company owns 10% or more of its stock.

MCTA – The Missouri Internet & Television Association has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

The Minnesota Telecom Alliance is a non-profit 501(c)(6) organization that has no parent company, and no publicly held company has a 10% or greater ownership interest in the Minnesota Telecom Alliance.

NATE: The Communications Infrastructure Contractors Association (NATE) is a Section 501(c)(6) not-for-profit corporation organized under the laws of South Dakota. NATE does not have a parent corporation, and no publicly held corporation has an ownership stake of 10% or more in it.

National Multifamily Housing Council, Inc. (NMHC) is a Section 501(c)(6) not-for-profit corporation organized under the laws of Washington, D.C. NMHC does not have a parent corporation, and no publicly held corporation has an ownership stake of 10% or more in the corporation.

NCTA – The Internet & Television Association has no parent companies, subsidiaries, or affiliates whose listing is required by Rule 26.1.

Ohio Cable Telecommunications Association has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

The Ohio Telecom Association is a non-profit 501(c)(6) organization that has no parent company, and no publicly held company has a 10% or greater ownership interest in the Ohio Telecom Association.

Power & Communications Contractors Association (PCCA) is a Section 501(c)(6) not-for-profit corporation organized under the laws of Missouri. PCCA does not have a parent corporation, and no publicly held corporation has an ownership stake of 10% or more in it.

Texas Association of Business has no parent corporation, and no publicly held company owns 10% or more of its stock.

Texas Cable Association has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Texas Telephone Association is a non-profit 501(c)(6) organization that has no parent company, and no publicly held company has a 10% or greater ownership interest in the Texas Telephone Association.

USTelecom – The Broadband Association has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Wireless Infrastructure Association (WIA) is a Section 501(c)(6) not-for-profit corporation organized under the laws of Virginia. WIA does not have a

parent corporation, and no publicly held corporation has an ownership stake of 10% or more in it.

WISPA – The Association For Broadband Without Boundaries has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND REQUEST FOR ORAL
ARGUMENT.................................................................................i

CORPORATE DISCLOSURE STATEMENT ...............................ii

INTRODUCTION.........................................................................1

JURISDICTIONAL STATEMENT ...............................................5

STATEMENT OF THE ISSUES ...................................................6

STATEMENT OF THE CASE .......................................................7

    A.    Statutory Background ....................................................7

        1.    The Shrinking Digital Divide ..............................7

        2.    The IIJA's Support For Broadband......................9

    B.    Regulatory Background ................................................11

SUMMARY OF ARGUMENT.....................................................16

STANDARD OF REVIEW ..........................................................22

ARGUMENT ..............................................................................22

I.    THE COMMISSION LACKS STATUTORY AUTHORITY TO
IMPOSE DISPARATE-IMPACT LIABILITY....................................23

    A.    The Plain Text Of Section 60506(b)(1) Authorizes Only
Disparate-Treatment Rules...........................................24

    B.    Other Interpretive Tools Confirm The Plain Text........35

        1.    Congress did not mention disparate impact in
enacting the bipartisan IIJA ...............................35

2. Congress did not silently permit the Commission to outlaw ordinary business practices in the broadband industry ........................................................38

3. Congress did not discourage ISPs from building out internet infrastructure ...........................................42

C. At A Minimum, The Major-Questions Doctrine Precludes Reading Section 60506 To Encompass Disparate-Impact Liability .............................................46

1. Imposing disparate-impact liability here presents a major question.....................................................47

2. Section 60506 does not supply the clear congressional authorization required............................................51

II. THE COMMISSION LACKS STATUTORY AUTHORITY FOR ITS NOVEL BURDEN-SHIFTING FRAMEWORK ...............52

A. There Is A Settled Burden-Shifting Framework For Disparate-Impact Liability ..............................................53

B. Congress Did Not Depart From The Settled Burden-Shifting Framework Here ..............................................55

III. THE COMMISSION LACKS STATUTORY AUTHORITY TO REGULATE ENTITIES OTHER THAN INTERNET SERVICE PROVIDERS..........................................................58

A. The Statutory Text And Structure Restrict The Commission To Regulating ISPs ....................................58

B. The Major-Questions Doctrine Confirms That The Commission Lacks Authority To Regulate Non-ISPs .................62

IV. THE COMMISSION LACKS STATUTORY AUTHORITY FOR THE FULL SUITE OF ENFORCEMENT MECHANISMS IT CLAIMS ........................................................65

A. Section 60506 Does Not Authorize Monetary Penalties ..............65

B.     The Commission's Counterarguments Lack Merit ......................69

V.    THE ORDER IS ARBITRARY AND CAPRICIOUS...........................72

    A.     The Commission Failed To Explain Its Departure
          From The Standard Disparate-Impact Framework ....................72

    B.     The Commission Did Not Consider The Rule's Full
          Costs Or Justify Its Coverage .........................................................73

CONCLUSION.....................................................................................................76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors* v. *HHS*,
  594 U.S. 758 (2021)..............................................46, 52, 64

*Albemarle Paper Co.* v. *Moody*,
  422 U.S. 405 (1975).......................................................53

*AMG Cap. Mgmt., LLC* v. *FTC*,
  593 U.S. 67 (2021)...............................................6, 66, 71

*Babb* v. *Wilkie*,
  589 U.S. 399 (2020).......................................................24

*Biden* v. *Nebraska*,
  143 S. Ct. 2355 (2023) ...........................................*passim*

*Boykin* v. *Bank of Am. Corp.*,
  162 Fed. Appx. 837 (11th Cir. 2005)..............................56

*Brnovich* v. *Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021) ................................................31

*BST Holdings, LLC* v. *OSHA*,
  17 F.4th 604 (2021).......................................................49

*Burlington N. & Santa Fe Ry. Co.* v. *White*,
  548 U.S. 53 (2006).........................................................25

*Chamber of Commerce of the U.S.A.* v. *CFPB*,
  2023 WL 5835951 (E.D. Tex. Sept. 8, 2023)...................50

*Chevron U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984).......................................................34

*Chisom* v. *Roemer*,
  501 U.S. 380 (1991).......................................................36

ix

*Comcast Corp.* v. *FCC,*
    600 F.3d 642 (D.C. Cir. 2010).............................................................71

*Commissioner* v. *Keystone Consol. Indus., Inc.,*
    508 U.S. 152 (1993).............................................................................55

*Doe* v. *BlueCross BlueShield of Tenn., Inc.,*
    926 F.3d 235 (6th Cir. 2019) ...........................................................29

*EchoStar Satellite LLC* v. *FCC,*
    704 F.3d 992 (D.C. Cir. 2013)..........................................................71

*FCC* v. *American Broad. Co.,*
    347 U.S. 284 (1954).............................................................................68

*FCC* v. *Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).............................................................................73

*FCC* v. *Prometheus Radio Project,*
    592 U.S. 414 (2021)..............................................................7, 21, 72

*Griggs* v. *Duke Power Co.,*
    401 U.S. 424 (1971)................................................................27, 28, 36

*ICC* v. *American Trucking Ass'ns,*
    467 U.S. 354 (1984)......................................................................21, 67

*International Bhd. of Teamsters* v. *United States,*
    431 U.S. 324 (1977).............................................................................26

*Jackson* v. *Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005).............................................................................24

*Koons Buick Pontiac GMC, Inc.* v. *Nigh,*
    543 U.S. 50 (2004)...............................................................................36

*Lamie* v. *United States Tr.,*
    540 U.S. 526 (2004).............................................................................34

*Louisiana* v. *EPA,*
    2024 WL 250798 (W.D. La. Jan. 23, 2024) ....................................51

*Marx* v. *General Revenue Corp.*,
568 U.S. 371 (2013)................................................................34

*Mayor of Baltimore* v. *Azar*,
973 F.3d 258 (4th Cir. 2020)....................................................75

*MCI Telecomms. Corp.* v. *AT&T*,
512 U.S. 218 (1994)................................................................48

*Meacham* v. *Knolls Atomic Power Lab'y*,
554 U.S. 84 (2008)..............................................................6, 54

*Midatlantic Nat'l Bank* v. *New Jersey Dep't of Env't Prot.*,
474 U.S. 494 (1986)................................................................55

*Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ................................................................ 73

*Murray* v. *UBS Sec., Inc.*,
601 U.S. 23 (2024)..............................................................6, 25

*Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*,
462 U.S. 669 (1983)................................................................25

*NFIB* v. *OSHA*,
595 U.S. 109 (2022)..........................................................47, 49

*SEC* v. *Graham*,
823 F.3d 1357 (11th Cir. 2016) ..............................................68

*Smith* v. *City of Jackson*,
544 U.S. 228 (2005)........................................................*passim*

*Texas Dep't of Hous. & Cmty. Affs.* v. *Inclusive Communities
Project, Inc.*,
576 U.S. 519 (2015)........................................................*passim*

*United States* v. *Adler*,
590 F.3d 581 (8th Cir. 2009) ..................................................41

*United States* v. *Philip Morris USA, Inc.*,
396 F.3d 1190 (D.C. Cir. 2005)............................................6, 68

*University of Tex. Sw. Med. Ctr.* v. *Nassar*,
570 U.S. 338 (2013) ...............................................25

*Utility Air Regul. Grp.* v. *EPA*,
573 U.S. 302 (2014) ........................................*passim*

*Van Buren* v. *United States*,
593 U.S. 1648 (2021) ...........................................38

*Verizon* v. *FCC*,
740 F.3d 623 (D.C. Cir. 2014) .............................45

*Watson* v. *Fort Worth Bank & Tr.*,
487 U.S. 977 (1988) ............................................56

*West Virginia* v. *EPA*,
597 U.S. 697 (2022) ........................................*passim*

*Whitman* v. *American Trucking Ass'ns*,
531 U.S. 457 (2001) ............................................46

**Statutes**

5 U.S.C. § 706 .................................................22, 72

28 U.S.C.
§ 2342 ...............................................................5
§ 2344 ...............................................................5

29 U.S.C. § 3248 ...................................................38

42 U.S.C.
§ 2000e .........................................................6, 54
§ 9849 ...............................................................38
§ 12112 .............................................................26
§ 18116 .............................................................38

47 U.S.C.

§ 151 ..................................................................63
§ 153 ..................................................................44
§ 154 ............................................................6, 71

§ 201...............................................................................44

§ 203...............................................................................44

§ 254...............................................................................70

§ 402.................................................................................5

§ 405.................................................................................5

§ 503...........................................................................6, 66

§ 1754.......................................................................*passim*

49 U.S.C. § 40127 .........................................................38

American Recovery and Reinvestment Act of 2009,
    Pub. L. No. 111-5, 123 Stat. 516 ....................................7

Infrastructure Investment and Jobs Act,
    Pub. L. No. 117-58, 135 Stat. 429 ..........................*passim*

**Regulatory Materials**

47 C.F.R.
    § 1.4...............................................................................5

    § 16.2.....................................................................*passim*

    § 16.3.............................................................................12

    § 16.5......................................................................55, 56

Fourteenth Broadband Deployment Report,
    FCC 21-18, GN Docket No. 20-269 (Jan. 19, 2021).......................8

*In re Improving Competitive Broadband Access to Multiple
Tenant Environments,*
    37 FCC Rcd. 2448 (2022)..............................................61

*In re Promotion of Competitive Networks in Local
Telecommunications Markets,*
    23 FCC Rcd. 5385 (2008)..............................................63

*In re Protecting & Promoting the Open Internet,*
    30 FCC Rcd. 5601 (2015)..............................................45

*Safeguarding and Securing the Open Internet,*
    88 Fed. Reg. 76048 (Nov. 3, 2023)................................46

2024 Section 706 Report,
FCC 24-27, GN Docket No. 22-270 (Mar. 18, 2024).........................................9

**Other Authorities**

Samuel R. Bagenstos, *Bottlenecks and Antidiscrimination Theory: A New Theory of Equal Opportunity*,
93 Tex. L. Rev. 415 (2014)...............................................................50

*Black's Law Dictionary* (11th ed. 2019)...............................................67

FCC, *Connecting America: The National Broadband Plan* (2010) ........................................................................8

FCC, *FCC to Vote on Restoring Net Neutrality* (Apr. 3, 2024), https://www.fcc.gov/document/fcc-vote-restoring-net-neutrality ...........................................................46

Laura Meckler & Devlin Barrett, *Trump Administration Considers Rollback of Anti-Discrimination Rules*, Wash. Post (Jan. 3, 2019) .................................................50

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2019) .............................67

We Are Apartments, *National Data: Apartment Homes*, https://weareapartments.org/data/..........................................62

Michael Selmi, *Was the Disparate Impact Theory a Mistake?*, 53 UCLA L. Rev. 701 (2006)..............................................50

USTelecom, *2022 Broadband Capex Report* (Sept. 8, 2023), https://utelecom.org/research/2022-broadband-capex ...........................8, 49

*Webster's New World College Dictionary* (5th ed. 2016)..................................24

White House, *Affordable Connectivity Program Enrollment Fact Sheets*, https://www.whitehouse.gov/build/resources/affordable-connectivity-program-enrollment-fact-sheets ...............................10

**INTRODUCTION**

In late 2021, a bipartisan group in Congress passed the Infrastructure Investment and Jobs Act (IIJA). The IIJA authorized $1.2 trillion in infrastructure spending, including $65 billion for high-speed internet, or "broadband." Tucked into that 1,000-page statute, at the end of a 70-page section addressing broadband, is a single paragraph requiring the Federal Communications Commission to adopt rules "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." Pub. L. No. 117-58, § 60506(b)(1), 135 Stat. 429, 1246. That paragraph generated zero legislative history or political debate.

Section 60506 should have been as unremarkable as it was uncontroversial. After all, Congress frequently requires that recipients of federal funds avoid intentional discrimination, and Congress had just earmarked billions of dollars to support internet service providers (ISPs) in building out broadband. Given those partnerships with ISPs, it is unsurprising that Congress wanted to prohibit them from intentionally discriminating among their current or prospective customers.

The Commission, however, issued a rule that rewrites the statute to do something much more unusual—indeed, unprecedented. In the Commission's

view, Section 60506 authorizes it to forbid any entity from engaging in any business practice that has a *disparate impact* on broadband access based on the listed characteristics, including "income level." According to the Commission, Congress did not just ensure that its partners do not intentionally discriminate; it created a first-of-its-kind regime requiring scrutiny of common business practices for their differential effect on customers of varying income levels. And Congress supposedly did so without a word in the statute about disparate impact or a single line of debate.

The Commission's theory is not plausible. Start with the words Congress chose: "digital discrimination" "based on" protected characteristics. As the Supreme Court has repeatedly made clear, that is hallmark disparate-*treatment* language focused on intentional discrimination. By contrast, Section 60506 contains none of the outcome-focused language that the Court has previously (if rarely) interpreted to authorize disparate-*impact* liability. No legislator with even a passing familiarity with the Supreme Court's decisions would have chosen the language of Section 60506 to create a disparate-impact regime for broadband access.

More generally, disparate-impact liability is not something that Congress slips into laws with oblique language and no fanfare. The Supreme

Court has cautioned that, without robust safeguards, disparate-impact liability threatens to "undermine . . . the free market system" itself. *Texas Dep't of Hous. & Cmty. Affs.* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519, 544 (2015). That threat is particularly stark here, because interpreting Section 60506 to cover disparate impacts based on "income level" would throw into doubt all manner of standard business practices, including pricing decisions, credit checks, and marketing campaigns—all of which could affect high- and low-income customers differently. It strains credulity for the Commission to say that a bipartisan majority of Congress quietly subjected a wide swath of the economy to a disparate-impact regime with such dramatic consequences, in one brief paragraph of a 1,000-page omnibus infrastructure law. At a minimum, the Commission cannot show that Congress clearly authorized disparate-impact liability in Section 60506. *See West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022).

Nor did the Commission stop at creating an atextual disparate-impact regime. It also developed an unprecedented disparate-impact framework that is particularly prejudicial to defendants. In the rare contexts where the Supreme Court has recognized disparate-impact claims, it has required a particular burden-shifting framework. Under that framework, a defendant

can defeat a claim if it can show that the policy causing a disparity is "necessary to achieve a valid interest." *Inclusive Communities*, 576 U.S. at 541. But the Commission's rule recognizes only a much narrower version of this defense. And while the *Inclusive Communities* framework shifts the burden back to plaintiffs to offer a feasible alternative practice that would not cause a disparate impact, the Commission keeps the burden squarely on the defendant. No disparate-impact regime has ever functioned that way.

The Commission's rule is unlawful in at least two other respects. First, the rule's sweeping definition of "covered entities" encompasses not only ISPs, but also a broad range of other entities with the potential to indirectly affect broadband deployment, including infrastructure companies, contractors, and financial institutions—some of which are not traditionally subject to the Commission's jurisdiction. Congress did not authorize that overreach. Second, the Commission asserts the authority to subject all of these entities to onerous monetary forfeitures. The Commission has no statutory authority to impose backward-looking relief, including monetary forfeitures, for violations of rules issued under Section 60506.

Finally, the Order is arbitrary and capricious. The Commission wrongly claims that its burden-shifting framework "fully comport[s] with" *Inclusive*

*Communities.* App. 18-19 (Order ¶ 39). The Commission has thus refused to acknowledge, let alone explain, the critical differences. The Commission also failed to consider the full range of compliance costs that its novel regime will impose on all manner of businesses, even those with little or no control over broadband deployment or access. Nor did it justify its decision to extend liability to non-ISP entities that have no direct control over a consumer's ability to subscribe to broadband. That is textbook unreasonable decision-making.

Whether because the Commission exceeded its statutory authority or because it acted arbitrarily and capriciously, this Court should set aside the Order.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over these petitions for review under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The Order was published in the Federal Register on January 22, 2024. Petitioners timely filed their petitions "within 60 days of its entry," on January 30 and 31; February 1, 12, 16, and 27; and March 1 and 8, 2024. 28 U.S.C. § 2344; *see* 47 U.S.C. § 405(a); 47 C.F.R. § 1.4(b)(1).

# STATEMENT OF THE ISSUES

1. Whether Section 60506 of the Infrastructure Investment and Jobs Act authorizes the Commission to prohibit business practices that cause a disparate impact on the basis of covered characteristics, including income level. *Murray* v. *UBS Sec., Inc.*, 601 U.S. 23 (2024); *Inclusive Communities*, 576 U.S. 519; *Smith* v. *City of Jackson*, 544 U.S. 228 (2005); *Biden* v. *Nebraska*, 143 S. Ct. 2355 (2023).

2. Whether, if Section 60506 authorizes disparate-impact liability, it further authorizes the Commission's novel burden-shifting framework. *Inclusive Communities*, 576 U.S. 519; *Meacham* v. *Knolls Atomic Power Lab'y*, 554 U.S. 84 (2008); 42 U.S.C. § 2000e-2(k)(1)(A)(i)-(ii).

3. Whether Section 60506 authorizes the Commission to regulate entities other than internet service providers. *Nebraska*, 143 S. Ct. 2355.

4. Whether Section 60506 authorizes the Commission to enforce its rule with monetary forfeitures. *AMG Cap. Mgmt., LLC* v. *FTC*, 593 U.S. 67 (2021); *United States* v. *Philip Morris USA, Inc.*, 396 F.3d 1190 (D.C. Cir. 2005); 47 U.S.C. § 503(b)(1); 47 U.S.C. § 154(i).

5. Whether the Order is arbitrary and capricious because (a) the Commission failed to explain its departure from the standard burden-shifting

framework for disparate-impact claims, or (b) the Commission failed to consider the full costs of the rule and to justify its regulation of non-ISPs. *FCC* v. *Prometheus Radio Project*, 592 U.S. 414 (2021).

## STATEMENT OF THE CASE

### A.    Statutory Background

On November 15, 2021, President Biden signed into law the bipartisan Infrastructure Investment and Jobs Act.  Clocking in at over 1,000 pages, the IIJA provided approximately $1.2 trillion in federal infrastructure funding, including $550 billion for programs like modernizing airports and seaports and building a national network of electric-vehicle chargers. *See* Pub. L. No. 117-58, 135 Stat. 429.  In Division F of the statute, Congress appropriated over $65 billion for expanding access to broadband internet service—its latest effort to address the "digital divide" that has prevented "the benefits of broadband" from being "broadly enjoyed by all." *Id.* § 60101, 135 Stat. at 1182.

### 1.    The Shrinking Digital Divide

In 2009, Congress directed the Federal Communications Commission to develop a National Broadband Plan to ensure that "all people of the United States have access to broadband capability."  American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2), 123 Stat. 115, 516. The next year, the Commission reported that the number of Americans with

high-speed internet had "grown from eight million in 2000 to nearly 200 million," "[f]ueled primarily by private sector investment and innovation." FCC, *Connecting America: The National Broadband Plan* xi (2010). Still, as of 2009, about a third of Americans did not have broadband. To address that "digital exclusion," the Commission recommended that the federal government "encourage more private innovation and investment," including by "support[ing] deployment of broadband . . . in high-cost areas" and "ensur[ing] that low-income Americans can afford broadband." *Id.* at xi, 5.

That strategy has been working. Since 2010, broadband providers have invested nearly a trillion dollars in building out internet infrastructure, resulting in a massive expansion of Americans' access to broadband. *See* USTelecom, *2022 Broadband Capex Report* (Sept. 8, 2023), https://ustelecom.org/research/2022-broadband-capex/. By the end of 2019, over 313 million Americans—approximately 96%—had access to broadband at home. *See* Fourteenth Broadband Deployment Report, FCC 21-18, GN Docket No. 20-269 ¶ 33 & fig.1 (Jan. 19, 2021). Last month, the Commission concluded that even under a substantially more rigorous definition of "broadband," 91% of Americans had access to broadband at home.

*See* 2024 Section 706 Report, FCC 24-27, GN Docket No. 22-270 ¶¶ 20, 22 (Mar. 18, 2024).

Nevertheless, as Congress recognized in the IIJA, there are still Americans who do not have high-speed internet. This remaining "digital divide" reflects two persistent realities. First, some Americans still do not have access to broadband. They live in areas, such as remote rural communities, where the per-unit costs of deploying internet infrastructure are high and investment is not always financially justifiable for ISPs. Second, some Americans choose not to purchase broadband for a variety of reasons. That is, even where broadband service is fully available, some (often lower-income) Americans do not sign up for it.

## 2.    The IIJA's Support For Broadband

The IIJA addresses both challenges. Title I of Division F establishes the statute's flagship program, the "Broadband Equity, Access, and Deployment Program," or BEAD, to address broadband access. *See* Pub. L. No. 117-58, § 60102(b), 135 Stat. at 1184. The BEAD Program provides $42.5 billion in federal grants to support deployment of new internet infrastructure, primarily in areas where "the cost of building out broadband

service is higher" because of their "remote location" or "lack of population density." *Id.* § 60102(a)(2)(G), 135 Stat. at 1184-1185.

Title III of Division F, also referred to as the Digital Equity Act, addresses the other side of the coin: "adoption of broadband" where it is already available. Pub. L. No. 117-58, § 60302, 135 Stat. at 1209. The Digital Equity Act provides $2.75 billion in funding to States, nonprofits, and others to "promote the achievement of digital equity, support digital inclusion activities, and build capacity for . . . adoption of broadband by residents." *Id.* § 60304(a)(1), 135 Stat. at 1212-1213; *see id.* § 60305, 135 Stat. at 1222-1228.

Title V of Division F, titled "Broadband Affordability," authorizes additional subsidies to further boost broadband adoption. Specifically, Title V appropriates $14.2 billion for the Affordable Connectivity Program, which subsidizes broadband for qualified low-income Americans. Pub. L. No. 117-58, 135 Stat. at 1382. As of February 2024, 23 million households were participating in that program.[1]

Tucked into the end of Title V is the 300-word provision at issue here: Section 60506. That provision begins by declaring that it is the "policy of the

---

[1] The White House, *Affordable Connectivity Program Enrollment Fact Sheets*, https://www.whitehouse.gov/build/resources/affordable-connectivity-program-enrollment-fact-sheets (last visited Apr. 22, 2024).

United States that, insofar as technically and economically feasible," "subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service." 47 U.S.C. § 1754(a). Section 60506(b) then provides that the Commission:

> shall adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including—
>
> (1) preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and
>
> (2) identifying necessary steps for the Commission[] to take to eliminate discrimination described in paragraph (1).

47 U.S.C. § 1754(b).

The Senate passed the IIJA by a vote of 69-30, with 19 Republican Senators supporting it. The House of Representatives agreed to the Senate bill by a bipartisan vote of 228-206. On November 15, 2021, President Biden signed the IIJA into law.

## B. Regulatory Background

In March 2022, the Commission released a Notice of Inquiry seeking comment on whether it would be "permissible under subsection 60506" to "establish a 'discriminatory effects' or disparate impact test," rather than

"require discriminatory intent." App. 244 (Notice of Inquiry ¶ 22). As far as Industry Petitioners are aware, that was the first time anyone—any individual legislator, the President, or the Commission—had mentioned the concept of disparate-impact liability under the IIJA's broadband provisions. Nine months later, the Commission formally proposed to "adopt a definition of 'digital discrimination of access' that encompasses actions or omissions by a provider that differentially *impact* consumers' access to broadband internet access service." App. 263 (Notice of Proposed Rulemaking ¶ 12) (emphasis added).

On November 20, 2023, the Commission voted 3-2 to adopt the rule. App. 1 (Order 1). The final rule asserts sweeping authority over the business practices of ISPs and other actors who play any role in facilitating consumers' internet access.

First, as previewed in its proposal, the Commission interpreted the phrase "digital discrimination of access" in Section 60506(b)(1) to cover both disparate treatment and disparate impact. 47 C.F.R. § 16.3. The final rule thus makes it unlawful for:

> any broadband provider, or covered entity as described in this part, to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that *differentially*

> *impact* consumers' access to broadband internet
> access service based on their income level, race,
> ethnicity, color, religion, or national origin or are
> intended to have such differential impact.

*Id.* (emphasis added).

Second, the Commission explained that a covered entity violates the rule

if it causes an unjustified disparate impact with respect to many aspects of

internet service, including, but not limited to:

> deployment, . . . speeds, capacities, latency, data
> caps[,] network infrastructure deployment, network
> reliability, network upgrades, network maintenance,
> customer-premises equipment, . . . installation[,] . . .
> contractual terms generally, mandatory arbitration
> clauses, pricing, deposits, discounts, customer service,
> language options, credit checks, marketing or
> advertising, contract renewal, upgrades, account
> termination, transfers to another covered entity, and
> service suspension.

App. 52-54 (Order ¶ 102). The Commission further stated that its rule covers

"both actions and omissions, whether recurring or a single instance,

concerning these aspects of service." *Id.*

Third, the Commission adopted a sweeping definition of "covered

entities." App. 44 (Order ¶ 85). It explained that the rule "extend[s] not only

to broadband providers, but also to entities that provide services that facilitate

and meaningfully affect consumer access to broadband internet access

service." *Id.* The Commission acknowledged that the rule would thus cover

"apartment owners" and other "entities outside the communications industry"—including entities that have never been subject to the Commission's jurisdiction or have been only for narrow purposes. App. 45 (Order ¶ 87 & n.275). The Commission also swept in "contractors retained by" ISPs and entities that merely "maintain[] and upgrad[e] network infrastructure." App. 44 (Order ¶ 85). It also "decline[d] to expressly carve out" local governments. App. 45-46 (Order ¶ 88).

Fourth, the Commission stated that it would enforce its rule through self-initiated investigations and informal complaints from the public. App. 66 (Order ¶ 132). The Commission also took the view that it may rely on the "general enforcement provisions" of the Communications Act, *see* App. 62 (Order ¶ 122), and thus could order that Act's "full suite of available remedies, including the possibility of monetary forfeitures," App. 69 (Order ¶ 141).

Finally, the Commission described the circumstances in which it would conclude that a policy or practice that causes a disparate impact is nonetheless lawful. The Commission recognized that, "[u]nder traditional disparate impact analysis," a defendant may show "that the challenged policy or practice is justified by a substantial, legitimate business interest." App. 32 (Order ¶ 63). But the Commission stated that it would require a defendant to further

"prove that the policy or practice is . . . justified by genuine issues of technical and economic feasibility," as "evidenced by prior success by covered entities under similar circumstances." App. 26, 34 (Order ¶¶ 50, 66) (citation omitted).

Commissioners Carr and Simington dissented. Both observed that "never before . . . has the FCC (or any federal agency for that matter) claimed this degree of control over the Internet." App. 220 (Carr Dissent); *see* App. 231 (Simington Dissent) (describing the rule as "the most open-ended liability regime that the FCC has ever seen—indeed, one broader than any civil rights law Congress has ever passed"). Commissioner Carr worried that the Commission had "swe[pt] entire industries into the FCC's jurisdiction for the first time ever" and ignored the "limits Congress imposed on the FCC's enforcement authority." App. 221, 225 (Carr Dissent). He also criticized the rule's narrow "feasibility" defense, observing that the rule would "supplant[] the business judgment of essentially the entire Internet delivery ecosystem." App. 223 (Carr Dissent). Both dissenters emphasized that "Congress would not have authorized" the rule's far-reaching disparate-impact standard "in a less than one page section of a thousand-page bill." App. 231 (Simington Dissent); *see* App. 222 (Carr Dissent).

## SUMMARY OF ARGUMENT

The Commission's rule is unlawful at every turn. Its imposition of disparate-impact liability, its framework for adjudicating disparate-impact claims, its coverage of far-flung entities, and its asserted enforcement mechanisms all exceed the narrow statutory authority Congress granted in Section 60506. To top it off, the Commission failed to satisfy the elementary requirements of reasonable and reasonably explained decision-making.

I.     The Commission lacks statutory authority to impose disparate-impact liability. The plain text of the statute compels that conclusion. Every traditional tool of statutory interpretation confirms it. And if any doubt remains, the major-questions doctrine dispels it.

A.     The plain text of Section 60506 authorizes only disparate-treatment rules. The Commission grounds its rule in Congress's direction to prevent "digital discrimination of access based on" the covered characteristics. 47 U.S.C. § 1754(b)(1). That statutory phrase contains the hallmarks of a disparate-*treatment* regime and omits any language that is naturally read to permit disparate impact. If Congress had intended to authorize the Commission to impose a sweeping disparate-*impact* regime, presumably it would have used the language the Supreme Court has deemed essential to

authorizing disparate-impact liability.  Section 60506 contains nothing of the sort.

B.     Other tools of statutory interpretation confirm that Section 60506 does not authorize disparate-impact liability.  First, under the Commission's interpretation, Congress imposed a novel regime in which ordinary business practices are off limits if they have different effects on consumers of different income levels.  Yet no legislator, for or against the IIJA, said a word about such a regime.  That silence speaks volumes.

Second, the implausible—and even absurd—consequences of the Commission's reading cast serious doubt on its correctness.  The Commission not only has stretched a disparate-treatment statute to cover disparate impact, but has also expanded its mandate to cover commonplace business practices.  Such practices—like deposit requirements, late fees, and even uniform prices—may affect high- and low-income consumers differently, and the Commission has thus claimed the power to deem them unlawful.

Third, the Commission's disparate-impact theory is incompatible with Congress's broader approach of encouraging broadband deployment in areas where market conditions do not support private investment.  The threat of onerous penalties under the Commission's disparate-impact theory would

have the opposite effect, deterring ISPs from deploying or upgrading infrastructure. The Commission's theory is also inconsistent with longstanding statutes that allow it to regulate a provider's rates only if that provider is a common carrier. Disparate-impact liability premised on income effectively allows rate regulation, and Congress did not tuck into a minor provision of the IIJA the groundbreaking authorization for the Commission to treat ISPs as common carriers.

C.     The text and ordinary tools of statutory interpretation are all that are needed to resolve this case. But the major-questions doctrine puts the proper resolution beyond doubt. Whether the Commission may impose an aggressive form of liability on a wide range of entities—including some outside the Commission's traditional jurisdiction—for engaging in commonplace business practices is a major question in every relevant respect. The rule is unprecedented and expansive; it threatens to chill billions of dollars of infrastructure investment; and it relies on a politically controversial and rarely used form of liability. A clear statement of congressional authorization is needed for that power grab. None can be found in Section 60506, a single, unremarkable paragraph in a 1,000-page omnibus infrastructure bill.

II.    Even if Section 60506 could be read to authorize some form of disparate-impact liability, it would not authorize the unprecedented framework the Commission adopted here.  The Supreme Court has prescribed a three-step burden-shifting framework for adjudicating disparate-impact claims.  First, the plaintiff must show that the defendant's policy caused a differential impact.  Second, the burden shifts to the defendant to establish that the policy is justified by substantial, legitimate interests.  Third, the burden shifts back to the plaintiff to offer less discriminatory alternatives.

The Commission's rule inexplicably departs from that settled framework.  It takes some substantial, legitimate interests off the table at the second step, allowing a defendant to argue only that it would be technically or economically infeasible to forgo its policy.  At the third step, it puts the burden on the defendant to prove a negative:  that there is no less discriminatory alternative policy that could satisfy its interests.  And it would hold defendants liable for a "single instance," rather than a policy, with a disparate impact.  App. 53-54 (Order ¶ 102).  There is zero indication in Section 60506 that Congress intended to depart thrice over from the Supreme Court's settled framework for disparate-impact liability.

III.    The Commission also lacks statutory authority to regulate entities other than ISPs.

A.    The relevant statutory text focuses exclusively on the relationship between consumers and ISPs.  It applies only to those entities that offer broadband service to their "subscribers" and have the ability to control the "deployment" and "quality" of that service.  Non-ISPs do not have broadband subscribers and have little to no control over whether or how providers offer broadband.  Other parts of the statute confirm its focus on ISPs, including by requiring equal access "within the service area" of a particular provider—a metric that makes sense only for ISPs.

B.    Here again, if the statutory text and structure left any doubt, the major-questions doctrine confirms that the Commission lacks authority to regulate non-ISPs in this rule.  The rule would apply to entities making up a huge swath of the American economy, even though many of those entities lack direct control over consumers' ability to subscribe to broadband, and fall far outside the Commission's limited expertise over communications.  Congress did not supply the requisite clear congressional authorization for that regulation.

IV.   The Commission also seeks to enforce its unlawful rule with unauthorized remedial powers.  The Commission claims the authority to use the "full suite" of remedies available under the Communications Act, including "monetary forfeitures."  App. 69 (Order ¶ 141).  But unlike other provisions of the IIJA, Section 60506 does not include explicit authorization for any penalties.  The Supreme Court has held that an agency may have implicit authority to take enforcement actions "directly and closely tied to" its "specific statutory mandate."  *ICC* v. *American Trucking Ass'ns*, 467 U.S. 354, 367 (1984).  Here, the Commission's mandate to "prevent[]" and "eliminate" digital discrimination may implicitly authorize it to impose limited forward-looking remedies, like appropriately tailored cease-and-desist orders.  But it does not imply authorization to pursue backward-looking penalties like monetary forfeitures.

V.   At the very least, the Commission's Order should be set aside because it is arbitrary and capricious.  The Commission repeatedly fell short of the basic requirement that an agency "reasonably consider[] the relevant issues and reasonably explain[] the decision."  *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  First, the Commission failed to explain, or even acknowledge, its departure from the standard burden-shifting

framework for disparate-impact claims.  Second, the Commission failed to consider the full set of costs the rule will impose, including the costs borne by covered entities other than broadband providers.  And while the Commission ignored the costs to non-ISPs, it simultaneously assumed the benefits of regulating them—failing to justify extending liability to entities that have no direct control over a consumer's ability to subscribe to broadband.

## STANDARD OF REVIEW

This Court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

## ARGUMENT

Section 60506 should be an uncontroversial provision:  it prohibits internet service providers from intentionally discriminating in providing access to broadband.  The Commission, however, has interpreted the statute to impose disparate-impact liability, to adopt a new burden-shifting framework unknown to civil-rights law, to reach a wide array of actors beyond ISPs, and to subject all of them to monetary fines.  Section 60506 says not one word about any of this, because Congress never considered any of it.  For any one of the Commission's departures from the statute, the rule should be set

aside as unlawful. In the alternative, the Order should be vacated as arbitrary and capricious, because the Commission failed to explain its deviations from the usual burden-shifting framework for disparate-impact liability and to weigh and justify the costs of the rule for those entities without direct control over broadband access.

## I. THE COMMISSION LACKS STATUTORY AUTHORITY TO IMPOSE DISPARATE-IMPACT LIABILITY.

Section 60506 does not authorize the Commission's disparate-impact regime. This Court need look no further than the provision's plain text, which uses classic disparate-treatment language. But every traditional tool of interpretation confirms what the plain text says: the legislative history is conspicuously silent on disparate impact, the Commission's reading would remake the broadband industry in ways that range from implausible to absurd, and the Commission's rule is inconsistent with Congress's approach to broadband regulation both in general and in the IIJA itself. If any doubt remains, the major-questions doctrine resolves it. At a minimum, Congress did not clearly authorize the sweeping power that the Commission has asserted.

## A. The Plain Text Of Section 60506(b)(1) Authorizes Only Disparate-Treatment Rules.

Disparate-impact liability is the exception, not the rule. The Supreme Court has therefore interpreted statutes to authorize disparate-impact liability only when the text compels such a reading. The text of Section 60506 compels the opposite conclusion. In directing the Commission to adopt rules to prevent "digital *discrimination* of access *based on*" the covered characteristics, 47 U.S.C. § 1754(b)(1) (emphases added), Congress used language that the Supreme Court has said refers to disparate treatment. Just as importantly, Congress did *not* use formulations associated with disparate impact.

1. Section 60506(b)(1) uses multiple terms that the Supreme Court has consistently interpreted to refer only to disparate treatment. Start with the term "discrimination." The ordinary meaning of "discriminate" is "to make distinctions in treatment." *Webster's New World College Dictionary* 420 (5th ed. 2016). The Supreme Court has time and again embraced that ordinary meaning, explaining that "the 'normal definition of discrimination' is 'differential treatment.'" *Jackson* v. *Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (citation omitted) (Title IX); *see Babb* v. *Wilkie*, 589 U.S. 399, 405 (2020) (same for Age Discrimination in Employment Act); *Burlington N. &*

*Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 59 (2006) (noting in the Title VII context that "[n]o one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals"); *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U.S. 669, 682 n.22 (1983) (explaining that, in the equal-protection context, "discriminate[]" means "less favorable treatment").

Indeed, the Supreme Court recently reaffirmed that "normal definition" in *Murray* v. *UBS Securities, Inc.*, 601 U.S. 23, 34 (2024). In *Murray*, the Court considered a provision of the Sarbanes-Oxley Act stating that no employer may "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee . . . because of" the employee's protected whistleblowing activity. *Id.* at 26 (citation omitted). Although the Court declined to impose a requirement of retaliatory intent, it reiterated that the term "discriminate" means intentional treatment: "[p]rohibited discrimination occurs when an employer 'intentionally treats a person worse because of' a protected characteristic." *Id.* at 34 (citation omitted).

Section 60506(b)(1) also uses the phrase "based on," which likewise is associated with disparate treatment. The Supreme Court has explained that "based on" is synonymous with "because of." *University of Tex. Sw. Med. Ctr.*

v. *Nassar*, 570 U.S. 338, 350 (2013). And the Court has held that claims of less favorable treatment "*because of* . . . race, color, religion, sex, or national origin" generally require "[p]roof of discriminatory motive." *International Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 335 n.15 (1977) (emphasis added); *see Smith* v. *City of Jackson*, 544 U.S. 228, 249 (2005) (O'Connor, J., concurring in the judgment) (To "take an action against an individual *because of*" a protected trait "plainly requires discriminatory intent.").

Either "discrimination" or "based on" would alone be sufficient to indicate disparate treatment under Supreme Court precedent. In combination, "discrimination . . . based on" a covered characteristic can mean only one thing: intentionally treating groups differently because of that characteristic.

2. On the other side of the ledger, Section 60506(b)(1) does *not* contain language expressly or impliedly authorizing disparate-impact liability. Congress has included express authorization for disparate-impact liability in other statutes. *See, e.g.*, 42 U.S.C. § 12112(b)(3) (defining "discriminate" under the Americans with Disabilities Act to include "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the

basis of disability"). Even the Commission does not contend that Section 60506 includes comparably express authorization.

Nor does Section 60506(b)(1) contain the type of language that falls short of express authorization but that the Supreme Court has nevertheless identified as triggering disparate-impact liability. The Court has read disparate-impact liability into only three statutes: Title VII, the Age Discrimination in Employment Act (ADEA), and the Fair Housing Act (FHA). In each, the statute "begin[s] with prohibitions on disparate treatment," and then uses a critical word—"otherwise"—"to introduce [a] results-oriented phrase." *Texas Dep't of Hous. & Cmty. Affs.* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519, 534 (2015). The Court has explained that language like "otherwise make unavailable" is "of central importance" because it "refers to the consequences of actions and not just to the mindset of actors." *Id.* at 533-534.

The "otherwise" formulation first appeared in Title VII. In addition to prohibiting intentional discrimination, Title VII makes it unlawful to use a protected characteristic as a reason "to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee." *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 426 n.1 (1971) (citing 42 U.S.C. § 2000e-2)

(emphasis added).  The Supreme Court observed that "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." *Id.* at 432.

Next, in *Smith*, the Court considered the ADEA, which similarly includes both a prohibition on intentional discrimination and a provision making it unlawful to "deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee."  544 U.S. at 233 (emphasis added) (quoting 29 U.S.C. § 623(a)(2)).  Citing *Griggs*, the plurality explained that the "otherwise" phrase imposes disparate-impact liability because, like the language in Title VII, it "focuses on the *effects* of the action on the employee rather than the motivation . . . of the employer." *Id.* at 236.

Most recently, in *Inclusive Communities*, the Supreme Court considered the FHA, which makes it unlawful to "refuse to sell or rent, . . . or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable* or deny, a dwelling to any person" because of a protected characteristic. 576 U.S. at 533 (emphasis added) (quoting 42 U.S.C. § 3604(a)).  Again, the Court concluded that the "otherwise" phrase authorized disparate-impact liability because it "signal[ed] a shift in emphasis from an actor's intent to the consequences of his actions." *Id.* at 535.

Comparable language is conspicuously absent from Section 60506(b)(1). Like Title VII, the ADEA, and the FHA, Section 60506(b)(1) contains language prohibiting intentional discrimination. But unlike those other statutes, Section 60506(b)(1) does not contain *additional* language associated with disparate impact. Congress is presumed to be aware of the Supreme Court's decisions interpreting "discrimination" "based on" protected characteristics to mean intentional differential treatment, as well as its decisions interpreting certain "otherwise" phrases to cover conduct with a disparate impact. *See Merck & Co.* v. *Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.").

If Congress had intended to authorize disparate-impact liability here— particularly a first-of-its-kind regime that can penalize disparities based on consumers' income—it surely would have used the same words that it had used before and that the Supreme Court has described as "of central importance" to recognizing disparate-impact liability. Instead, Section 60506 says nothing about otherwise adversely affecting access to broadband or otherwise making unavailable broadband access. That omission is dispositive. *See Doe* v. *BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241-242 (6th Cir. 2019)

(holding that Section 504 of the Rehabilitation Act "does not prohibit disparate-impact discrimination" because the statutory text lacks "language like 'otherwise adversely affect' or 'otherwise make unavailable'").

3.     In the Order, the Commission offered two textual defenses of interpreting "digital discrimination of access" in Section 60506(b)(1) to impose disparate-impact liability.  Neither is persuasive.

a.     First, the Commission argued that the statutory text is "results based."  App. 19 (Order ¶ 39) (citation omitted).  The Commission pointed to "references [to] 'equal access,' 'equal opportunity' and other terminology that goes to results or consequences of actions," and "not to the mindset of actors."  App. 23 (Order ¶ 44).  But the Commission is misreading both the language and the context in which it appears.

For starters, statutory language about "equal opportunity" is more consistent with disparate treatment than disparate impact.  Section 60506(a) declares "the policy of the United States that, insofar as technically and economically feasible[,] subscribers should benefit from equal access to broadband internet access service."  47 U.S.C. § 1754(a)(1).  It then defines "equal access" as "the equal opportunity to subscribe to" broadband.  *Id.* § 1754(a)(2).  By referring to an equal *opportunity* to subscribe, Congress was

not looking to equality of *outcomes*. That language instead refers to eliminating intentional discrimination that could affect subscribers' opportunities to access broadband. Indeed, the Supreme Court has rejected the idea that "equal opportunity" guarantees justify a disparate-impact analysis. *See Brnovich* v. *Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2339 (2021) ("[T]he mere fact there is some *disparity in impact* does not necessarily mean that a system is not equally open or that it does not give everyone an *equal opportunity* to vote.") (emphases added).

In any event, the "equal access" and "equal opportunity" language cited by the Commission does not even appear in the provision at issue. After Subsection (a) sets out the overarching goal of equal access to broadband, Subsection (b) instructs the Commission to "adopt final rules to facilitate equal access." 47 U.S.C. § 1754(b). Subsection (b)(1) then tells the Commission that those rules should "include[] . . . preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." *Id.* § 1754(b)(1). Only that specific source of authority in Subsection (b)(1) controls here. The Commission's rule, after all, provides a "definition of 'digital discrimination of access'" in Subsection (b)(1). App. 16-17, 31 (Order ¶¶ 33, 61). The Commission cannot avoid the text of Subsection (b)(1) by

pointing to language in the preceding umbrella paragraph (Subsection (b)) and the precatory statement of policy (Subsection (a)). In the operative provision, Congress used language that naturally refers only to intentional discrimination, and did not use any results-oriented language that could impose disparate-impact liability.

b. Second, the Commission argued that certain language in Section 60506(b) would be "largely superfluous" if Section 60506(b)(1) were read to encompass only disparate-treatment liability. App. 32-33 (Order ¶ 63). Section 60506(b) directs the Commission to promulgate "final rules to facilitate equal access to broadband internet access service, *taking into account the issues of technical and economic feasibility*." 47 U.S.C. § 1754(b) (emphasis added). In the Commission's view, that caveat would be unnecessary under a disparate-treatment regime, because intentional discrimination can almost never be justified by feasibility concerns. App. 33 (Order ¶ 65). The Commission's reading is wrong for several reasons.

As a threshold matter, there is no superfluity. Section 60506(b) directs the Commission to promulgate "final rules to facilitate equal access to broadband internet access service ... *including*—(1) preventing digital discrimination of access"; and "(2) identifying necessary steps for the

Commission[] to take to eliminate discrimination described in paragraph (1)." 47 U.S.C. § 1754(b)(1)-(2) (emphasis added). In other words, promulgating rules to prevent digital discrimination is not the only possible subject of the Commission's rulemaking. In particular, Subsection (b)(2) goes beyond the prohibition on disparate treatment in Subsection (b)(1). It authorizes "identifying necessary steps for the Commission[] to take to eliminate" digital discrimination. *Id.* § 1754(b)(2). There is nothing odd or incongruous about ensuring that whatever "necessary steps" the Commission identifies—or any other rules it promulgates under Subsection (b)—are technically and economically feasible.

The feasibility limit also serves an important function even within Subsection (b)(1) itself. Under a disparate-treatment framework, plaintiffs can attempt to support an inference of intentional discrimination by pointing to evidence of disparate impact. *See* App. 67 (Order ¶ 135) (citing *Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977)). Defendants often seek to rebut that inference by arguing that their policy or practice is justified by technical and economic feasibility. *See id.* For instance, if a plaintiff pointed to statistical disparities in broadband access to support an inference of intentional discrimination, the provider could respond

by showing that it would be economically infeasible to deploy the relevant service in an unserved area. In short, arguments about feasibility play a role even to rebut charges of intentional discrimination.

In all events, even if there were some superfluity, that still would not justify ignoring the plain text of the statute. "The canon against surplusage is not an absolute rule." *Marx* v. *General Revenue Corp.*, 568 U.S. 371, 385 (2013). "Where there are two ways to read the text," one that adheres to the plain text and one that eliminates surplusage, "applying the rule against surplusage is, absent other indications, inappropriate." *Lamie* v. *United States Tr.*, 540 U.S. 526, 536 (2004). If giving the phrase "digital discrimination of access based on" protected characteristics its plain meaning would leave the feasibility clause with a less prominent role to play, this Court "should prefer the plain meaning since that approach respects the words of Congress." *Id.*[2]

---

[2] The statute unambiguously precludes disparate-impact liability, so the Commission's interpretation does not warrant deference under *Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Even if the statute were ambiguous, the Commission's interpretation would still not be entitled to deference for three reasons. First, the major-questions doctrine applies. *See infra*, pp. 46-52. Second, even if the major-questions doctrine did not apply, the Supreme Court is considering whether to overrule *Chevron* in *Loper Bright Enterprises* v. *Raimondo*, No. 22-451, and *Relentless* v. *Department of Commerce*, No. 22-1219. Third, even if *Chevron* applies, the Commission's interpretation is unreasonable at *Chevron*'s second step.

**B.    Other Interpretive Tools Confirm The Plain Text.**

Other tools of statutory interpretation confirm that Congress did not authorize disparate-impact liability in Section 60506.  First, there is not a word about disparate-impact liability in the provision's legislative history, as one would expect to find if Congress had intended to create such a novel and disruptive regime.  Second, the Commission's disparate-impact reading would produce highly implausible, or even absurd, consequences.   And third, imposing disparate-impact liability under the digital-discrimination provision here would conflict with Congress's broader approach to regulating broadband.

> **1.    Congress did not mention disparate impact in enacting the bipartisan IIJA.**

As the Commission acknowledges, the legislative history of Section 60506 is "sparse" and contains no "mention of disparate impact."  App. 29 (Order ¶ 57).  The lack of any relevant legislative history confirms that Congress did not authorize the Commission to impose a novel and far-reaching disparate-impact regime.

a.    It bears repeating that the Commission's construction of the statute is unprecedented:  no other federal regulatory scheme subjects businesses to liability if their practices disparately affect consumers of

different income levels. *See supra*, pp. 1-2. If Congress had intended to enact a policy "so sweeping and so relatively unorthodox," common sense dictates that "at least some of the Members would have identified or mentioned it at some point" in the legislative history. *Chisom* v. *Roemer*, 501 U.S. 380, 396 & n.23 (1991) (citation omitted). Yet the congressional record contains not a single word about disparate impact. That legislative silence is a powerful clue—the classic "dog that did not bark." *Id.*; *see Koons Buick Pontiac GMC, Inc.* v. *Nigh*, 543 U.S. 50, 63 (2004).

b.      Congress's silence is particularly telling because it has been vocal elsewhere. In *Inclusive Communities*, for example, the Supreme Court relied on the robust support for disparate-impact liability in the FHA's legislative history. 576 U.S. at 536-537, 539. The Court also relied on legislative history in finding disparate-impact liability under Title VII and the ADA. *See Griggs*, 401 U.S. at 434-436; *Smith*, 544 U.S. at 232-233, 238 (plurality opinion). In sharp contrast to those statutes, the legislative record of Section 60506 contains no mention whatsoever of disparate-impact liability. Instead, the provision passed without fanfare or even discussion.

In fact, many Members of Congress who voted for the bipartisan IIJA have since made clear that they did *not* intend Section 60506 to impose

disparate-impact liability. Senator Collins, the lead Republican negotiator for the broadband provisions of the IIJA, has criticized the Commission's rule for "go[ing] far beyond the intent of Congress, as set [out] in Section 60506," and undermining the "carefully negotiated bipartisan" statute. Letter from Sen. Collins to Chair Rosenworcel (Nov. 20, 2023). In addition, nine Republican Senators who voted in favor of the IIJA (Senators Grassley, Fischer, Cramer, Tillis, Risch, Crapo, Sullivan, Wicker, and Capito) have declared that imposing disparate-impact liability would "turn section 60506 on its head" and contravene "the plain meaning of the IIJA." Letter from Senator Ted Cruz, et al., to Chair Rosenworcel (Nov. 10, 2023). To be sure, five Democratic Senators have asserted that "Congress passed Section 60506 to . . . target disparate impacts of digital discrimination," Letter from Sen. Warnock et al. to Chair Rosenworcel (Aug. 4, 2023), but neither those officials nor any others articulated that goal anywhere in the legislative record.

c.    The Commission attempts to spin the sparse legislative history in *its* favor. In the Commission's view, Congress could not have sought to impose only disparate-treatment liability because "there is little or no evidence in the legislative history . . . that impediments to broadband internet access service are the result of intentional discrimination." App. 25 (Order ¶ 47). But

Congress routinely includes prophylactic provisions barring intentional discrimination in connection with the expenditure of federal funds.  *See, e.g.*, 49 U.S.C. § 40127 (Wendell H. Ford Aviation Investment and Reform Act for the 21st Century); 42 U.S.C. § 18116 (Affordable Care Act); 29 U.S.C. § 3248 (Work Force Innovation Opportunity Act); 42 U.S.C. § 9849 (Head Start). Indeed, Congress made the same choice in a nearby provision in the IIJA, which states that no person may "be subjected to discrimination under any program or activity that is funded in whole or in part with" Digital Equity Act funds "on the basis of" certain protected characteristics.  Pub. L. No. 117-58, § 60307(a)(1), 135 Stat. at 1231.  Congress was appropriating billions of dollars in the IIJA to expand internet access.  There is nothing remarkable about directing the Commission to prohibit ISPs from intentionally discriminating, even though that is not a pervasive problem in the industry.

> 2. **Congress did not silently permit the Commission to outlaw ordinary business practices in the broadband industry.**

It is especially implausible that Congress would have silently authorized the Commission's disparate-impact regime, given the drastic consequences. *See Van Buren* v. *United States*, 593 U.S. 374, 393 (2021) ("[T]he far-reaching consequences of the Government's reading ... underscore[] [its]

implausibility."). Congress would not have threatened a large swath of ordinary business activity in a major sector of the American economy through oblique language buried in a massive omnibus bill.

It is important to understand how the Commission has added to Congress's handiwork. Section 60506 instructs the Commission to promulgate rules to prevent "digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin," 47 U.S.C. § 1754(b)(1), and it defines "equal access" to broadband as "the equal opportunity to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions," *id.* § 1754(a)(1). Taken together, those provisions stand for the general proposition that ISPs may not intentionally discriminate in broadband speed or capacity (or some other comparable quality-of-service metric) on the basis of income level (or the other listed characteristics). ISPs may not, for instance, adopt a policy of preferential treatment for customers with high incomes, such as boosting internet speeds in high-income neighborhoods but not in low-income neighborhoods simply because of those income disparities.

Not content with that limited mandate, the Commission has asserted authority to impose disparate-impact liability based on a limitless array of

factors "that could affect consumers' ability to receive and effectively utilize broadband internet access service." App. 54 (Order ¶ 103). More specifically, the Commission's rule bars disparate impacts with respect to "any components of service quality or terms and conditions on which broadband internet access service is provided." 47 C.F.R. § 16.2. The Commission understands that to include not only the technical "[d]eployment of broadband infrastructure, network upgrades, and network maintenance," but also non-technical practices like "pricing," "promotional rates," "imposition of late fees," "use of customer credit and account history," "[m]arketing," and "customer service." *Id.* And according to the Commission, the rule "cover[s] both actions and omissions, whether recurring or a single instance, concerning these aspects of service." *Id.* The Commission could thus prohibit, or at least significantly restrict, covered businesses from engaging in many common practices that may disparately affect customers of different income levels.

Indeed, the rule could even be read to bar ISPs from charging a uniform price for their services. When a business charges one price for a particular service, it will necessarily be more difficult for a low-income customer to afford the service than a high-income customer. The Commission embraces the unbridled power to "determine whether prices are 'comparable' within the

meaning of the equal access definition." App. 56 (Order ¶ 105). Although the Commission adds that it "need not *prescribe* prices for broadband internet access service," *id.*, of course the power "[to] determine whether prices are 'comparable' within the meaning of the equal access definition" is the power to determine which price is appropriate, no matter what the Commission calls it, *see* App. 221 & n.3, 223 (Carr Dissent).

As far as Industry Petitioners are aware, there is no other regime—in the broadband industry or elsewhere—that works like this rule, threatening business practices that have a differential effect based on income. Given the unprecedented nature of the rule, it will be difficult for covered entities to predict with any degree of certainty how the Commission will determine whether practices or prices are permissible. Imposing disparate-impact liability in this context thus raises concerns under both the vagueness and nondelegation doctrines, whereas a disparate-treatment construction avoids the need to confront those concerns. *See United States* v. *Adler*, 590 F.3d 581, 584 (8th Cir. 2009) (avoiding statutory interpretation that "would raise serious concerns about whether the statute is void for vagueness").

### 3. Congress did not discourage ISPs from building out internet infrastructure.

The Commission's disparate-impact theory also would create serious inconsistencies with Congress's longstanding approach to facilitating broadband access and allowing ISPs to operate in a competitive market. Those inconsistencies again make the Commission's theory of the text implausible.

a. Congress's core goal in the IIJA was to facilitate internet access by using subsidies to encourage the buildout of broadband infrastructure in areas where market forces have not led to private investment. The Commission's disparate-impact regime would have the opposite effect. If the Commission determines that an ISP's choice to build out or upgrade broadband access in a particular area has a disparate impact, the Commission could impose heavy monetary penalties or effectively require the ISP to build out elsewhere to address any perceived disparity. The Commission has again embraced this consequence of its interpretation, explaining that its "rules will require greater diligence by covered entities in determining and documenting the reasons for access gaps in their service areas." App. 27 (Order ¶ 52). As Commissioner Carr described, that amounts to "unfunded build mandates." App. 221 (Carr Dissent).

The risk of being slapped with such unfunded mandates will deter ISPs from building out or upgrading broadband infrastructure. ISPs deploy new facilities incrementally, neighborhood by neighborhood, depending on factors like the relative costs of deployment, relative demand, and the presence or absence of competing ISPs. Because no ISP can deploy everywhere at once, any ISP's deployment decisions will leave some neighborhoods served and others unserved at any given point in time. And as a statistical near-certainty, *some* of the later-reached neighborhoods will have households in protected categories, opening the door to disparate-impact complaints. The Commission's new regime thus gives ISPs obvious disincentives against new broadband deployment, lest deploying *anywhere* create liability for not investing *everywhere*. That is the opposite of the result Congress intended when it enacted the IIJA.

In particular, the deterrent effect of the Commission's disparate-impact regime cannot be squared with the BEAD Program, in which the IIJA set aside over $42 billion for deploying broadband infrastructure. Even the Commission implicitly recognized that tension, because it created a presumption of compliance with its digital-discrimination rule for ISPs' use of BEAD funds. *See* App. 69 (Order ¶ 142). The need for a special presumption

to harmonize its disparate-impact regime with the BEAD Program "should have alerted [the government] that it had taken a wrong interpretive turn." *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 328 (2014).

b. The Commission's disparate-impact reading of Section 60506 is also irreconcilable with Congress's broader approach to regulating broadband. It effectively ushers in rate regulation and common-carrier treatment for ISPs, a dramatic step that Congress has forbidden.

The Communications Act generally permits the Commission to regulate a provider's rates only to the extent that provider is a "common carrier" under Title II of that Act. 47 U.S.C. §§ 201, 203; *see id.* § 153(51). Although there is a live dispute over whether broadband services can be classified as "telecommunications services" subject to common-carrier regulation, they were not classified that way when Congress enacted Section 60506.

The Commission's disparate-impact regime blows past that Title II dispute and effectively subjects ISPs to common-carrier treatment. Most notably, it allows price control akin to rate regulation. When a business attempts to justify to the Commission whatever practice is alleged to have a disparate impact on high- and low-income customers, the Commission plans to analyze factors like "projected income, projected expenses, net income,

expected return on investment, competition, cash flow, market trends, and working capital requirements." App. 37 (Order ¶ 71). That is, the Commission intends to determine whether a charged rate is appropriate and thus lawful—"the very definition of rate regulation." *In re Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5922 (2015) (dissenting statement of Comm'r Pai). The Commission even admits that in its view Section 60506 "aligns with" the obligations established by Section 202 of the Communications Act. App. 24 (Order ¶ 45 & n.134). Section 202, in turn, is the very provision of Title II that "establish[es] the basic common carrier obligation." *Verizon* v. *FCC*, 740 F.3d 623, 657 (D.C. Cir. 2010).

There is no reason to think that Section 60506 authorizes the Commission to treat ISPs as common carriers. Elsewhere in the IIJA, Congress expressly stated that it did not want broadband rates to be regulated. *See* Pub. L. No. 117-58, § 60102(h)(5)(D), 135 Stat. at 1201. And again, ISPs were *not* subject to Title II regulation when Section 60506 was enacted. Although the Commission has recently proposed changing course, that proposal is the subject of significant political disagreement—making it highly unlikely that Congress would have endorsed the same policy on a bipartisan basis without any legislative debate. *See* Proposed Rule,

*Safeguarding and Securing the Open Internet*, 88 Fed. Reg. 76048 (Nov. 3, 2023).[3]  Regardless of whether Congress has authorized the Commission to treat ISPs as common carriers, that important decision belongs in the Title II context, not slipped through the back door of a short provision of the IIJA. After all, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman* v. *American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

C. **At A Minimum, The Major-Questions Doctrine Precludes Reading Section 60506 To Encompass Disparate-Impact Liability.**

Although the statutory language on its own resolves this case, the major-questions doctrine confirms that the Commission's reading of Section 60506 cannot stand.  Under that doctrine, a court may not construe a statute to "authoriz[e] an agency to exercise powers of vast economic and political significance" unless the statute speaks "clearly." *Alabama Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 764 (2021) (internal quotation marks omitted).  Whether the Commission may subject entities representing a sizable percentage of the

---

[3]  The Commission is scheduled to vote on the proposed rule on April 25, 2024.  *See* FCC, *FCC to Vote on Restoring Net Neutrality* (Apr. 3, 2024), https://www.fcc.gov/document/fcc-vote-restoring-net-neutrality.

U.S. economy to an unprecedented, uncertain, and politically controversial liability regime raises a major question. And the Commission cannot "point to 'clear congressional authorization' to justify" its sweeping assertion of regulatory authority. *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2375 (2023) (quoting *West Virginia*, 597 U.S. at 723.

### 1. Imposing disparate-impact liability here presents a major question.

The Commission's assertion of authority is major in every relevant respect: it covers all entities that play a role in providing broadband and subjects to scrutiny virtually every business decision they make, including the prices they charge; it puts at risk billions of dollars in broadband investment; and it rests upon a politically controversial theory of liability.

a. The Commission's asserted authority is unprecedented and expansive in several ways, a "'telling indication' that the [rule] extend[s] beyond the agency's legitimate reach." *NFIB* v. *OSHA*, 595 U.S. 109, 119 (2022) (citation omitted). The rule sweeps in businesses and individuals that have never before counted the Commission as a primary regulator, *see infra*, Part III; it threatens liability for engaging in a wide range of common business practices, *see supra*, Section I.B.2; it exposes ISPs to the risk of unfunded, billion-dollar buildout obligations to equalize any perceived deployment

disparities, *see supra*, Section I.B.3; and it effectively gives the Commission authority over ISP rate decisions, *see supra*, Section I.B.2.  In another FCC case, the Supreme Court reasoned that "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion."  *MCI Telecomms. Corp.* v. *AT&T*, 512 U.S. 218, 231 (1994).  But that is just the authority that the Commission is claiming here.

The Commission asserts that it does not seek to regulate rates or impose unfunded buildout mandates.  *See* App. 30, 56 (Order ¶¶ 57 n.171, 105).  That assurance rings hollow for the reasons discussed.  *See supra*, Section I.B.3.  In any event, what matters for the major-questions doctrine is the breadth of the agency's claimed authority when taken to its logical end, not the narrower action the agency takes in a particular instance.  *West Virginia*, 597 U.S. at 728.  The Commission cannot paper over its extravagant assertion of authority by disavowing rate regulation or buildout mandates for the time being.

b.  The Commission's disparate-impact rule has vast economic significance.  Broadband is a multi-billion-dollar industry, representing a "significant portion of the American economy."  *Utility Air*, 573 U.S. at 324.  ISPs have invested over $70 billion into building out their networks and

infrastructure each year since 2013.  *See* App. 419-420 (AT&T Comments).  In 2022 alone, the broadband industry made a record $102 billion in capital investments.  USTelecom, *2022 Broadband Capex Report* (Sept. 8, 2023).  Cumulatively since 1996, the industry has invested $2.1 *trillion* in infrastructure.  *Id.*  Existing and future private investments will be put at risk if an ISP may face liability, including monetary forfeitures, whenever it makes a business decision that could affect consumers differently depending on their income.

If the risk of new and unpredictable liability diminishes capital investments by even a percentage point or two, that would amount to billions of dollars in lost infrastructure spending.  The Supreme Court has applied the major-questions doctrine to rules with similar or lesser economic impact, such as a vaccine mandate estimated to cost less than $3 billion.  *See NFIB*, 595 U.S. at 109; *BST Holdings, LLC* v. *OSHA*, 17 F.4th 604, 617 (5th Cir. 2021).  And the anticipated consequences for the broadband industry are just one slice of the rule's economic impact:  the rule governs industries across the broader U.S. economy, such as housing, construction, and financial services, each of which will take its own financial hit.  *See infra*, pp. 57-64.

c.     Moreover, the very concept of disparate-impact liability is a subject of significant political controversy.  "The disparate impact doctrine remains the most controversial aspect of American antidiscrimination law." Samuel R. Bagenstos, *Bottlenecks and Antidiscrimination Theory: A New Theory of Equal Opportunity*, 93 Tex. L. Rev. 415, 434 (2014); *see* Michael Selmi, *Was the Disparate Impact Theory a Mistake?*, 53 UCLA L. Rev. 701, 702 (2006) ("Within antidiscrimination law, no theory has attracted more attention or controversy than the disparate impact theory.").  And the Executive Branch's stance on disparate-impact liability flip-flops with changes in political administration. *See, e.g.*, Laura Meckler & Devlin Barrett, *Trump Administration Considers Rollback of Anti-Discrimination Rules*, Wash. Post (Jan. 3, 2019), https://tinyurl.com/3xktrc8n.

d.     Other courts have recently applied the major-questions doctrine to agency attempts to impose disparate-impact liability.  One court applied the doctrine to the Consumer Financial Protection Bureau's asserted authority "to police the financial services industry" for business practices with disparate impacts. *Chamber of Commerce of the U.S.A.* v. *CFPB*, 2023 WL 5835951, at *8 (E.D. Tex. Sept. 8, 2023).  The court observed that disparate-impact liability "is something that Congress rarely authorizes" and "is a question of major

economic and political significance." *Id.* at *7-8. Another court applied the doctrine to the Environmental Protection Agency's efforts to impose disparate-impact mandates as a condition on federal funding. *Louisiana* v. *EPA*, 2024 WL 250798, at *30 (W.D. La. Jan. 23, 2024). The major-questions doctrine should apply with equal, if not greater, force here, because the Commission has adopted the most wide-reaching form of disparate-impact liability yet.

> **2.** **Section 60506 does not supply the clear congressional authorization required.**

The Supreme Court has repeatedly held that when an agency asserts authority to resolve a major question, a "merely plausible textual" basis will not suffice; instead, the agency must show "'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723 (quoting *Utility Air*, 573 U.S. at 324); *see Nebraska*, 143 S. Ct. at 2375. The Commission does not come close to meeting that high bar. Section 60506 "provides no authorization for" the Commission's disparate-impact regime "even when examined using the ordinary tools of statutory interpretation—let alone 'clear congressional authorization' for such a program." *Nebraska*, 143 S. Ct. at 2375; *see supra*, pp. 23-26.

Section 60506 is a single paragraph consisting of just over 300 words within a 1,000-page omnibus infrastructure bill. The Commission relies on a "wafer-thin reed," *Alabama Ass'n*, 594 U.S. at 765, within that paragraph: a generic objective of "equal access." App. 20-21 (Order ¶ 42). "Equal access," especially when defined to mean equality of opportunity, is fully consistent with a prohibition on disparate treatment and far from a clear imposition of disparate-impact liability. It is implausible that Congress would have "effected a 'fundamental revision'" of the regulatory scheme governing ISPs in such an oblique way. *West Virginia*, 597 U.S. at 728 (quoting *MCI*, 512 U.S. at 231).

## II. THE COMMISSION LACKS STATUTORY AUTHORITY FOR ITS NOVEL BURDEN-SHIFTING FRAMEWORK.

Even if Section 60506 authorized some form of disparate-impact liability, it would not authorize the disparate-impact standards the Commission adopted here. The Supreme Court has articulated a three-step burden-shifting framework to determine disparate-impact liability. *Inclusive Communities*, 576 U.S. at 541. Yet the Commission inexplicably abandoned that three-step framework here in favor of a different framework with fewer protections for defendants. Nothing in Section 60506 authorizes that unprecedented approach.

**A.    There Is A Settled Burden-Shifting Framework For Disparate-Impact Liability.**

In the Supreme Court's three-step process for adjudicating disparate-impact claims, the burden shifts twice. First, the plaintiff must show that the defendant maintained a policy or practice that caused a differential impact based on a protected characteristic. *Inclusive Communities*, 576 U.S. at 527; *see Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 425 (1975). Second, if the plaintiff successfully does so, then the burden shifts to the defendant to "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Inclusive Communities*, 576 U.S. at 527 (citation omitted). Third, if the defendant identifies a legitimate nondiscriminatory interest, the burden shifts back to the plaintiff, who may only "prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* In other words, the burden ultimately remains with the plaintiff to prove that the challenged policy is "artificial, arbitrary, and unnecessary." *Id.* at 540.

The Supreme Court first adopted that three-step burden-shifting framework when interpreting Title VII. *See Albemarle*, 422 U.S. at 425. Congress later codified that approach in the Civil Rights Act Amendments of

1991. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i)-(ii). Those amendments confirmed that at the second step an employer may show that its challenged practice is "consistent with business necessity," and at the third step "the complaining party" must "make[] the demonstration" of a less discriminatory "alternative employment practice." *Id.*; *see Meacham* v. *Knolls Atomic Power Lab'y*, 554 U.S. 84, 98-99 (2008) (applying an analogous framework to the ADEA).

In *Inclusive Communities*, the Supreme Court rejected a different approach that required *the defendant* to prove not only a legitimate interest, but the lack of any alternative practice with a lesser impact. 576 U.S. at 528. The Court emphasized that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 533. Such limitations are "necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 544. A regime that imposed liability without those protections, by contrast, would "undermine[] its own purpose" and raise "serious constitutional concerns." *Id.* at 543-544.

## B. Congress Did Not Depart From The Settled Burden-Shifting Framework Here.

Congress enacted Section 60506 against this backdrop.  Even assuming Congress authorized disparate-impact liability, the *Inclusive Communities* model is the only form of disparate-impact liability it could have meant.  When Congress legislates using terms or concepts with a "settled judicial and administrative interpretation," it is presumed to have incorporated that interpretation.  *Commissioner* v. *Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993).  And conversely, if Congress had intended for Section 60506 to break from the settled framework for disparate-impact liability, it would have said so.  *See Midatlantic Nat'l Bank* v. *New Jersey Dep't of Env't Prot.*, 474 U.S. 494, 501 (1986) ("[I]f Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.").

The Commission's framework departs from the *Inclusive Communities* burden-shifting framework in three critical respects.  First, the Commission unduly limits the scope of business interests a defendant may raise at the second step.  Rather than allowing defendants to raise any "substantial, legitimate, nondiscriminatory interest," *Inclusive Communities*, 576 U.S. at 527, the Commission requires a defendant to identify "genuine issues of technical or economic feasibility," 47 C.F.R. § 16.5(b).  The Commission

further defines "economically feasible" narrowly to mean "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated by new economic conditions." *Id.* § 16.2(h); *see id.* § 16.2(k) (similar for "technically feasible"). And it has adopted the truly radical position that "differences in … profitability" do not satisfy a defendant's burden to show lack of feasibility, App. 15, 30 (Order ¶¶ 27, 58); *see* App. 232 (Simington Dissent), excluding run-of-the-mill cost-based decisions that would be a legitimate justification in any other disparate-impact context.[4]

Second, under *Inclusive Communities*, the burden at the third step is on the *plaintiff* to show a less discriminatory alternative that would serve the defendant's legitimate business interests. 576 U.S. at 527. The Commission has instead placed that burden on the *defendant*. 47 C.F.R. § 16.5(c). The agency "anticipate[s] that [a defendant's] proof" "will include proof that there is not a reasonably available and achievable alternative policy or practice."

---

[4] *See, e.g.*, *Watson* v. *Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) ("cost" of a policy is a legitimate interest under Title VII); *Smith*, 544 U.S. at 259 (O'Connor, J., concurring in the judgment) ("employer decisions that are intended to cut costs" are protected under the ADEA); *Boykin* v. *Bank of Am. Corp.*, 162 Fed. Appx. 837, 840 (11th Cir. 2005) (high cost of loan was a "legitimate nondiscriminatory reason" for denying it under the FHA).

App. 26 (Order ¶ 50).  Placing the onus on defendants to prove a negative—that no possible alternative policy could reasonably achieve the same ends—is much more difficult than requiring them to "state and explain the valid interest served by their policies," as the Supreme Court has.  *Inclusive Communities*, 576 U.S. at 541.

Third, *Inclusive Communities* makes clear that a defendant must maintain a *policy* causing a disparate impact.  An isolated incident does not suffice.  576 U.S. at 543.  The Supreme Court explained that a plaintiff challenging a developer's decision to build in a particular location "will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all."  *Id.*  Here, by contrast, the Commission explicitly states that its rule "cover[s] both actions and omissions, whether recurring or a *single instance*."  App. 53-54 (Order ¶ 102) (emphasis added).

Taken together, the Commission's changes to the standard burden-shifting framework would override the "profit-related decisions that sustain a vibrant and dynamic free-enterprise system."  *Inclusive Communities*, 576 U.S. at 533.  By adopting a liability standard that extends far beyond the goal of "remov[ing] artificial, arbitrary, and unnecessary barriers," *id.* at 540

(citation omitted), the Commission has blown past anything Congress would have authorized, even had it chosen a disparate-impact regime.

## III. THE COMMISSION LACKS STATUTORY AUTHORITY TO REGULATE ENTITIES OTHER THAN INTERNET SERVICE PROVIDERS.

The Commission did not stop at establishing an unauthorized and unprecedented disparate-impact regime. It also expanded the reach of that unlawful rule beyond ISPs to *all* entities whose services in some way may "facilitate and affect consumer access to broadband internet access service." 47 C.F.R. § 16.2. That sweeping definition extends from construction crews to apartment owners to the banks that finance ISPs' buildouts. *See* App. 220 (Carr Dissent). Congress did not authorize that overreach.

### A. The Statutory Text And Structure Restrict The Commission To Regulating ISPs.

The statutory text makes clear that Congress did not authorize the Commission to make digital-discrimination rules for entities other than ISPs.

1. From top to bottom, Section 60506 is focused on ISPs and their subscribers. Beginning with the statement of policy, Congress declared that "*subscribers* should benefit from equal access to broadband internet access service within *the service area of a provider* of such service." 47 U.S.C. § 1754(a)(1) (emphases added). Congress again focused on ISPs and

subscribers in Subsection (a)(2), where it defined "equal access" as the "equal opportunity *to subscribe to an offered service* that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area." *Id.* § 1754(a)(2) (emphasis added). And again when Congress authorized the Commission to adopt rules to "facilitate equal access" to broadband service, *id.* § 1754(b), it targeted "provider[s]" that can directly control a consumer's ability "to subscribe to an offered service," *id.* § 1754(a)(1)-(2). Only ISPs have subscribers; only ISPs can "offer" broadband "service" in a particular "service area"; and only ISPs have ultimate control over service metrics like "speeds, capacities, [and] latency." Every textual clue indicates that Congress was protecting against digital discrimination by ISPs.

Non-ISPs do not have broadband subscribers and do not control whether ISPs offer broadband service or the nature of that service. For example, the rule covers "[e]ntities maintaining and upgrading network infrastructure," as well as contractors that work with them. 47 C.F.R. § 16.2. But infrastructure companies and contractors perform work at an ISP's direction and lack discretion over which broadband services to offer and where to offer them. *See* App. 551 (NATE Comments). Even if an infrastructure

company were to unilaterally build a wireless tower in an unserved area, consumers would not be able to "subscribe" unless an ISP chose to install facilities on the tower and offer services to consumers.

Other language in Section 60506 confirms that the Commission lacks authority to regulate non-ISPs. In Section 60506(a)(1), Congress announced its goal of equal access "within the service area of a provider of [broadband internet access] service." 47 U.S.C. § 1754(a)(1). That geographic limit makes sense only if ISPs are the entities being regulated. It is perfectly logical for Congress to want ISPs to offer the equal opportunity to subscribe to broadband within their service areas. But there is no logical reason why Congress would believe that some *other entity*—like a bank, a union, or a contractor—bears responsibility for equal access to broadband among consumers within an *ISP's* service area.

Section 60506(d) cuts the same way. Congress directed the Commission not only to promulgate its own federal digital-discrimination rules, but also to "develop model policies and best practices that can be adopted by States and localities to ensure that *broadband internet access service providers* do not engage in digital discrimination." 47 U.S.C. § 1754(d) (emphasis added). That language confirms that Congress's concern in Section 60506 was in barring

ISPs—not apartment owners, contractors, banks, or local governments—from digital discrimination. There is no reason why Congress would have wanted the Commission to adopt sweeping *federal* regulations for a whole host of entities across industries, but to develop model *state* policies only for ISPs.

2.     In response, the Commission contended that "entities other than broadband providers might impede equal access to broadband internet access service." App. 45 (Order ¶ 87). But it has not grounded that concern in relevant examples or the statutory text. The Commission offered the example of a "landlord restricting broadband options within a building even if multiple providers are available." *Id.* But that is an issue regarding tenants' access to competing providers, not discrimination among consumers. *See In re Improving Competitive Broadband Access to Multiple Tenant Environments*, 37 FCC Rcd. 2448, 2449-2450 (2022). In any event, all sorts of entities could have some *indirect* impact on whether a consumer can subscribe to broadband, from the bank that does not permit direct debits to the local government that restricts zoning for towers. But the text reveals Congress's reasonable focus on entities that exert *direct* control over the "opportunity to subscribe to an offered service"—*i.e.*, that offer that service. 47 U.S.C. § 1754(a)(2). After all, Congress was concerned with the basic goal of

"ensur[ing] that broadband internet access service providers do not engage in digital discrimination." *Id.* § 1754(d). There is a not one word in the statute about digital discrimination by the other entities that the Commission seeks to regulate.

**B. The Major-Questions Doctrine Confirms That The Commission Lacks Authority To Regulate Non-ISPs.**

If the statutory text left any doubt, the major-questions doctrine forecloses the Commission's assertion of regulatory authority over entities so far outside its purview.

1. As explained above, the Commission's rule is "major" across multiple dimensions. *See supra*, Section I.C. Extending the rule's application to covered entities beyond ISPs—from contractors to building owners to local governments—only multiplies the rule's already "vast economic and political significance." *Utility Air*, 573 U.S. at 324 (internal quotation marks omitted). The apartment industry alone creates 380,000 jobs and generates $194.9 billion a year, including $64.6 billion in property taxes. *See* We Are Apartments, *National Data: Apartment Homes*, https://weareapartments.org/data/ (last visited Apr. 22, 2024).

The Commission is also asserting "an enormous and transformative expansion in [its] regulatory authority" to entities it has never regulated, or

has regulated only in limited ways. *Utility Air*, 573 U.S. at 324. The rule will cover some entities, like financial institutions, that the Commission has never regulated in its 90-year history. *See* App. 220 (Carr Dissent). It will cover others, like residential building owners, that are not generally within the agency's jurisdiction and that the Commission has previously declined to regulate. *See In re Promotion of Competitive Networks in Local Telecommunications Markets*, 23 FCC Rcd. 5385, 5391 (2008) (regulating ISPs, rather than building owners, with respect to competitive communication services). The rule's direct and pervasive regulation of building owners, banks, unions, and other non-ISPs represents a dramatic and novel expansion of the Commission's authority.

Many of those non-ISP covered entities are far outside the Commission's core expertise, and the Commission "has no comparative expertise in making certain policy judgments" about their practices. *West Virginia*, 597 U.S. at 729 (internal quotation marks omitted). The Commission is responsible for regulating "interstate and foreign commerce in wire and radio communication." 47 U.S.C. § 151. It is not a roving expert in every industry with a remote connection to communications. By contrast, other agencies like the Department of Housing and Urban Development, the

Department of Agriculture, or the Department of Justice have industry-specific expertise regulating at least some of the covered entities under this rule.

The breadth of covered entities encroaches not only on other federal agencies' expertise, but also on States' prerogatives. A federal agency's intrusion in areas that are "the particular domain of state law" is yet another reason for skepticism about its asserted authority. *Alabama Ass'n*, 594 U.S. at 764. For example, the Supreme Court has recognized that the landlord-tenant relationship is generally a matter of state law, and has required "exceedingly clear language" for federal agencies to regulate that relationship. *Id.* The Commission here seeks to intrude upon that domain of state law by including building owners as covered entities.

2. Because the Commission's regulation of non-ISPs presents a major question, it requires clear congressional authorization. Section 60506 does not supply it. The only entities mentioned in the entire provision are providers of "broadband internet access service." 47 U.S.C. § 1754(a)(1), (d). And the Commission acknowledges that it was "not explicitly tasked with regulating entities outside the communications industry." App. 45 (Order ¶ 87). Under the major-questions doctrine, the Commission's concession is

fatal.  The Commission thus lacks statutory authority to extend its digital-discrimination rules to entities other than ISPs.

## IV.  THE COMMISSION LACKS STATUTORY AUTHORITY FOR THE FULL SUITE OF ENFORCEMENT MECHANISMS IT CLAIMS.

The Commission's power grab runs all the way to remedies.  The Commission has asserted the authority to enforce violations of its novel disparate-impact scheme using the "full suite" of remedies available under the Communications Act, including "monetary forfeitures."  App. 69 (Order ¶ 141).  But Section 60506 is not a Communications Act provision.  And while Congress expressly authorized the Commission to use monetary forfeitures to enforce *other* provisions of the IIJA, it nowhere authorized the Commission to pursue that type of retrospective remedy to enforce Section 60506.  Instead, the statute at most authorizes the Commission to take certain forward-looking enforcement actions, like imposing cease-and-desist orders.

### A.  Section 60506 Does Not Authorize Monetary Penalties.

Section 60506 does not mention monetary forfeitures.  That silence is telling.  In a neighboring provision of the IIJA, Congress established the Affordable Connectivity Program, which focuses on broadband affordability.  For that program, Congress expressly authorized the Commission to

"enforc[e] compliance with this section" by "impos[ing] forfeiture penalties under section 503 of the Communications Act of 1934."  Pub. L. No. 117-58, § 60502(a)(3)(B)(ii), 135 Stat. at 1240.  The contrast between the two provisions shows that Congress knew how to authorize the Commission to pursue monetary forfeitures, and chose not to do so here.  *See AMG Cap. Mgmt., LLC* v. *FTC*, 593 U.S. 67, 76-77 (2021) (treating Congress's express authorization of monetary remedies in Section 19 of the FTC Act as evidence that Congress did not impliedly authorize those remedies in Section 13).

Nor does any other statutory provision authorize the Commission to seek forfeitures to enforce Section 60506.  Ordinarily when the Commission imposes forfeitures, it relies on the penalty provision of the Communications Act.  *See* 47 U.S.C. § 503(b)(1).  But that provision does not apply here because it authorizes forfeitures only for violations of *the Communications Act*, along with other specific statutory provisions that do not include Section 60506.  *See id.* (authorizing forfeitures for certain violations of "any of the provisions of this chapter" and a few other enumerated provisions).  Section 60506 is not part of the Communications Act:  Congress expressly incorporated certain new provisions added by the IIJA into the Communications Act, but declined to do so for Section 60506.  *See, e.g.*, Pub. L. No. 117-58, §§ 60503, 60602,

135 Stat. at 1244, 1246. The Communications Act thus cannot supply the authorization that is missing from the text of Section 60506.

Importantly, the absence of forfeiture authority does not leave the Commission powerless to enforce the rules that it implements pursuant to Section 60506. Although an agency's authority is generally limited by Congress's decision not to grant any express powers, the Supreme Court has held that an agency may have implicit authority to take enforcement actions "directly and closely tied to" its "specific statutory mandate." *American Trucking Ass'ns*, 467 U.S. at 367. Here, the Commission's "specific statutory mandate" is to take steps to "prevent" digital discrimination and to identify measures necessary to "eliminate" such discrimination. App. 62 (Order ¶ 122). Both of those verbs call for prospective, forward-looking action. *See Black's Law Dictionary* 1439 (11th ed. 2019) (defining "prevent" as "[t]o stop from happening; to hinder or impede"); *Merriam-Webster's Collegiate Dictionary* 404 (11th ed. 2020) (defining "eliminate" as "to put an end to or get rid of: remove"). Here, Section 60506's forward-looking mandate at most implicitly authorizes the Commission to adopt rules with appropriate forward-looking remedies, such as properly tailored cease-and-desist orders.

The Commission's statutory authorization to "prevent" discrimination and to identify steps needed to "eliminate" such discrimination is not a blanket license to fashion any remedy against discrimination that it chooses. More specifically, the Commission's statutory mandate does not imply any authorization to pursue monetary forfeitures, which are backward-looking penalties rather than forward-looking relief. *See SEC* v. *Graham*, 823 F.3d 1357, 1361 (11th Cir. 2016) (distinguishing between injunctions, which "look forward in time" "to prevent future violations," and civil penalties, which "address[] a wrong done in the past") (citation omitted). Indeed, given the canon against construing ambiguous statutes to authorize civil penalties, statutes that are altogether silent on penalties *cannot* be interpreted that way. *See FCC* v. *American Broad. Co.*, 347 U.S. 284, 298 (1954) (recognizing that, even in civil cases, "penal statutes are to be construed strictly").

In an analogous context, the D.C. Circuit held that a provision authorizing district courts to "prevent and restrain" violations of RICO does not implicitly authorize courts to order disgorgement. *United States* v. *Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005). The court reasoned that the phrase "prevent and restrain" focuses on "forward-looking remedies that are aimed at future violations," while disgorgement, like the monetary

forfeitures contemplated here, is "quintessentially backward-looking" and "focused on remedying the effects of past conduct." *Id.* at 1198. The same logic applies to Section 60506. The Commission's authorization to "prevent" digital discrimination and to identify steps needed to "eliminate" such discrimination does not allow it to pursue a backward-looking forfeiture remedy.

### B. The Commission's Counterarguments Lack Merit.

The Commission has offered two justifications for its assertion of authority to seek forfeiture. Neither is persuasive.

1. The Commission relies on its statutory directive in Section 60506 to "revise its public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination." 47 U.S.C. § 1754(e). The agency argues that "there would be little point" for Congress to direct it to hear complaints "if [it] lacked any of [its] traditional powers to act on them." App. 62 (Order ¶ 122). That argument might mean that the Commission must have *some* power to act, but it does not explain why the Commission needs the power to exact monetary forfeitures rather than impose

forward-looking relief like cease-and-desist orders.[5]   Moreover, the Commission's argument ignores the other functions of complaint processes besides pursuing remedies, including to allow the Commission to gather data it currently lacks about whether there is intentional discrimination occurring in the industry.  *See* App. 61 (Order ¶ 119).

The Commission also suggests that it should be able to pursue retroactive remedies to enforce complaints under Section 60506 because such remedies are allowed under the Communications Act.  *See* App. 62 (Order ¶ 122).   The apparent idea is that because Congress built off the Communications Act's complaint process, Congress implicitly authorized all of that Act's remedial authority.  But that conclusion does not logically follow.  The Commission's authorization to use its existing complaint process to accept complaints of digital discrimination does not mean it automatically possesses the same substantive powers in resolving those complaints.

---

[5]  The potential availability of cease-and-desist remedies to address practices that result in unlawful discrimination does not imply that the Commission may impose unfunded buildout mandates.  Congress has always coupled service obligations with effective funding mechanisms.  *See* 47 U.S.C. § 254.  Nothing in Section 60506 plausibly suggests congressional intent to impose unfunded buildout mandates on ISPs for the first time.  *See* App. 503-515 (AT&T Reply Comments).

2.	The Commission argues in the alternative that its ancillary jurisdiction under Section 4(i) of the Communications Act authorizes the enforcement mechanisms it claims here.  App. 64 (Order ¶ 127); *see* 47 U.S.C. § 154(i).  Ancillary jurisdiction has no application here, however, because the Commission may assert ancillary jurisdiction only when fulfilling functions assigned to it *under the Communications Act.  See Comcast Corp.* v. *FCC*, 600 F.3d 642, 654 (D.C. Cir. 2010).  As noted above, Section 60506 is not part of the Communications Act, and the Commission did not implement this rule pursuant to the Communications Act.

In any event, the use of monetary forfeitures is not reasonably ancillary to the Commission's statutory functions.  The Commission has not shown that monetary forfeitures are "necessary in the execution" of Section 60506—that is, that it cannot carry out its obligations without imposing retroactive forfeitures.  47 U.S.C. § 154(i).  Moreover, the Supreme Court has recently cautioned against allowing agencies to create penalty regimes out of whole cloth.  *See AMG Cap. Mgmt.*, 593 U.S. at 76-77.  Under these circumstances, allowing the Commission to use its ancillary jurisdiction to impose monetary penalties would be inconsistent with both congressional intent and the separation of powers.  *See EchoStar Satellite LLC* v. *FCC*, 704 F.3d 992, 999

(D.C. Cir. 2013) ("[W]e refuse to interpret ancillary authority as a proxy for omnibus powers limited only by the FCC's creativity.").

## V. THE ORDER IS ARBITRARY AND CAPRICIOUS.

Even if the Order were statutorily permissible, it should be set aside because it is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Arbitrary-and-capricious review "ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision." *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Two aspects of the order fail that standard. First, the Commission did not explain its departure from the standard burden-shifting framework that applies to disparate-impact claims. Second, the Commission failed to adequately consider the costs of its rule or justify the scope of its broad definition of "covered entities."

### A. The Commission Failed To Explain Its Departure From The Standard Disparate-Impact Framework.

In the Order, the Commission claimed that its burden-shifting framework relied on "guidance provided in the Supreme Court's decision in [*Inclusive Communities*]" and adopted a "formulation of this traditional test" for disparate-impact liability. App. 18-19, 32 (Order ¶¶ 39, 63). That is not correct. The Commission deviated from the Supreme Court's framework in important ways. *See supra*, pp. 54-57. The Commission therefore needed to

"display awareness" that it was departing from the *Inclusive Communities* framework and "provide [a] reasoned explanation" for doing so. *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But nowhere has the Commission offered a "satisfactory explanation" for its novel burden-shifting framework. *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins. Co.* 463 U.S. 29, 43 (1983).

### B. The Commission Did Not Consider The Rule's Full Costs Or Justify Its Coverage.

The Order is arbitrary and capricious for another reason: it fails to adequately consider and justify the rule's full costs. A regulation is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem," such as the substantial costs on an industry. *State Farm*, 463 U.S. at 43. In addition, an agency must identify and explain a "rational connection between the facts found and the choice made." *Id.* (citation omitted).

1. The Commission's conclusory statement that it does not "think [the rule] will disincentivize investment in broadband networks" does not discharge the Commission's duty to consider the costs and benefits of its regulation. App. 27 (Order ¶ 52). Two shortcomings are particularly glaring.

First, the Commission failed to adequately consider the negative effect of disparate-impact liability on broadband investment, which commenters had highlighted. *See, e.g.*, App. 489-491 (USTelecom Comments), 425-426 (AT&T Comments). As Commissioner Carr noted in his dissenting statement, the Order contains no formal cost-benefit analysis. App. 226 (Carr Dissent). Instead, "the Order just asserts that the disparate impact standard will not chill investment." *Id.*; *see* App. 26-27 (Order ¶¶ 51-52). But the threat that providers will be required to engage in unprofitable—or at least less profitable—practices necessarily will reduce their incentives to invest, with particularly significant effects on smaller providers. *See* App. 498 (WISPA Comments), 433 (ACA Connects Comments). The Commission needed to consider and weigh that cost.

Second, the Commission did not even purport to consider the substantial costs its rule will impose on covered entities other than ISPs. As explained, the rule sweeps in a broad class of covered entities, including "[l]andlords," "construction crews," "unions," "marketing agencies," "banks," and "government[s]." App. 220 (Carr Dissent); *see supra*, pp. 57-64. Many of these entities—some of which have never before been subject to any Commission scrutiny—repeatedly expressed concerns about the rule's reach. *See, e.g.*,

App. 440-441 (Local Governments Comments), 534-535 (WIA Reply Comments), 474-478 (NMHC and NAA Comments). The Commission cannot seriously "contend that the cost of such drastic measures is not 'an important aspect of the problem.'" *Mayor of Baltimore* v. *Azar*, 973 F.3d 258, 282 (4th Cir. 2020) (quoting *State Farm*, 463 U.S. at 43); *see id.* (vacating rule because agency failed to adequately consider costs, including the need to "hire new staff, engage in construction, and set up new bookkeeping methods").

2.      Relatedly, the Commission did not advance any "rational connection" in support of its decision to extend liability to entities besides ISPs. *See supra*, pp. 57-64. The Commission made no findings in its rule that non-ISPs (or ISPs for that matter) had engaged in digital discrimination of access. It merely speculated that some "covered entities" as defined in the rule "might" or "could" engage in some type of barred conduct in the future. App. 45 (Order ¶ 87). That failure to consider whether regulating non-ISPs would actually produce any benefits is particularly egregious in light of the Commission's simultaneous failure to consider the substantial costs of regulating non-ISPs.

Not only did the Commission fail to support its decision with factual findings, but it also ignored critical explanations in the record about why

non-ISPs should not be covered.  For example, one commenter explained that infrastructure providers, such as companies that construct wireless towers, have no power to dictate subscribers' access to broadband.  App. 551 (NATE Comments).  The Commission acknowledged the "tension in the record as to the role" that certain covered "entities play," but proffered no explanation for dismissing it.  App. 46 (Order ¶ 88).  The Commission's failure to adequately support or explain its decision is the height of arbitrariness.

## CONCLUSION

For the foregoing reasons, the Court should hold unlawful and set aside the Commission's Order.

Respectfully submitted,

<u>s/ Jeffrey B. Wall</u>

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for Petitioner Chamber of Commerce of the United States of America*


ROMAN MARTINEZ
MATTHEW A. BRILL
BLAKE E. STAFFORD
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioners MCTA – The Missouri Internet & Television Association, Ohio Cable Telecommunications Association, Florida Internet & Television Association, Texas Cable Association, and NCTA – The Internet & Television Association*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Counsel for Petitioners Chamber of Commerce of the United States of America, Texas Association of Business, and Longview Chamber of Commerce*


THOMAS SCOTT THOMPSON
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
(202) 434-7440
SThompson@mintz.com

*Counsel for Petitioners the Wireless Infrastructure Association, Power & Communications Contractors Association, and NATE: The Communications Infrastructure Contractors Association*

MICHAEL H. PRYOR
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

DAVID B. MESCHKE
ROSA L. BAUM
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202

*Counsel for Petitioner National
Multifamily Housing Council, Inc.*


JEFFREY A. LAMKEN
RAYINER I. HASHEM
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2024
jlamken@mololamken.com

*Counsel for Petitioner ACA Connects
– America's Communications
Association*

THOMAS M. JOHNSON, JR.
JEREMY J. BROGGI
MICHAEL J. SHOWALTER
BOYD GARRIOT
WILLIAM TURNER
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

*Counsel for Petitioners Minnesota
Telecom Alliance, Ohio Telecom
Association, USTelecom – The
Broadband Association, CTIA –
The Wireless Association,
Broadband Association of
Alabama and Mississippi, Texas
Telephone Association, and
WISPA – The Association For
Broadband Without Boundaries*


STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW | Suite 400 |
Washington, DC 20036
(202) 416-6744
scoran@lermansenter.com

*Counsel for Petitioner WISPA –
The Association For Broadband
Without Boundaries*


AUGUST 16, 2024

# CERTIFICATE OF COMPLIANCE

This final brief complies with Federal Rule of Appellate Procedure 32(a) and this Court's order of April 2, 2024 because it contains 14,980 words.

This final brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface in Microsoft Word 2016, version 16.0.5452.1001.

Pursuant to Eighth Circuit Rule 28A(h), the electronic version of this brief was scanned for viruses and is virus-free.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 16, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, I electronically filed the foregoing final brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 16, 2024